# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

OJSC UKRNAFTA,        §
                                §

       *Plaintiff,*        §
                                §

v.                                §        CIVIL ACTION H-09-891
                                §

CARPATSKY PETROLEUM CORP., *et al.,*        §
                                §

       *Defendants.*        §

## MEMORANDUM OPINION AND ORDER

Pending before the court is a motion to confirm an arbitration award and dismiss the plaintiff's claims with prejudice. Dkt. 33. After considering the motion, supplemental briefing, response, reply, surreply, and record evidence, the court is of the opinion that the motion to confirm the arbitration award should be GRANTED, and the motion to dismiss is DENIED WITHOUT PREJUDICE.

## I. BACKGROUND

This case stems from a joint venture agreement ("JV") between the plaintiff OJSC Ukrnafta ("Ukrnafta") and Carpatsky Petroleum Corporation ("CPC"), Texas,[1] along with a joint activity agreement ("JAA") and amendments thereto. Dkt. 33. The JV, which was signed in 1994, relates to joint development of an oil field in Ukraine, and the JAA, which was signed in 1995, relates to a specific gas condensate field in Ukraine. *Id.* The original JAA contains a dispute resolution provision that requires disputes to be submitted to arbitration. *Id.* at 4 n.4. An amendment to the

---

[1] The branch of CPC that originally entered into the JV was a Texas corporation, but it merged into a newly created Delaware corporation of the same name in 1996. Dkt. 1-7. For ease of reference, the court will refer to the Texas corporation as "CPC-Texas" and the Delaware corporation as "CPC-Delaware" when it is necessary to distinguish between the two entities.

JAA signed in 1998 ("Amended JAA") amended the dispute resolution provision to provide that disputes would be arbitrated in Stockholm, Sweden by the Arbitration Institute of the Stockholm Chamber of Commerce, that the arbitration would be conducted pursuant to the UNCITRAL Arbitration Rules, and that the "material law of Ukraine" would apply. *Id.*; Dkt. 33, Ex. 2 § 21 (amending article XX, sections 20.4 and 20.5 of the JAA). CPC-Delaware referred a dispute to the Arbitration Institute of the Stockholm Chamber of Commerce pursuant to this provision on September 28, 2007. *Id.* at 4 (citing Dkt. 33, Ex. 1(final arbitration award) ¶ 55).

On February 3, 2008, Ukrnafta filed a petition in the 190th Judicial District Court of Harris County Texas against CPC-Delaware, Taurex Resources PLC, Robert Bensch, and Kuwait Energy Company K.S.C. Dkt. 1-7. In the petition, Ukrnafta asserts that it signed the JV and JAA with CPC-Texas, which was a company incorporated in Texas. *Id.* CPC-Texas, however, merged with CPC-Delaware, a newly-created company, on July 18, 1996, and CPC-Delaware was the surviving entity from the merger. *Id.* In the petition, Ukrnafta contends that CPC-Texas did not inform it that it was going out of business and wished to substitute a new company to take its place in the JAA. *Id.* Ukrnafta contends that this failure to inform it of the change was inconsistent with the agreements between the parties and contrary to the requirements of Ukranian law, which governs the agreements. *Id.* Ukrnafta contends that subsequent to the merger, CPC-Delaware signed amendments to the agreements, including the Amended JAA, using the CPC-Texas corporate seal. *Id.*

Ukrnafta asserts the following claims: (1) negligent misrepresentation (against CPC, Taurex, and Bensch); (2) fraud (against CPC, Taurex, and Bensch); (3) misappropriation of trade secrets (against CPC, Taurex and Bensch); (4) tortious interference with existing contract (against CPC and

Bensch); and (5) unjust enrichment (against CPC, Taurex, and Bensch). *Id.* Ukrnafta also requests a declaratory judgment, permanent injunction, and attorneys' fees. *Id.*

CPC removed the case to this court on March 26, 2009. Dkt. 1. In the notice of removal, CPC pointed out that the dispute is between United States and Ukranian companies and that both the United States and Ukraine are parties to the Convention on the Recognition and Enforcement of Foreign Arbitration Awards.[2] *Id.* As such, CPC asserted that the court has original jurisdiction over the case because it arose under the laws and treaties of the United States.[3] *Id.*

On April 4, 2009, CPC filed a motion to stay pending a decision by the Swedish arbitration tribunal. Dkt. 6. It argued that the court could only make determinations based on the validity of the arbitration agreement itself and that if the validity of the entire agreement was at issue, the arbitration panel must decide. *Id.* On April 7, 2009, the court entered an order staying the case. Dkt. 11. The court held that there was a valid agreement to arbitrate and noted that the "question was whether the transfer of interest to a successor in interest was a breach of the contract or a violation of Ukrainian law," which "goes to the merits of the breach of contract claim to be determined by the arbitrator." *Id.* The court also held that Ukrnafta was required to arbitrate its claim notwithstanding the successor-in-interest issue. *Id.* Additionally, the court held that the claims in this case fall within the scope of the arbitration clause. *Id.*

---

[2] Ukrnafta filed a motion to remand on April 27, 2009. Dkt. 15. The motion, however, was filed stricken because it was filed while the case was stayed pending a decision from the Swedish arbitration tribunal. Dkt. 17. Ukrnafta never filed another motion to remand.

[3] CPC did not get the consent of the other defendants before removing because the other defendants had not been served. Dkt.1. Bensch and Taurex Resources PLC were both served on April 2, 2009. Dkts. 7, 8. Kuwait Energy Company has not been served.

Ukrnafta filed a notice of appeal to the Fifth Circuit on April 18, 2009, seeking a writ of mandamus. Dkt. 12. The Fifth Circuit denied the petition for a writ of mandamus on May 4, 2009. Dkt. 16. The case remained stayed until March 10, 2011. *See* Dkt. Mar. 10, 2011.

On March 10, 2011, CPC filed a motion to dismiss and motion to confirm arbitration award. Dkt. 21. It advised the court that the Stockholm arbitral tribunal had issued a final award in favor of CPC, and it claimed that the arbitral panel had rejected all of the theories upon which this case is based. *Id.* (citing Dkt. 21, Ex. 1 (final award)). Ukrnafta responded that the court should refuse to enforce the award, which Ukrnafta claimed was invalid. Dkt. 22. On October 10, 2011, the court considered all the arguments and elected to stay the case again because there were ongoing appeals of the arbitration in Sweden. Dkt. 29.

On September 23, 2013, CPC moved to reinstate the case, asserting that if the court chose not to reinstate, it risked the expiration of the statute of limitations. Dkt. 32. On this same date, CPC filed another motion to confirm the Swedish arbitration award and dismiss Ukrnafta's claims with prejudice. Dkt. 33. It additionally filed an unopposed motion to stay briefing and decision on the motion to confirm the arbitration award and dismiss Ukrnafta's claims. Dkt. 34. On September 26, 2013, the court granted the motion to reinstate the case and the motion to stay. Dkt. 35. On July 21, 2014, the court again administratively closed the case. Dkt. 36.

On May 12, 2015, CPC again moved to reinstate. Dkt. 37. It asserted that all Swedish proceedings had concluded as of March 26, 2015, and that the final arbitration award in favor of CPC had been upheld. *Id.* It asked the court to reinstate the case and set a briefing schedule on its motion to confirm the award and dismiss the Ukrnafta's claims. *Id.* (referring to Dkt. 33). Ukrnafta responded that the Swedish appeals were still ongoing, as Ukrnafta's attorneys were preparing an

appeal to the Swedish Supreme Court. Dkt. 39. On June 11, 2015, the court denied the motion to reinstate, noting that its intention was to "stay this case until all appellate proceedings in Sweden are 'fully and finally resolved.'" *Id.* (citing Dkt. 35). The case remained stayed until February 1, 2017. *See* February 1, 2017 Dkt. Entry.

The court reopened the case on February 1, 2017, after granting an unopposed motion to reinstate the case, which was filed by CPC on January 31, 2017. Dkts. 41, 42. CPC filed a supplemental brief in support of its September 23, 2013 motion to confirm the arbitration award and dismiss Ukrnafta's claims on March 3, 2017. Dkt. 43. Ukrnafta filed a response on May 9, 2017, and CPC filed a reply on June 14, 2017. Dkts. 46, 51. Ukrnafta filed a surreply on July 14, 2017. Dkt. 52. The September 23, 2013 motion is now ripe for disposition.

## II. Legal Standard

The recognition and enforcement of foreign arbitral awards is governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), June 10, 1958. 21 U.S.T. 2517, 330 U.N.T.S. 38 (entered into force with respect to the United States, Dec. 29, 1970), implemented at 9 U.S.C. §§ 201–08. The United States, Ukraine, and Sweden are all signatories to the New York Convention. 21 U.S.T. 2517. The parties do not dispute that the arbitration agreement at issue here falls under the New York Convention. "The district courts of the United States . . . have original jurisdiction over" cases falling under the New York Convention. 9 U.S.C. § 203. "[A]ny party to the arbitration may apply to any court having jurisdiction [under the implementing legislation] for an order confirming the award." 9 U.S.C. § 207. The application to confirm the award must be brought within three years of the award. *Id.*

A district court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition of enforcement . . . specified in the [New York] Convention." *Id.* Only courts in countries with "primary jurisdiction" can annul the award. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara (Karaha II)*, 364 F.3d 274, 287 (5th Cir. 2004). Courts in the countries in which or under the laws of which the arbitration took place have primary jurisdiction. *Id.* Other countries with jurisdiction to enforce an award have what is referred to as "secondary jurisdiction." *Id.* "[A] court with secondary jurisdiction is limited to deciding whether the award may be enforced in that country." *Id.* Courts with primary jurisdiction may evaluate "a request to annul or set aside the award," but courts with secondary jurisdiction may only refuse enforcement under the specific grounds enumerated in Article V of the Convention." *Id.* at 288. A court of secondary jurisdiction "may not refuse to enforce an arbitral award solely on the ground that the arbitrator may have made a mistake of law or fact." *Id.*

This court has secondary jurisdiction. Thus, the court *must* enforce the award unless one of the grounds enumerated in Article V is present. Under Article V,

> "1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:
>> (a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
>> (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
>> (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the

submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country."

*Id.* at 287 n.16 (quoting Article V).

The party opposing confirmation, Ukrnafta in this case, bears the burden of proving the application of one or more of the grounds for non-enforcement. *Id.* at 288. Defenses to confirmation are construed narrowly in order "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts." *Id.* (citations omitted).

### III. ANALYSIS

CPC argues that the court is a secondary jurisdiction and may only determine whether the award should be enforced within its jurisdictional boundaries. Dkt. 43 at 8. It contends that the findings of the arbitral tribunal and the Swedish courts rejecting the Ukrnafta's arguments are entitled to deference since Sweden is a primary jurisdiction. *Id.* at 9.

Ukrnafta first makes a procedural argument that the court should not enforce the award because CPC did not provide certified copies of the award and a certified translation at the time of

its application, which Ukrnafta asserts is required by Article IV of the New York Convention. Dkt. 46 at 2. Ukrnafta next argues that the court should not enforce the Swedish award pursuant to Article II of the New York Convention, which requires that the agreement to arbitrate is in writing, because Ukranian courts have found that the agreement was signed by an entity that no longer exists and is thus void. *Id.* at 3. Ukrnafta additionally argues that the court should refuse to enforce the award under Article V of the New York Convention for the following reasons: (1) the arbitration agreement is invalid; (2) Ukrnafta did not have an opportunity to present its case; (3) the award was beyond the scope of the purported agreement to arbitrate; (4) the arbitration was not in accordance with the agreement of the parties; and (5) enforcement of the award would be contrary to public policy. *Id.* at 8–22. Ukrnafta additionally asserts that the court should set aside the award because the tribunal manifestly disregarded the parties' agreement or the law. *Id.* at 22–25. Ukrnafta's final argument is that dismissal of Ukrnafta's claims is not appropriate in this case because Ukrnafta's claims are not the same as the issues addressed in the arbitration. *Id.* at 25.

CPC argues, in reply, that the court is confined to considering the Article V defenses and that Ukrnafta has not proven any of these. Dkt. 51. CPC asserts that the Ukranian courts' refusal to recognize the final award is not relevant because Ukraine does not have primary jurisdiction. *Id.* As far as the argument regarding certified copies, CPC states that the court has three sworn, translated copies of the agreement. *Id.* CPC argues that all of Ukrnafta's claims should be dismissed on the grounds of *res judicata* and collateral estoppel. *Id.*

The court will address each of Ukrnafta's arguments as to why the court should not enforce the award *in seriatim* and then consider CPC's motion to dismiss.

## A.    Article IV: Certified Copies

Ukrnafta asserts that a party may not obtain recognition and enforcement under the New York Convention unless it submits the original arbitration agreement or a certified copy *at the time of the application*.  Dkt. 46 at 4.  Additionally, the party must submit a certified translation if the agreement is not in the language of the country in which enforcement is sought.  *Id.*  Ukrnafta contends that CPC has "flouted these procedural requirements" and that failure to adhere to the requirements precludes enforcement.  *Id.*  Ukrnafta argues that CPC's failure to follow the procedures outlined in Article IV of the New York Convention deprives the court of jurisdiction to confirm the award.  *Id.* at 5.

CPC concedes that the English translation of the arbitration agreement it attached to its motion to confirm was not a certified copy, but it asserts that sworn copies of the originals of each amendment, including the one containing the relevant arbitration provision, along with English translations were submitted to the court with Ukrnafta's motion for preliminary injunction.  Dkt. 51 at 23 (citing Dkt. 3, Exs. 1–5).  Additionally, CPC notes that it filed certified and translated copies of the relevant amendment as an exhibit to its reply in support of its first motion to confirm.  *Id.* (citing Dkt. 25, Ex. C (filed April 14, 2011)).  CPC also attached certified and translated copies of the relevant amendment to the reply to the current motion to confirm.  *Id.* ("To avoid any further debate on this issue, [CPC] has again attached a certified, translated copy of the 1998 Amendment as Exhibit A to this Reply.").

"Article IV [of the New York Convention] provides that a party can obtain enforcement of its award by furnishing to the putative enforcement court the authenticated award and the original arbitration agreement (or a certified copy of both)."  *Karaha Bodas Co., L.L.C. v. Perusahaan*

9

*Pertambangan Minyak Dan Gas Bumi Negara (Karaha I)*, 335 F.3d 357, 368 (5th Cir. 2003). The New York Convention specifically states that the party applying to "obtain . . . recognition and enforcement" of an award "shall, at the time of the application, supply . . . [t]he duly authenticated original award or a duly certified copy thereof" and the "original agreement referred to in article II or a duly certified copy thereof." Dkt. 33, Ex. 5 (the New York Convention). Additionally, the party "shall produce a translation of these documents" into the "official language of the country in which the award is relied upon." *Id.*

In this case, CPC did not originally file this lawsuit to obtain enforcement of an award; rather, Ukrnafta filed it to assert various tort claims relating to the parties' contractual relationship or lack thereof. *See* Dkt. 1-7. Ukrnafta attached certified copies of the agreements and their amendments as well as English translations to its motion for a preliminary injunction, which it filed four days after CPC removed the case to this court. Dkt. 3 & Exs. CPC filed its first and second motions to confirm the arbitration award after these certified copies were already in the record. *See* Dkt. 21 (first motion to confirm, filed 3/10/2011); Dkt. 33 (second motion to confirm, filed 9/23/2013). It was not necessary for CPC to file additional copies of documents that were already clearly in the record. Sometimes procedural rules need to be viewed through a lens of reason. The court declines to deny enforcement of an arbitration award entered by a foreign jurisdiction based on a procedural issue that in reality has no impact whatsoever.

The court has reviewed the cases Ukrnafta cites in support of its argument that the "court does not have jurisdiction to confirm an award if a party fails to satisfy the requirements of Article IV." *See* Dkt. 46 at 5. First, Ukrnafta cites *Czarina, LLC v. W.F. Poe Syndicate*, 358 F.3d 1286, 1292 (11th Cir. 2004). In *Czarina*, the Eleventh Circuit indeed noted that "courts have dismissed

[actions] for lack of jurisdiction" when Article IV is not satisfied. *Czarina*, 358 F.3d at 1291. In *Czarina*, there was a question as to whether there was an actual writing documenting the agreement at issue. *Id.* at 1289, 1291–92. The *Czarina* court held that "the party seeking confirmation of an award falling under the Convention must meet article IV's prerequisites to establish the district court's subject matter jurisdiction to confirm the award." *Id.* at 1292. Article IV requires the party seeking enforcement to "supply" the agreement or a duly certified copy. *See id.* at 1291 (quoting Article IV). Here, a duly certified copy was already supplied, and to require it to be supplied again would be placing form over substance. The court holds that the prerequisites were met.

Ukrnafta also cites two unpublished district court cases to support its view that the court has no jurisdiction to confirm the award because CPC did not file new certified copies of the agreement to arbitrate when it filed its motions to confirm: *Guang Dong Light Headgear Factory Co., Ltd. v. ACI International, Inc.*, No. 03-4165-JAR, 2005 WL 1118130, at *4 (D. Kan. May 10, 2005), and *Amerada Hess Corp. v. S/S Athena*, Nos. 82-3553, 85-3215, 1986 WL 1165741 (D. Md. Jan. 16, 1986). In *Guang Dong Light*, the federal district court in the District of Kansas held that the party seeking enforcement of an agreement to arbitrate failed to provide the court with documentation of an agreement to arbitrate as "[t]he only submission of this agreement is an unsigned draft of the agreement made by [the defendant], which does not include an agreement to arbitrate." 2005 WL 1165741, at *4. The court held that even though an agreement to arbitrate was discussed in the arbitration award, the court was "without jurisdiction to confirm the award to the extent that it adjudicates the meaning of any Joint Venture agreement, as Guang Dong fail[ed] to meet the jurisdictional prerequisites for confirmation." *Id.* The situation in *Guang Dong Light* is completely different than the situation here, as here the court actually has multiple copies of the agreement to

arbitrate. Similarly, the court in *Amerada Hess* did not have a certified copy of the actual arbitration award. *Amerada Hess*, 1986 WL 1165741. Here, CPC attached a certified English translation of the award to its first and second motions to confirm. Dkt. 21, Ex. 1; Dkt. 33, Ex. 1.

In the cases cited by Ukrnafta, the courts did not find a lack of jurisdiction because the documents were not filed concurrently with the motion to confirm. The courts *never received* the needed documents. In this case, the court has the documents. Ukrnafta's jurisdictional objections are OVERRULED. The court finds that it has jurisdiction to consider CPC's motion to confirm.

## B.    Article II: An Agreement in Writing

Article II of the New York Convention requires contracting states to recognize arbitration agreements that are in writing, and the term "agreement in writing" includes "an arbitral clause in a contract or arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." Dkt. 33, Ex. 5 (N.Y. Convention). Ukrnafta argues that the court should refuse to enforce the Swedish award pursuant to Article II because Ukranian courts, which it contends are courts of primary jurisdiction, have found that the agreement is void and that, consequently, there is no "agreement in writing" that is "signed by the parties." Dkt. 46. The agreement specifies that it must be interpreted under the material law of Ukraine, and Ukrnafta urges the court to accept as conclusive the Ukranian court system's interpretation of its own laws. *Id.* It argues that "[b]y the terms of the Convention, this Court cannot enforce the arbitral award" because Ukranian courts have determined it is unenforceable on the "basis of the absence of an enforceable executed written agreement." *Id.*

CPC argues that the Ukranian courts' refusal is not a basis to deny confirmation of the award. Dkt. 51 (citing *Karaha II*, 364 F.3d at 289, and *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 21 (D.D.C. 2011)). CPC contends that the New York

Convention only permits non-enforcement of an award based on the decisions of courts in the primary jurisdiction, which it contends are only courts in the country where the arbitration was decided (Sweden) and courts in the country under the *procedural* laws of which the arbitration was conducted (Sweden). *Id.* CPC argues that Ukraine, like the United States, is a secondary jurisdiction. *Id.* Additionally, CPC asserts that it is not surprising that Ukraine did not recognize the Swedish award because Ukraine is "the home state of a government-affiliated party resisting enforcement." *Id.*

Ukrnafta takes issue with CPC's assertion that it is an arm of the Ukranian government, arguing that under Ukranian law, Ukrnafta and the State of Ukraine are entirely distinct and the State owns no shares of Ukrnafta. Dkt. 52 at 2. Ukrnafta additionally argues that Ukraine is a primary jurisdiction and that the Ukranian courts have found the agreement invalid, which prohibits this court from enforcing the award under both Article II and Article V, section 1(a). *Id.* at 4.

What is relevant for the Article II inquiry is whether the court may refuse to enforce the arbitration award pursuant to Article II's requirement that there must be an agreement in writing based on rulings of the Ukranian court system. As noted in Part II, *supra*, since this court is a court of secondary jurisdiction, it may only refuse to enforce an arbitration award under the grounds outlined in Article V. Ukrnafta has not provided authority supporting the idea that the court may refuse to enforce the award under Article II. *See* Dkt. 46 at 7–11 (citing only *Delgado v. Shell Oil Co.*, 890 F. Supp. 1324, 1363 (S.D. Tex. 1995), which supports the contention that the court should accept the Ukranian courts' interpretation of Ukranian law but does not involve international arbitration or the New York Convention). Thus, the court will only consider the Article II arguments to the extent they intertwine with the Article V arguments, to which the court now turns.

## C. Article V Defenses

This court, as a court of secondary jurisdiction, may decline to enforce the Swedish arbitration award if Ukrnafta can demonstrate that it should not enforce it for one of the reasons set

forth in Article V of the Convention. Ukrnafta presents the following arguments as reasons why the court should not enforce under Article V: (1) the arbitration agreement is invalid; (2) Ukrnafta did not have an opportunity to present its case; (3) the award was beyond the scope of the purported agreement to arbitrate; (4) the arbitration was not in accordance with the agreement of the parties; and (5) enforcement of the award would be contrary to public policy. The court will consider each argument in turn.

### 1.       Validity of Agreement

Under Article V(1)(a), the court may refuse to recognize the award if "'the said agreement [to arbitrate] is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made.'" *Karaha II*, 364 F.3d at 287 n.16.

Ukrnafta argues that the court should not enforce the arbitration agreement pursuant to Article V, section 1(a) of the New York Convention because the arbitration agreement is invalid under the law to which the parties have subjected it—Ukranian law. Dkt. 46 at 12. Ukrnafta provides court orders from Ukraine that indicate that the courts in that country have held that the Amended JAA, in which the relevant arbitration agreement is located, is invalid under Ukranian law. Dkt. 46 & Exs. 7–9. Ukrnafta contends Ukraine is a primary jurisdiction. Dkt. 46.

CPC asserts that both the arbitral tribunal and Swedish courts determined that under Swedish procedural law, Ukrnafta's complaints about jurisdiction were raised too late and well after Ukrnafta accepted the validity of the written arbitration agreement. Dkt. 51. CPC contends that this finding is binding because only Sweden has primary jurisdiction. *Id.* CPC argues that Ukraine has secondary jurisdiction. *Id.* CPC also argues that this court has already ruled that the decision

14

regarding whether the agreement was valid was a decision for the arbitration panel, not this court. *Id.* (citing Dkt. 11 at 5).

The court will first review the rulings of this court, the arbitral tribunal, Swedish courts, and Ukranian courts relating to whether the agreement is valid. Then the court will discuss how these rulings fit into the Article V(1)(a) analysis.

### a.    This Court

On April 7, 2009, this court determined that the "question of whether the transfer of interest to a successor in interest was a breach of the contract or a violation of Ukranian law goes to the merits of the breach of contract claim to be determined by the arbitrator." Dkt. 11. It noted Ukrnafta's claim that CPC-Delaware was not a signatory to the Amended JAA, but found that Ukrnafta agreed to the arbitration clause and that CPC-Delaware, as CPC-Texas's successor in interest, could enforce the arbitration provision. *Id.* The court also found that the "claims arising from the transfer of [CPC-]Texas's interest and the alleged dissemination of the related trade secrets falls within the scope of the arbitration clause." *Id.*

### b.    The Swedish Arbitration

The Swedish arbitral tribunal noted that under the laws of Delaware, CPC-Texas merged into CPC-Delaware and CPC-Delaware "succeeded to all rights and obligations" of CPC-Texas. Dkt. 33, Ex. 2 (final award) at 59. The tribunal determined that CPC did not have an obligation under the contract to notify Ukrnafta of this change and, regardless, "it appear[ed] that [Ukrnafta] was informed about this merger at the time." *Id.* at 60. The arbitral tribunal also took note of the fact that Ukrnafta did not assert that it suffered harm from the contractual partner changing from CPC-Texas to CPC-Delaware. *Id.*

In a separate decision on jurisdiction, the arbitral tribunal rejected Ukrnafta's argument that it did not know about the CPC merger until after the arbitration was well underway. Dkt. 33-4 at 23. It noted that all of the arbitration documents were signed by CPC-Delaware and that Ukrnafta had entered into an arbitration agreement with CPC-Delaware by "engaging in the arbitration without reservation." *Id.* at 24. It additionally found that any objections to its jurisdiction based on the CPC-Texas versus CPC-Delaware argument were untimely. *Id.*

### c.    Swedish Courts

### I.    First Swedish Court Case - Competence of Arbitral Tribunal - District Court

On March 3, 2009, while the Swedish arbitration was still ongoing, Ukrnafta filed an application with the Stockholm District Court Department 5 requesting a declaration that the arbitral tribunal was not competent the adjudicate the dispute between Ukrnafta and CPC. Dkt. 43-1 at 4. The arbitral tribunal's decision on jurisdiction was entered on April 22, 2009. Dkt. 46, Ex. 4. The arbitral tribunal's final award was issued on September 24, 2010, and the Stockholm District Court entered its decision on December 13, 2011. Dkt. 43-1 at 1, 4.

The court first pointed out that it was not bound by the arbitrators' decision on jurisdiction under the Swedish Arbitration Act. *Id.* at 21. It also noted that the parties had agreed that "the issue of the validity of the arbitration agreement should be considered in accordance with Swedish law." *Id.* at 22. The court determined that "the issue of whether the [CPC] merger was implemented in a lawful way" should be determined pursuant to "American law," and that under American law, CPC-Delaware "assumed all the rights and obligations that belonged to [CPC-Texas] prior to the merger and that through the merger [CPC-Texas] ceased to exist as an independent legal subject." *Id.* at 23. The court noted that the agreement between the parties that was in force at the time of the CPC

merger had an arbitration provision requiring arbitration in Kiev, Ukraine, and held that "the merger cannot under any circumstances be deemed to have meant that an arbitration agreement had arisen between [CPC-Delaware] and Ukrnafta, owing to universal succession, with the effect that disputes between the parties should be determined through Swedish arbitration proceedings." *Id.* However, it ultimately found that the "real implication of the merger as a measure was limited in practice to a change of the registration district for the [CPC] company." *Id.* at 25. Additionally, "the powers of the representatives who entered into the Addendum 1998 on behalf of the parties have not been called into question" and a "valid arbitration agreement has thus already arisen through the signing of Addendum 1998 and the arbitrators were competent on these grounds." *Id.* at 26.

The district court also addressed other reasons why the arbitration agreement was valid. The district court found that Ukrnafta had knowledge of the merger and "continued to apply contracts in relation to [CPC-Delaware] for several years in the knowledge of the merger." *Id.* at 27. It held, after considering Ukrnafta's actions subsequent to the merger, that "Ukrnafta must be deemed to have entered into the arbitration agreement now being called into question through acceptance by conduct." *Id.* at 29. The district court additionally found that Ukrnafta certainly became aware that the other party to the arbitration was CPC-Delaware when arbitration documents were submitted by CPC-Delaware in August 2008 and that Ukrnafta's objection to the jurisdiction of the arbitrators in December 2008 was too long of a delay. *Id.* at 30. The court also ordered Ukrnafta to compensate CPC for its litigation costs. *Id.*

### ii. First Swedish Court Case - Competence of Arbitral Tribunal - Svea Court of Appeal One

Ukrnafta appealed to the Svea Court of Appeal and again argued that "the parties did not conclude an arbitration agreement." Dkt. 43-2 at 3. On November 30, 2012, the Svea Court of

Appeal "confirmed" the judgment of the district court. *Id.* at 10. The court determined that Ukrnafta was "deemed to have accepted the competence of the arbitral tribunal" due to its actions and, as such, "the arbitral tribunal ha[d] also become competent, regardless of whether any arbitration agreement was concluded beforehand." *Id.* The court found no need to address the other reasons presented relating to the competence of the arbitral tribunal. *Id.* It ordered Ukrnafta to pay CPC's litigation costs for the appeal. *Id.* at 11.

### iv. First Swedish Court Case - Competence of Arbitral Tribunal - Swedish Supreme Court One

Ukrnafta moved to appeal to the Swedish Supreme Court. Dkt. 43-3. On June 14, 2013, the Swedish Supreme Court found that no reasons were shown to grant the appeal. *Id.* at 3.

### v. Second Swedish Court Case - Tribunal Exceeding Mandate - Svea Court of Appeal

On December 23, 2010, Ukrnafta filed a second proceeding relating to the arbitration in the Svea Court of Appeal. Dkt. 41-5. It requested that the court set aside the award, arguing that the tribunal had exceeded its mandate and that Ukrnafta did not have a sufficient opportunity to present its case during the arbitration. *Id.* at 4. On March 26, 2015, the Svea Court of Appeal held that the arbitral tribunal had not exceeded its mandate with regard to any of the issues submitted by Ukrnafta and that the parties "were afforded good opportunities, both before and after the final hearing" to present their cases regarding the issue about which Ukrnafta wished to submit additional evidence. *Id.* at 15–21. The Court of Appeal additionally ruled that the case could not be appealed. *Id.* at 21.

### vi. Second Swedish Court Case - Tribunal Exceeding Mandate - Swedish Supreme Court

Notwithstanding the Svea Court of Appeal's ruling that its order could not be appealed, Ukrnafta filed an appeal in the Swedish Supreme Court, arguing that the Court of Appeal had

committed a grave procedural error. Dkt. 41-6. The Supreme Court issued a decision on December 9, 2016. *Id.* The court held that the "arguments presented by Ukrnafta do not mean that there has been any grave procedural error in the Court of Appeal that can be assumed to have affected the outcome of the case" and rejected the appeal. *Id.* at 4.

### d. Ukranian Courts

The Ukranian courts came to a different decision. On October 14, 2009, the High Commercial Court of Ukraine issued a decision after considering CPC's appeal of a judgment that was issued by the Kyive Court of Appeal on August 26, 2008. Dkt. 46, Ex. 9. The original claim was prosecuted by the Deputy Public Prosecutor of Ukraine on behalf of the State and the Ministry of Protection of the Environment of Ukraine against Open Stock Joint-Stock Company Ukrnafta and CPC. *Id.* The decision indicates that CPC's representative "did not show up." *Id.* The court noted that the case concerned an application by the Deputy Prosecutor acting on behalf of the Ministry of Protection of the Environment to invalidate the agreements at issue in the instant case. *Id.* CPC-Delaware lodged the appeal and asked the court to "cancel the appealed decisions of the courts of first and appeal instances and to remand the case for reconsideration should the Court find relevant the opinion of an American lawyer attached to the cassation appeal." *Id.* at 2. The court determined that the appeal should be dismissed because CPC-Texas—the party that entered into the JAA—ceased to exist in 1996 and did not exist at the time the disputed agreements were executed on its behalf. The court found that "[f]or this reason any actions undertaken on behalf of a non-existent company could not create legal consequences in the form of conclusion of civil legal agreements and, accordingly, cannot serve as grounds for establishing, amendment or termination of civil rights or obligations of either the terminated legal entity or for its legal successors." *Id.* at 4. It thus determined that the "acts of persons aimed at execution of the agreements on behalf of [CPC-Texas] after July 22, 1996 did not result in conclusion of the agreements." *Id.* at 5. The court

held that because the disputed agreements "could not be deemed as concluded," the court had no subject-matter jurisdiction over the dispute and that "the disputed agreements cannot be the subject of assessment in respect to their compliance with the law." *Id.* Ukranian courts only "consider cases within disputes." *Id.* The court therefore terminated the proceedings. *Id.*

### e.    Primary Versus Secondary

As noted above, this court originally determined that it was up to the arbitrator to decide the impact of Ukrnafta's argument that the Amended JAA was invalid because CPC-Texas did not exist when it signed the amendment. The arbitration panel subsequently determined that it did not matter, which was affirmed by Swedish courts, and Ukranian courts at some point reached the opposite conclusion. The court thus must determine to what extent these conflicting rulings impact its decision regarding whether to confirm the arbitration under the New York Convention.

Article V(1)(e) of the New York Convention allows courts to refuse to enforce an award if it has been set aside by "the country in which, or under the law of which, that award was made." Dkt. 26-1, art. V(1)(e). The Fifth Circuit interprets this language as follows: "Under the [New York] Convention, 'the country in which, or under the [arbitration] laws of which, [an] award was made' is said to have *primary* jurisdiction over the arbitration award." *Karaha I*, 335 F.3d at 364 (second and third alterations and emphasis in original). Thus, "under the laws of which" does not mean the substantive or material laws of which, but the *arbitration* laws of which.

In *Karaha Bodas,* Karaha Bodas Company brought a lawsuit in federal district court in the Southern District of Texas to confirm a Swiss arbitration award.[4] *See Karaha Bodas Co., L.L.C. v.*

---

[4] The *Karaha Bodas Co.* case has been in front of the Fifth Circuit twice. *See Karaha Bodas Co.*, 264 F. Supp. 2d 470 (S.D. Tex. 2002) (Atlas, J.), *rev'd by* 335 F.3d 357 (5th Cir. 2003); and *Karaha Bodas Co. (Karaha II)*, 364 F.3d 274 (5th Cir. 2004) (cert. denied). A related case was later

*Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 264 F. Supp. 2d 470 (S.D. Tex. 2002) (Atlas, J.), *rev'd by Karaha I*, 335 F.3d 357 (5th Cir. 2003). The *Karaha Bodas* case involved an agreement with an arbitration clause requiring all disputes to be arbitrated in Switzerland pursuant to the UNCITRAL Arbitral Rules. *Karaha I*, 335 F.3d at 360. It was undisputed that Indonesian substantive law applied, but the parties disputed which country's procedural law applied. *Karaha II*, 364 F.3d at 290. The Swiss arbitration tribunal determined that Swiss procedural law applied, and the Fifth Circuit found that "[u]nless the Tribunal manifestly disregarded the parties' agreement or the law, there [wa]s no basis to set aside the determination that Swiss procedural law applied." *Id.* Additionally, the Fifth Circuit noted that under the New York Convention, "an agreement specifying the place of the arbitration creates a presumption that the procedural law of the place applies to the arbitration." *Id.* at 291. Later in the opinion, the court referred to the presumption as a "strong presumption." *Id.* at 292.

This case is very similar to *Karaha Bodas*. The *Karaha Bodas* agreement required arbitration in Switzerland. Here, the agreement requires arbitration in Sweden. The *Karaha Bodas* agreement and the agreement in this case both required the arbitration panel to apply UNCITRAL Arbitration

---

heard by the Second Circuit. *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara (Karaha III)*, 500 F.3d 111 (2nd Cir. 2007). Karaha Bodas filed this related case in New York to enforce the Texas district court's judgment because Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Perusahaan") had several bank accounts in New York. *Id.* at 116. While the New York litigation was proceeding, Perusahaan filed a lawsuit in the Cayman Islands to vitiate the foreign arbitral award, claiming that the award was procured by fraud. *Id.* at 117. Karaha Bodas moved for an injunction prohibiting Perusahaan from maintaining the lawsuit in the Cayman Islands. *Id.* at 118. The New York district court entered a permanent injunction, and Perusahaan appealed. *Id.* The Second Circuit ultimately held that "the Cayman Islands has no arguable basis for jurisdiction to adjudicate rights and obligations of the parties with respect to the Award." *Id.* at 125. The Second Circuit affirmed the New York district court's order granting the injunction with slight modifications. *Id.* at 130.

Rules. The *Karaha Bodas* agreement required Indonesian substantive law. The agreement in this case requires Ukranian "material law." Applying the *Karaha II* strong presumption that the procedural law of the place of arbitration applies and buttressing that presumption with the fact that at least one of the Swedish court opinions indicates that the parties a*greed* that Swedish procedural law applies, the court finds that the procedural law of Sweden applied and that Sweden is therefore the *only* primary jurisdiction. The award has not been set aside by the primary jurisdiction. Accordingly, the Ukranian ruling that the agreement to arbitrate is invalid does not provide an avenue for the court to refuse to enforce the award under Article V(1)(e). Ukrnafta's objection that the court cannot enforce the award under Article V(1)(e) is OVERRULED.

### 2. Ukrnafta's Ability to Present Its Case

Ukrnafta's next Article V argument is that the court should refuse to enforce the arbitration award under Article V(1)(b) because the arbitration tribunal did not allow Ukrnafta to present key evidence and arguments on multiple issues. Dkt. 46 at 13. Under Article V(1)(b), the court may refuse to recognize or enforce the arbitration award if Ukrnafta presents proof that it "was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present its case." Dkt. 21-6. The Fifth Circuit instructs that Article V(1)(b) "'sanctions the forum state's standards of due process'"—in this case the United States. *Karaha II*, 364 F.3d at 298 (quoting *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 145 (2d Cir. 1992)). Under U.S. due process standards, the "parties must have an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 299 (quoting *Iran Aircraft*, 980 F.2d at 146).

Ukrnafta contends that the court should refuse to honor the award under Article V(1)(b) because (1) Ukrnafta did not have the opportunity to respond to the imposition of damages in excess

of the contractual limitation of liability; and (2) Ukrnafta did not have the opportunity to present its case on damages. Dkt. 46 at 13–18. The court will consider each argument in turn.

### a. Response to Damages in Excess of Contractual Limitation

The final award included lost profits even though the JAA limited recovery to direct loss. Dkt. 46 at 15. Ukrnafta contends that the arbitration tribunal refused to acknowledge the parties' contractual limitation of liability based on a Ukranian law that CPC never even raised during the arbitration proceedings. Dkt. 46 at 13. It argues that under Article 20.1 of the JAA, recovery was limited to direct losses, and the lost profits awarded by the tribunal are not direct losses. *Id.* at 14 (citing Dkt. 46, Exs. 6, 18). According to Ukrnafta, the possibility that Ukranian law might bar the limitation of liability was not raised until the final hearing of the arbitration, and it was raised by the tribunal—not CPC. *Id.* (citing Dkt. 46, Ex. 20 (hearing transcript)). Ukrnafta notes that its legal expert testified at that hearing that there was no Ukranian law barring a limitation of liability provision, and CPC did not provide any evidence during the hearing to contradict this testimony. *Id.* (citing Dkt. 46, Ex. 20). Ukrnafta contends that the tribunal restricted post-hearing briefing to addressing the evidence advanced during the arbitration proceedings and that CPC, in contravention to this restriction, asserted in its post-hearing brief that Article 614 of the Ukranian Civil Code barred any limitation of liability for intentional breaches. *Id.* Ukrnafta concedes that it responded to this argument in its response to CPC's post-hearing brief, but it argued only that (1) CPC had raised this argument too late, failed to plead the issue, and did not provide any relevant evidence regarding its application; and (2) Article 614 did not apply. *Id.* at 15. Ukrnafta states that it did not submit evidence supporting its argument that the law did not apply because it felt CPC had not carried its burden of introducing evidence to support the argument. *Id.*

The arbitral tribunal found that Article 614 prevented the limitation of liability provision, and Ukrnafta thus takes issue with this ruling because Ukrnafta believes it was deprived of the opportunity to be meaningfully heard on the issue of damages. *Id.* (citing Dkt. 46, Ex. 17 ¶ 325). Ukrnafta concedes that the Swedish Court of Appeal decided against Ukrnafta on this issue, but Ukrnafta argues that this court should not defer to the Swedish Court of Appeal's decision because CPC incorrectly informed the Swedish Court of Appeal that the arbitration tribunal invited the parties to submit arguments regarding Article 614 in their post-hearing briefing. *Id.*

CPC contends that Ukrnafta was afforded due process. Dkt. 51 at 13. CPC notes that Ukrnafta's expert incorrectly stated during the hearing that there was no provision of Ukranian law barring enforcement of the limitation of liability provision, and that both parties addressed this issue in post-hearing briefing. *Id.* CPC points out that Ukrnafta did not request to reopen evidence based on the limitation of liability question. *Id.* at 14. As far as Ukrnafta's argument that CPC was only supposed to submit post-hearing briefing on evidence presented at the hearing and that it misled the Court of Appeal by stating that the arbitration tribunal invited the parties to brief this issue, CPC directs the court to the transcript of the final hearing. *Id.* at 14 & n.18.

The court has reviewed the instructions, both written and verbal, that the arbitral tribunal provided the parties. The written directions for post-hearing submissions instructed that the briefing was to be submitted in two simultaneous rounds. Dkt. 46, Ex. 21. The first-round of briefing was to "FULLY wrap up the facts and law by referring . . . to the evidence advanced in the arbitral proceedings including the witness hearings." *Id.* The instructions noted that the parties should provide a "precise **legal analysis**" for each claim, including "governing law and relevant trade usages." *Id.* The instructions also stated that in the second round, the parties should reply to all

paragraphs in the opposing party's first round and "may, in addition, develop in a more narrative form other considerations they deem useful." *Id.* The tribunal also sent a letter that instructed that the parties could not amend or supplement their cases in the post-hearing briefing. Dkt. 46, Ex. 22.

In the oral instructions regarding the post-hearing briefing, the chairman of the tribunal stated that "all issues which are important and relevant and have been discussed here must be raised in the first round [of post-hearing briefing]." Dkt. 46, Ex. 20 at 111–12. The chairman further instructed: "One just has to look at the transcript and the documentation and the discussions, and you know all of the issues which have been at large debated in this arbitration, so they should be, if you want, wrapped up in terms of facts and law in the first round; and then in the second round we need replies." *Id.* at 112. The chairman also stated that "if any party wishes now to file further documents, or whatever, we want first to see an application to that effect, a motivated application. We will not receive anything just out of the blue. Unless the parties now say they need to file a couple of documents now which have arisen out of these proceedings, we would close the proceedings and say this is a cut-off date." *Id.* at 124. When the parties asked about specific documents they wished to submit, the chairman stated that they were "things which [arose] directly out of the hearing, so they can be submitted. Anything which goes beyond this should be the subject of a written request to the Tribunal with a copy of the other." *Id.* at 125. Thus, the chairman clearly indicated that the briefing could address "all issues which are important and relevant and have been discussed here," and that the parties could submit further documentation, along with a written request, for issues arising directly out of the hearing.

The issue of limitation of liability clearly came up at the hearing. The chairman asked Ukrnafta's expert—Professor Kuznietsova—if a party who has intentionally breached a contract can

invoke a contractual limitation of liability under Ukranian law. *Id.* at 99. After some translation issues, the expert responded that there was "no such rule in the Ukranian law." *Id.* at 101. When the chairman asked about caselaw, the expert responded, "So the scope of liability in Ukraine is not dependent upon the form or the level of the violation, the guilt of the violation." *Id.* The fact that the chairman of the tribunal asked this question should have led Ukrnafta to consider it "important and relevant," and it was certainly discussed, though not at length due to Ukrnafta's expert's response.

In its post-hearing brief, CPC quoted Ukrnafta's expert testimony relating to limitation of liability provisions and then stated that Kuznietsova's "testimony on this point is flatly wrong, as there is, indeed, such a provision in Ukranian law." Dkt. 46, Ex. 23 ¶¶ 394–95. CPC then quoted Article 614 of the Ukranian Civil Code, which states that a "'transaction ["*pravochin*" *in Ukrainian*] terminating or limiting the responsibility for intentional breach of obligation is null and void.'" *Id.* ¶ 396 (quoting Civil Code of Ukraine (2003), art. 614). CPC argued that Article 614 clearly encompasses the limitation of liability provision at issue and that if the tribunal found that Ukrnafta intentionally breached the JAA, then the limitation of liability provision could not bar CPC from recovering full damages, including lost profits. *Id.* ¶ 398.

Ukrnafta responded to these arguments in its response brief. Dkt. 46, Ex. 24 ¶¶ 320–30. Ukrnafta contended that Kuznietsova answered the question regarding Ukranian law correctly during the hearing. *Id.* ¶ 320. It then provided arguments regarding why Article 614 did not apply. *See id.* ¶¶ 321–23, 328–30 & n.71. It argued that, regardless, CPC did not plead intentional breach or present evidence that the alleged breach was intentional. *Id.* ¶¶ 324–27. Ukrnafta also asserted that CPC's argument was "very much an afterthought, not having been contended for in the Response

to Rejoinder, [and] [i]t was not addressed in the expert evidence of Prof. Kryvolapov," one of CPC's experts. *Id.* ¶ 330. Ukrnafta thus had an opportunity to respond to the argument, and it did so.

Here, in order to determine if Ukrnafta was afforded due process, the court must determine whether Ukrnafta was given an opportunity to respond at a meaningful time and in a meaningful manner. The arbitration tribunal clearly instructed the parties that it "would like to be able to make [its] award essentially based on the post-hearing briefs." Dkt. 46, Ex. 20 at 111. It advised the parties to discuss "all issues which are important and relevant and have been discussed here," and it specifically requested briefs "that can stand very much on their own." *Id.* at 113. There was no page limitation. *Id.* And the tribunal advised the parties to let it know if something was "strange or unclear." *Id.* at 114. Moreover, it gave the parties a procedure for requesting to file more documents. *Id.* at 125. The written instructions did contain an instruction that the parties could not amend or supplement their cases in the post-hearing briefing, but CPC's legal argument countering what Ukrnafta's expert said in the hearing regarding Ukranian law was within the bounds of "issues which are important and relevant and have been discussed here." Dkt. 46, Ex. 20 at 113 (hearing transcript). Ukrnafta had a chance to respond to the argument in its response brief, and there was a procedure for requesting to submit more documents if Ukrnafta felt that was necessary to adequately rebut CPC's assertions in its post-hearing brief.

The court finds that Ukrnafta had sufficient notice that this was an issue in the case and sufficient ways in which to adequately address the issue. It had an opportunity to be heard and was thus afforded due process. *Cf.* Dkt. 33-2 (final award) ¶ 325 ("[B]oth parties had ample opportunity to set out their respective positions with regard to this legal issue."). Ukrnafta's objection that it was

not afforded due process because it did not have an opportunity to respond to the limitation of liability issue is OVERRULED.

### b. Ukrnafta's Case on Damages

Ukrnafta also contends that it did not have a sufficient opportunity to present its case on damages. Dkt. 46 at 16. It asserts that the arbitration panel used a method that neither party advanced to calculate damages. *Id.* It argues that the tribunal's calculation was internally inconsistent and that both parties' experts had testified that the approach used by the tribunal would be inappropriate. *Id.* at 17. It asserts, nevertheless, that it "was provided no opportunity to counter this approach." *Id.* It also notes that it had sought leave to submit additional evidence on the issue of Ukranian gas price regulations, but the tribunal refused to accept it. *Id.* at 18.

CPC points out that Ukrnafta admits that both parties had ample opportunity to submit arguments and testimony relating to damages and that both parties' experts had commented on the type of calculation the tribunal ultimately used. Dkt. 51 at 15. CPC argues that "[t]his is not a due process violation—it is merely a disagreement with the damages found by the tribunal" and a "fair hearing does not require that Ukrnafta be allowed to re-hash the issue." *Id.* As far as the tribunal's refusal to allow Ukrnafta to present evidence on the issue of Ukranian gas price regulations, CPC argues that an "adverse ruling on the submission of information about the existence of a law after the close of the case is not a due process violation." *Id.* at 16. CPC further asserts: "For due process purposes, what matters is whether Ukrnafta was afforded an opportunity to present its position, not whether the tribunal accepted it." *Id.*

The court agrees with CPC. The fact that the tribunal used a method of calculating damages that differed from the method proposed by the parties does not present a due process violation.

Rather, it is an argument that the tribunal made an error in fact or law, which is an argument this court, as a court of secondary jurisdiction, may not address. *Karaha II*, 364 F.3d at 288.

With regard to Ukrnafta's evidence regarding the Ukranian gas price regulations, the tribunal noted that Ukrnafta requested to file new documents "on the issue of gas price control due to recent developments in this area in Ukraine" and that the tribunal advised that it "did not consider it necessary to receive any more information at this point but might revert to this issue at a later stage should it consider it necessary." Dkt. 33-1 ¶¶ 140–41. Again, this court cannot second guess the calls that the arbitral panel made. Ukrnafta had ample opportunity to present evidence to the panel, and if the panel did not think it needed the information that Ukrnafta requested to provide after the final hearing, then that was the panel's decision to make. Ukrnafta's due process objections are OVERRULED.

### 3. The Scopes of the Agreement and Award

Ukrnafta next argues that the court should refuse to enforce the award under Article V(1)(c) because the award either does not fall within the terms of the submission to arbitration or contains decisions that are beyond the scope of the submission to arbitration. Dkt. 46 at 18. Under Article V(1)(c), a court may refuse enforcement of an award if there is proof that the

> award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decision on matters submitted to arbitration can be separated from those not submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced.

Dkt. 33, Ex. 5.  Ukrnafta asserts that CPC invoked arbitration under section 20.4 of the JAA, and the tribunal's award included damages for future losses after the termination of the agreement, which went beyond section 20.4.  Dkt. 46 at 18.

CPC argues that Ukrnafta is mischaracterizing the nature of the award.  Dkt. 51 at 16.  CPC agrees that the arbitration was instituted under section 20.4 of the JAA and that the JAA limits recovery to direct damages, but it notes that the tribunal determined that Ukranian law bars enforcement of the damages limitation.  *Id.* at 17.  As far as "future losses after the termination of the agreement," CPC contends that the only reason the losses are after the termination of the agreement is because the Final Award terminated the JAA; this termination does not transform damages flowing from the breach to post-termination damages and, since it was issued under the common law, does not invoke Article 21.  *Id.*

The court agrees with CPC with regard to the damages limitation portion of the arbitration agreement.  The arbitration tribunal expressly noted that Article 20.1 of the JAA limits liability to direct damages and quoted the article:

> Respondent contends that Claimant's claim for damages is one for lost profits and subject to Art. 20.1 of the JAA.  Art. 20.1 limits the liability to direct damages.  Art. 20.1 of the JAA reads:
> > "Each of the Participants shall bear material liability for non-performance or inadequate performance of this Agreement, and exhibits hereto and, in the event of breach thereof, shall reimburse the other Participants for their direct losses that may arise through the fault of such Participant."

Dkt. 33-2 ¶ 313 (quoting Art. 20.1 of the JAA).  The tribunal acknowledged Ukrnafta's argument that lost profits were not "direct damages," but found that Ukrnafta's "liability for breaching the JAA is [not] limited by Art. 20.1 of the JAA."  *Id.* ¶¶ 313, 323.  It found that Ukrnafta breached the JAA

intentionally and that the limitation in Art. 20.1 thus did not apply. *Id.* ¶ 323. It noted that, "contrary to the testimony given by [Ukrnafta's] legal expert during the hearing . . . , Ukrainian law contains (in Art. 614 of the Civil Code) a provision preventing the limitation of liability in cases of intentional conduct, as do many other jurisdictions." *Id.* ¶ 325.

While certainly the section of the JAA discussing arbitration limits liability, the court cannot, as noted above, second guess the arbitration tribunal's interpretation of Ukranian law. The tribunal determined that the limitation was contrary to Ukranian law. Under this interpretation of Ukranian law, an award that did not limit the liability would be within the scope of the agreement as interpreted under Ukranian law, which is the law the parties agreed would apply.

With regard to post-termination profits, Ukrnafta contends the arbitrators awarded post-termination profits relating to Ukrnafta redeeming its share of joint property in the event the JAA terminates, which is a process contemplated by Article 21.7 of the JAA, which is completely separate from Article 20 and not supposed to be considered until after the JAA terminated. Dkt. 46 at 18. Ukrnafta points out the CPC admitted in its post-hearing briefing that it did not invoke the mechanism in Article 21.7. *Id.* at 18–19 (citing Dkt. 46, Ex. 29 ¶ 761).

The arbitral tribunal did not rely on Article 21.7 to award damages. *See* Dkts. 33-1, 33-2. Rather, it determined that damages should not be limited to direct loss under Ukranian law, and it proceeded to determine what damages were if this limitation were not imposed. *See* Dkt. 33-2. It reviewed the opinions of both experts extensively and calculated damages based on its view of damages that stemmed from the breach submitted for arbitration pursuant to Article 20.4. *See id.* It did not limit the damages to direct loss under Article 20.1 because it determined that would be contrary to the substantive law the parties chose to govern the agreement. *See id.* The court makes

no determination with regard to this issue because even if it disagreed, it is not empowered to correct errors of fact or law made by the panel. The Court of Appeal in the country of primary jurisdiction has already determined that the tribunal did not exceed its mandate. *See* Dkt. 43, Ex. D at 15 ("The conclusion of the Court of Appeal is therefore that the arbitral tribunal was not guilty of exceeding its mandate or of committing an irregularity in the course of the proceedings in those parts."). This objection is OVERRULED.

### 4. Agreement to Arbitrate

Ukrnafta also argues that the court should refuse to confirm the award under Article V(1)(d). Article V(1)(d) of the New York Convention allows a court of secondary jurisdiction to refuse recognition of an award if the "composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place." Dkt. 33, Ex. 5.

Ukrnafta argues that the arbitration was improper under Article V(1)(d) because Ukrnafta never agreed to arbitrate any issues with CPC-Delaware and there was no valid agreement between the parties. Dkt. 46 at 20. It contends that the original agreement that was signed by a party that actually existed at the time the agreement was signed–CPC-Texas–called for arbitration in Ukraine, not Sweden. *Id.* Ukrnafta contends that the court therefore should not enforce the award pursuant to Article V(1)(d) of the New York Convention. *Id.*

CPC asserts that the court should not overturn the tribunal's conclusion that the Amended JAA was valid and enforceable because the New York Convention does not empower the court to do so and because the tribunal's conclusion was correct. Dkt. 51 at 17.

As noted above, it was up to the arbitral tribunal to determine if the agreement was valid, not this court. The panel decided it was. Thus, the court cannot refuse to enforce the award under Article V(1)(d). This objection is OVERRULED.

### 5. Public Policy

Ukrnafta's final Article V argument relates to public policy. Under Article V(2)(b), the court may refuse to enforce an award if "the competent authority in the country where recognition and enforcement is sought finds that . . . [t]he recognition or enforcement of the award would be contrary to the public policy of that country." Dkt. 33, Ex. 5. Ukrnafta contends that recognizing and enforcing the award is "contrary to public policy because it would require illegality in the performance of the underlying contract and award." Dkt. 46 at 21. It notes that Ukranian courts held that all agreements entered into by CPC-Texas after it ceased to exist were void and that these "rulings have profound consequences in Ukraine" because a "null and void contract does not give rise to any rights or obligations." *Id.* Ukrnafta asserts that a null and void contract cannot be performed in Ukraine without *criminal* sanctions. *Id.* (citing Dkt. 46, Ex. 11 (Kartashov Aff.)). It additionally asserts that "payment of the arbitration award would be a criminal offense under Articles 364-1 and 367, as well as a failure to comply with a judicial decision under Article 382." *Id.* It contends, in fact, that Ukranian courts dismissed a motion filed by CPC-Delaware in Ukraine to enforce because (1) CPC-Delaware did not abide by formal requirements of Article IV; and (2) the purported arbitration agreement is null and void. *Id.* at 22. Ukrnafta argues that enforcement "of the award in a Texas court would counter the rulings of the country whose laws governed the purported agreement." *Id.* It contends that, consequently, international comity "strongly disfavors enforcement" as "forcing Ukrnafta to violate Ukranian law to pay the award would violate basic

notions of morality and justice." *Id.* (citing *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798–99, 113 S. Ct. 2891 (1993), and *In re Vitamin C Antitrust Litig.*, 837 F.3d 175, 182–83 (2d Cir. 2016)).

CPC points out that courts construe the public policy defense narrowly and argues that the court may only refuse enforcement if the award violates the forum state's notions of morality and justice. Dkt. 51 at 17–18 (citing *Karaha II*, 364 F.3d at 306). CPC asserts that the New York Convention "is not concerned with the public policy of Ukraine." *Id.* at 18. It argues that the public policy of the United States strongly favors enforcing agreements made by sophisticated parties conducting business in the global arena. *Id.* at 19. CPC reasons that if "a party were able to avoid enforcement under the Convention because its home country's laws allegedly prohibited it from honoring an international arbitration award, that would turn the Convention on its head and render it useless to the global economic community." *Id.*

The two cases cited by Ukrnafta, *Hartford Fire* and *In re Vitamin C*, do not involve the New York Convention. In *Hartford Fire*, the U.S. Supreme Court considered whether it was proper to refuse to exercise jurisdiction under the Sherman Act in the interests of the principle of international comity. 509 U.S. at 797. The argument against exercising jurisdiction was that it would require applying American antitrust law to the London reinsurance market, which could have resulted in conflicts. *Id.* at 797–98. The Court ultimately found that international comity did not counsel against exercising jurisdiction in that particular case because there was no indication that British law would require the reinsurers "to act in some fashion prohibited by the law of the United States," and they did not "claim that their compliance with laws of both countries [wa]s otherwise impossible." *Id.* at 799.

In *Vitamin C*, the Fifth Circuit addressed "whether principles of international comity required the district court to dismiss the suit" because "Chinese law required the defendants to engage in anticompetitive conduct that violated U.S. antitrust laws." 837 F.3d at 182. The court noted that comity "is both a principle guiding relations between foreign governments and a legal doctrine by which U.S. courts recognize an individual's acts under foreign law." *Id.* at 183 (citing *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1046 (2d Cir. 1996)). The court instructed that it had a duty to balance the interests of the United States and of the foreign state, as well as the "'mutual interests the family of nations have in just and efficiently functioning rules of international law.'" *Id.* (quoting *In re Maxwell*, 93 F.3d at 1048). The Fifth Circuit discussed the multi-factor balancing test for ascertaining if the court should abstain from exercising jurisdiction on comity grounds, and then pointed out that the U.S. Supreme Court relied primarily on the first factor, whether there was an actual conflict of law, in *Hartford Fire*.[5] *Id.* at 185 (discussing *Hartford Fire*, 509 U.S. at 798). The Fifth Circuit noted that "no conflict exists . . . where a person subject to regulation by two states can comply with the laws of both." *Id.* (alterations, quotations, and citations omitted). The Fifth Circuit

---

[5] The multi-factor balancing test to determine if a court should abstain on international comity grounds includes the following factors: "(1) Degree of conflict with foreign law or policy; (2) Nationality of the parties, locations or principal places of business of corporations; (3) Relative importance of the alleged violation of conduct here as compared with conduct abroad; (4) The extent to which enforcement by either state can be expected to achieve compliance, the availability of a remedy abroad and the pendency of litigation there; (5) Existence of intent to harm or affect American commerce and foreseeability; (6) Possible effect upon foreign relations if the court exercises jurisdiction and grants relief; (7) If relief is granted, whether a party will be placed in the position of being forced to perform an act illegal in either country or be under conflicting requirements by both countries; (8) Whether the court can make its order effective; (9) Whether an order for relief would be acceptable in this country if made by the foreign nation under similar circumstances; and (10) Whether a treaty with the affected nations has addressed the issue." *In re Vitamin C Antitrust Litig.*, 837 F.3d at 184–85 (citing *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1297–98 (3d Cir. 1979)). The parties do not analyze these factors in their briefing in this case.

determined that while the absence of a conflict made the other factors irrelevant, the factors were still relevant when a conflict was present. *Id.* It found that there was a true conflict between U.S. and Chinese law and then, after applying the other factors of the balancing test, determined that the factors weighed in favor of abstention. *Id.* at 185–94.

Ukrnafta makes much of the Supreme Court's statement in *United Fire* that the parties did not claim compliance with the laws of both countries was impossible, asserting that if Ukrnafta were to pay the award it would be a criminal violation in Ukraine. *See* Dkt. 46 at 22. Ukrnafta's expert states that "Ukrnafta does not have any presence or assets in the US" and so "any compliance with the Award (or a court judgment recognizing it) in the territory of the US would have to be made from within Ukraine, which would trigger responsibility under Arts. 364-1, 367, and 382 Criminal Code of Ukraine." Dkt. 46, Ex. 11 ¶ 13. The expert contends that "payment of the arbitration award *may* constitute a failure to comply with judicial decision" and Ukrnafta's officers "*may* be subject to criminal penalties if they attempted to pay an obligation that is not recognized in Ukraine." *Id.* (emphasis added).

In *Karaha II*, the Fifth Circuit explained that a court may refuse to recognize or enforce an arbitral award if doing so is contrary to the public policy of the *enforcing country*. 364 F.3d at 305–06. It instructed that the defense should be construed narrowly and applied only if "'enforcement would violation the forum state's most basic notions of morality and justice.'" *Id.* at 306 (quoting *M&C Corp. v. Erwin Behr GmbH & Co., KG*, 87 F.3d 844, 851 n.2 (6th Cir. 1996)). Thus, as CPC argues, it is the United States' public policy that is at issue.

That being said, the court's "analysis of a foreign arbitral award [should be] colored by 'concerns of international comity, respect for the capacities of foreign and transnational tribunals,

and sensitivity to the need of the international commercial system for predictability in the resolution of disputes . . . even assuming that a contrary result would be forthcoming in a domestic context.'" *Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG*, 783 F.3d 1010, 1018 (5th Cir. 2015)  In *Asignacion*, Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG ("Rickmers") filed a motion to enforce a Philippine arbitral award in a federal district court in the Eastern District of Louisiana.  *Id.* at 1013.  The district court did not enforce the award pursuant to Article V(2)(b) of the New York Convention.  *Id.* at 1013–14.  It found that enforcing the award violated public policy because under a traditional choice-of-law analysis, United States law should have applied, and United States law provides certain protections for seamen that the arbitral panel, which applied Philippine law, "effectively denied" to the Filipino seaman who was the plaintiff in the case.  *Id.* at 1014.  Rickmers appealed, and the Fifth Circuit considered whether the district court correctly determined that the case provided "the narrow circumstances that would render [an] arbitral award unenforceable under the Convention because it violates United States public policy."  *Id.* at 1016. First, the Fifth Circuit noted that it could not set aside the award if the Philippine arbitrators made an incorrect determination on choice of law because courts are unable, under the New York Convention, "to correct this sort of unexceptional legal error (if one was in fact made) when reviewing an arbitral award."  *Id.*

Next, the Fifth Circuit agreed that Asignacion's recovery would have been greater if he had prevailed in a suit under U.S. maritime law, and that "[s]eamen have long been treated as 'wards of admiralty.'"  *Id.* at 106–17.  It pointed out, however, that the "Supreme Court has rejected the 'concept that all disputes must be resolved under our laws and in our courts,' even when remedies under foreign laws do not comport with American standards of justice."  *Id.* at 1017 (quoting *M/S*

*Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9, 92 S. Ct. 1907 (1972)). Thus, even though the case involved a seaman, which U.S. public policy protected, the court noted that "United States public policy does not necessarily disfavor lesser or different remedies under foreign law." *Id.* It pointed out that while the New York Convention requires the court to consider U.S. public policy, not Philippine public policy, there was no showing, notwithstanding lesser remedies, that the arbitral award was "so inadequate as to violate this nation's 'most basic notions of morality and justice.'" *Id.* at 1020.

Here, Ukrnafta argues that enforcing the award violates notions of morality and justice because it would require Ukrnafta to violate its own country's laws. Dkt. 46 at 21. While certainly, comity concerns would weigh heavily against ordering an entity to violate the laws of another country, and Ukrnafta has presented evidence that Ukranian courts have found the contract giving rise to the arbitration agreement null and void under its laws, it is unclear how an enforcement action *in the United States* would result in Ukrnafta violating Ukranian law *in Ukraine*. Ukrnafta asserts it has no assets in the United States and that any satisfaction of the award would thus have to be achieved by funds held in Ukraine. But, under the New York Convention, "the U.S. court acts merely as a secondary-jurisdiction court . . . [and] only enforces, or refuses to enforce, awards arbitrated elsewhere." *Karaha I*, 335 F.3d at 372 n.59. "[T]he 'relitigation' of issues is characteristic of the Convention's confirmation and enforcement scheme," and a final judgment entered here "is not truly a decision on the merits," but simply "an order to enforce an award resulting from litigation elsewhere, which is not necessarily given *res judicata* effect in foreign jurisdictions." *Id.* at 372. U.S. courts are "courts of secondary jurisdiction, empowered only to enforce or refuse to enforce the foreign award, and *then only in the United States*." *Id.* at 373

(emphasis added). Thus, if the court were to enforce the award here, it would not be ordering Ukrnafta to withdraw money from its Ukranian account, which would possibly violate Ukranian law, to satisfy the judgment. Thus, there is no conflict like the conflict contemplated in the international comity analysis in *Hartford Fire*.

There has been no showing that enforcing the award would violate the United States' most basic notions of morality and justice. Moreover, the public policy of the United States strongly favors enforcing arbitration awards. *Id.* at 1015 ("An 'emphatic federal policy' favors arbitral dispute resolution." (quoting *Mitsubishi Motors corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631, 105 S. Ct. 3346 (1985)); *Fotochrome , Inc. v. Copal Co., Ltd.*, 517 F.2d 512, 516 (2d Cir. 1975) ("The public policy in favor of international arbitration is strong."). Additionally, while not necessarily relevant to the Article V(2)(b) analysis, it is worth noting that Ukraine also obviously favors enforcing international arbitration awards, as it is a signatory of the New York Convention. Ukrnafta's objection that enforcing the award is contrary to public policy under Article V(2)(b) of the New York Convention is OVERRULED.

D.      **Tribunal's Manifest Disregard**

Ukrnafta contends that the court may set aside the rulings of the arbitral tribunal because the tribunal showed manifest disregard for the law. Dkt. 46 at 22. It then proceeds to discuss the panel's damages calculation method and alleged misinterpretations of Ukranian law. *Id.* at 23. CPC contends that manifest disregard of the law "is not among the exclusive bases for non-enforcement listed in Article V of the Convention." Dkt. 51 at 19. CPC notes that at one time "manifest disregard" was an available defense but that courts no longer recognize it. *Id.* at 19–20 (citing *Int'l Trading & Inds. Inv. Co. v. CynCorp Aero. Tech.*, 763 F. Supp. 2d 12, 21 (D.D.C. 2011); *Yusuf*

*Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 20 (2d Cir. 1997), and *M&C Corp. v. Erwin Behr GmbH & Co.*, 87 F.3d 844, 951 (6th Cir. 1996)). It then argues that even if the standard still applied, it means more than a misunderstanding of the law by the arbitrators and requires that the arbitrators decided to ignore clearly governing law. *Id.* (citing *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 381–82 (5th Cir. 2004)).

In *M&C Corp. v. Erwin Behr GmbH & Co.*, the Sixth Circuit considered an argument in a New York Convention case that the court should modify or correct an arbitration award because the arbitrator exhibited a manifest disregard of the law, which is one of the reasons courts could refuse to enforce an arbitration award under the Federal Arbitration Act. 87 F.3d at 851. The court noted that 9 U.S.C. § 208 provides that the Federal Arbitration Act may apply to actions brought pursuant to the New York Convention so long as the Federal Arbitration Act is not in conflict with the New York Convention. *Id.* The court found, however, that "such a conflict does indeed exist." *Id.* It pointed out that Article V of the New York Convention "lists the exclusive grounds justifying refusal to recognize an arbitral award," and Article V does not "include miscalculations of fact or manifest disregard of the law." *Id.* It thus determined that the court was "without jurisdiction to engage in the type of review" requested. *Id.*

This court agrees that the standard does not apply here. Moreover, in *Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349, 355–56 (5th Cir. 2009), the Fifth Circuit held that "to the extent that manifest disregard of the law constitutes a nonstatutory ground for vacatur [of an arbitration award], it is no longer a basis for vacating awards under the FAA." It noted that "the term itself, as a term of legal art, is no longer useful in actions to vacate arbitration awards." 562 F.3d at 358.

The court holds that the manifest disregard standard does not apply here and, even if it did, there has been no showing that the arbitration panel deliberately disregarded what it knew to be the law to reach a particular result. *See, e.g.*, *Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 355 (5th Cir. 2004) (requiring "'that the arbitrator appreciate[d] the existence of a clearly governing principle but decide[d] to ignore or pay no attention to it'" (quoting *Prestige Ford v. Ford Dealer Comput. Servs., Inc.*, 324 F.3d 381, 395 (5th Cir. 2003))), *overruled by Citigroup Global Markets*, 562 F.3d at 355. Ukrnafta's objection based on the tribunal's alleged manifest disregard of the law is OVERRULED.

## E.     *Res Judicata* and Collateral Estoppel

CPC moves for dismissal of all of Ukrnafta's claims on *res judicata* and collateral estoppel grounds. Dkt. 33. Ukrnafta argues that dismissal of Ukrnafta's claims is not appropriate under either *res judicata* or collateral estoppel because neither the claims nor the issues in the legal proceeding and arbitration are the same. Dkt. 46 at 25 (citing *In re Ark-La-Tex Timber Co.*, 482 F.3d 319, 330 (5th Cir. 2007), and *United States v. Shanbaum*, 10 F.3d 305, 311 (5th Cir. 1994)). CPC contends that the fundamental argument underlying all of Ukrnafta's causes of action was rejected by the tribunal, and that the tribunal's decision carries claim preclusive and issue preclusive effects. Dkt. 33 at 12; Dkt. 51 at 23.

Collateral estoppel generally "precludes a party from litigating an issue already raised in an earlier action between the same parties." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 572 (5th Cir. 2005). "The application of collateral estoppel from arbitral findings is a matter within the broad discretion of the district court." *Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1137 (5th Cir. 1991) (citing *Parklane Hosiery, Inc. v. Shore*, 439 U.S. 322, 331, 99 S. Ct. 645 (1979)

and other cases). District courts should consider whether the arbitration "afforded litigants the 'basic elements of adjudicatory procedure,'" and whether "procedural differences between the arbitration and the district court proceedings might prejudice the party challenging the use of offensive collateral estoppel." *Id.* at 1137–38. The court must determine if the procedural differences might have caused a different result. *Id.* Additionally, "[p]reclusion of a previously-litigated issue under the doctrine of offensive collateral estoppel requires that the issue under consideration be identical to the issue previously litigated; that the issue was fully and vigorously litigated in the primary proceeding; that the previous determination of the issue was necessary for the judgment in that proceeding; and that no special circumstances exist that would render preclusion inappropriate or unfair." *Id.* at 1136. And, the court must consider any special "'federal interests warranting protection.'" *Id.* (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223, 105 S. Ct. 1238 (1985)). If a case does not involve federal statutory or constitutional rights, then "courts should use a case-by-case approach to determining the collateral estoppel effects of arbitral findings." *Id.* at 1136–37.

The parties devote perhaps three pages total briefing to a request to dismiss seven causes of action on collateral estoppel or res judicata grounds. *See* Dkts. 21, 22, 33, 46, 51. The court simply does not have the information it needs to use the case-by-case approach required for it to rule on this request. The request is therefore DENIED WITHOUT PREJUDICE. The court will consider a renewed motion in the proper motion for summary judgment format that outlines each claim and why CPC believes the claim is identical to the arbitration panel's findings. This briefing should contain citations to the final award or other arbitration documents that support the arguments. If Ukrnafta has arguments as to why the claims are not precluded, it may file a response distinguishing its

specific claims from the findings of the arbitration panel.  Conclusory assertions that the claims are the same or different are not acceptable.

## IV. Conclusion

CPC's motion to confirm the arbitration award is GRANTED.  CPC's motion to dismiss all of Ukrnafta's claims is DENIED WITHOUT PREJUDICE.


Signed at Houston, Texas on October 2, 2017.

_____
Gray H. Miller
United States District Judge