# EXHIBIT 1

Arbitration Institute
of the Stockholm Chamber of Commerce
SCC V (124/2007)

---

**ARBITRATION**

BETWEEN:

**CARPATSKY PETROLEUM CORPORATION (USA)**

Claimant

AND:

**OJSC UKRNAFTA (UKRAINE)**

Respondent

---

**FINAL AWARD**

---

Arbitral Tribunal

Sigvard Jarvin (arbitrator)
Per Runeland (arbitrator)
Wolfgang Peter (chairman)

24 September 2010

# TABLE OF CONTENT

A.   NAMES AND DESCRIPTION OF THE PARTIES ................................................... 3
    I.    Claimant ............................................................................................. 3
    II.   Respondent ....................................................................................... 3

B.   THE ARBITRAL TRIBUNAL ......................................................................... 4

C.   BACKGROUND OF THE DISPUTE .............................................................. 5

D.   THE ARBITRATION CLAUSE ..................................................................... 19

E.   SUMMARY OF THE ARBITRAL PROCEEDINGS ...................................... 20

F.   RELIEF SOUGHT ....................................................................................... 34
    I.    Claimant ........................................................................................... 34
    II.   Respondent ..................................................................................... 40

G.   APPLICABLE LAW ..................................................................................... 41

H.   JURISDICTION OF THE ARBITRAL TRIBUNAL ....................................... 42

I.   THE PARTIES TO THE JOINT ACTIVITY AGREEMENT ............................ 42

J.   CLAIMANT'S CLAIMS ................................................................................ 63
    I.    Limitation of Claimant's Claims ....................................................... 63
    II.   Respondent's asserted breach of the JAA through unilateral exploitation of the RC Field and preventing CPC from participating in the development of new wells on the field on a 50:50 basis ........................................... 66
    III.  Respondent's asserted breach of the JAA by unduly preventing CPC from exercising the right to top-up ................................................................. 85

K.   DAMAGES .................................................................................................. 94
    I.    Limitation of Liability to Direct Damages ........................................ 94
    II.   Quantum .......................................................................................... 99
    II.   Causation ...................................................................................... 108
    III.  Interest .......................................................................................... 111

L.   LEGAL FEES AND EXPENSES – COSTS OF THE ARBITRATION ................ 112
    I.    Legal fees and expenses; general observations on the Costs of Arbitration ............... 112
    II.   Costs of the arbitration .................................................................. 115

M.  AWARD ..................................................................................................... 115

N.   RECOURSE ................................................................................................ 117

A.    NAMES AND DESCRIPTION OF THE PARTIES

I.    **Claimant**

1.    Claimant is:

Carpatsky Petroleum Corporation
808 Travis Street, Suite 1040
Houston, Texas 77002
USA

a corporation incorporated in Delaware with the above-mentioned address in Houston, Texas,

hereinafter referred to as "CPC" or "Claimant",

represented in this arbitration by:

Ms. Brenda Horrigan
Salans
5 boulevard Malesherbes,
75008 Paris
France

II.    **Respondent**

2.    Respondent is:

OJSC Ukrnafta
Nestorivsky by-str. 3-5
Kiev, 04053
Ukraine

a corporation incorporated in Ukraine,

hereinafter referred to as "Ukrnafta" or "Respondent",

represented in this arbitration from its commencement until 2 June 2009 by:

Mr. Jonas Benedictsson
Baker & McKenzie
Linnégatan 18
P.O. Box 5719
114 87 Stockholm
Sweden

and Ms. Svitlana Romanova
Baker & McKenzie,
Kiev,
Ukraine

and from 24 February 2009 until 2 June 2009 also by

Mr. Kaj Hobér
Mannheimer Swartling
Norrmalmstorg 4
P.O. Box 1711
111 87 Stockholm
Sweden

On 2 June 2009, the above-mentioned counsel were replaced by

Mr. Trevor Mascarenhas and Mr. Steven Philippsohn
PCB Litigation LLP
Solicitors
International Press Centre
15th Floor, 76 Shoe Lane
London  EC4A 3JB
United Kingdom

The parties to this arbitration are jointly referred to as the "Parties".

## B.    THE ARBITRAL TRIBUNAL

3.    The Arbitral Tribunal is composed as follows:

Mr. Sigvard Jarvin
Jones Day
2, rue Saint-Florentin
75001 Paris
France

nominated by Claimant,

Mr. Per Runeland
SJ Berwin LLP
10 Queen Street Place
London EC4R 1BE
United Kingdom

nominated by Respondent,

4

Dr. Wolfgang Peter
Python & Peter
9 rue Massot
1206 Geneva
Switzerland

jointly appointed as chairman by Messrs. Jarvin and Runeland.

4.    On 28 February 2008, the Arbitral Tribunal wrote to the Arbitration Institute of the Stockholm Chamber of Commerce (hereinafter the "SCC") to request the agreement of the Parties to the appointment of Ms. Anne K. Hoffmann, LL.M. as Administrative Secretary to the Tribunal.

5.    On 12 March 2008, the SCC informed the Arbitral Tribunal that the Parties had raised no objections to the appointment of Ms. Hoffmann as Secretary to the Tribunal and that thus the Tribunal was at liberty to retain her.

6.    Thereupon, on 14 March 2008, the Arbitral Tribunal confirmed the appointment of Ms. Hoffmann as Administrative Secretary. Her contact details are as follows:

Ms. Anne K. Hoffmann, LL.M.
Python & Peter
9 rue Massot
1206 Geneva
Switzerland


C.    BACKGROUND OF THE DISPUTE

7.    On 16 May 1995, SE Poltavanaftogaz (hereinafter "PNG"), a subsidiary of Ukrnafta, and the state geological company Chernigivnaftogazgeologiya (hereinafter "CGG") entered into a Geological Survey Agreement concerning certain gas condensate fields, including the Rudivsko-Chervonozavodskiy field (hereinafter the "RC Field"). The parties agreed to procure the necessary licenses.

8.    On the same day, PNG and CGG entered into a Work Agreement for the construction and exploration of wells for pilot production, as well as transportation and sales of gas condensate. Pilot production was agreed for wells No. 2, 3, 4, 5, 6, 7, 8 and 9 of the Chervonozavodskiy field and wells No. 7 and 9 of the Rudivskiy field.

9.    In July 1995, PNG obtained the license for the pilot production at the RC Field while CGG obtained the license for the exploration of the RC Field. The exploration of this field required not only substantial investments, but also the use of advanced technologies and equipment. Due to the lack of funds and access to advanced technologies and equipment, in order to realize the exploration of the RC Field, PNG and CGG agreed to attract an outside investor representing advanced foreign experience in this area. PNG was thus given the task to enter into an agreement with the investor, to be approved by CGG, as the participation of a qualified investor was considered crucial for the realization of the project.

10.    In early summer of 1995, Respondent received a proposal from Carpatsky Petroleum Corporation, a company incorporated in Texas (hereinafter "CPC-TX") seeking to invest in the exploration and development of the RC Field. In minutes signed and exchanged on 25 July 1995 the intent of the parties was declared and approved by CGG.[1] According to the minutes, CPC-TX undertook to invest 20-30 million USD for the exploration of the RC Field. The exploration was scheduled to commence during the period from December 1995 to January 1996. Hence, it was agreed to engage CPC-TX as an investor and to prepare a final draft of a joint activity agreement between Poltavanaftogaz and CPC.

11.    On 14 September 1995, CPC-TX and PNG entered into Agreement # 410/95, a Joint Activity Agreement (hereinafter "the JAA"). The purpose of the JAA was, inter alia, to provide the organisational and economic conditions for the joint investment, exploration and development of the RC Field, to apply advanced domestic and foreign technologies for the intensification of its exploration and operation, and to increase the gas and gas condensate production volumes. Consequently, the JAA provided for the joint exploration and development by both parties of the RC Field. The "Joint Activity" regulated by the JAA was defined as

> "[...] investment and production activities which are based on cooperation between the Participants of this Agreement as regards the exploration and development of the Rudivsky-Chervonozavodsky field and which provide for the

---

[1] Exh. R-1.

*allocation of risks and results of such activities, being governed by this Agreement [...]."* (JAA, Definitions)

In Arts. 14.3 and 14.4, the JAA contains a dispute resolution clause providing for arbitration under the auspices of the International Commercial Arbitration Court of the Chamber of Commerce and Industry of Ukraine in Kyiv.

12. Furthermore, under Art. 10.2 of the JAA, the wells No. 2, 3, 4, 5, 6, 7, 8 and 9 of the Chevonozavodskiy Field and wells No. 2, 4, 10, 101, 105 and 371 of the Rudivskiy Field as well as future wells not specifically transferred to the so-called Separate Balance were excluded from the scope of the Joint Activity as "Base Hydrocarbons" and remained the property of Respondent. The object of the JAA was the "Additional Hydrocarbons" pursuant to Art. 10.3 of the JAA. Initially, the Joint Activity encompassed six wells. Three additional wells have been added since.

13. On 27 - 29 November 1995, both parties to the JAA met to discuss the organisation of the Joint Activity, i.e. the investment and production activity to be undertaken as well as to review the draft Joint Activity Program, i.e. the detailed work program, for 1996. As a result of the meeting, the parties signed Protocol No. 1 in which they, inter alia, agreed to establish a Management Committee initially composed of three members with another five members to be added, i.e. in total four representatives of each side. Moreover, the parties decided that CPC-TX should provide financing in an amount of not less than USD 3 million by April 1996 and at least USD 15 million by September - October 1996.[2]

14. The initial investments by CPC and PNG in the Joint Activity were to be made on a 50:50 basis, CPC's initial investment consisting of cash and technology contributions as well as advanced equipment while the initial investment of PNG in the Joint Activity was to be made in kind by way of certain wells to be explored. (JAA, Arts. 2.1 - 2.4)

15. While it was the parties' intention to invest on a 50:50 basis, the parties understood that this ratio might vary according to the actual contributions made. Accordingly, provisions were included into the JAA which permitted the actual share to be determined by reference to accumulated capital expenses and approved by the Management

---

[2] Exh. R-3.

Committee on a quarterly basis. The shares of profit and the number of each party's representatives on the Management Committee would then be calculated by reference to the actual share (see JAA, Arts. 2.2 - 2.7; 7.7 - 7.11; 13.2 - 13.4; 16.2).

16.    On 18 July 1996, a company which will be referred to as "CPC-DE" was incorporated in Delaware and CPC-TX was merged into CPC-DE. Thereupon, on 22 July 1996, CPC-TX ceased to exist.

17.    On 15 October 1996, PNG and a company designated as "Carpatsky Petroleum Corporation, USA" ("CPC") entered into an additional and amended JAA (hereinafter the "Restated JAA")[3] with reference to *"amendments and supplements to agreement No. 410/95"* made by and between them on 14 September 1995. In particular, the Restated JAA defined the amounts of Initial Contribution to the Joint Activity to be made by CPC. In particular, CPC was obliged to transfer to the Separate Balance investments in the form of funds equalling USD 2,500,000 and property (equipment, tools, vehicles and materials) worth USD 2,300,000 in the course of 1996 (Art. 2.1 - 2.3). The Restated JAA also contained in paras. 20.4 and 20.5 a dispute resolution clause providing for arbitration under the auspices of the International Commercial Arbitration Court at the Chamber of Commerce and Industry of Ukraine.

18.    Furthermore, the parties agreed in the Restated JAA that if one of the participants could not provide 50 percent of the investments necessary, the other participant could cover the deficit and cause the Management Committee to decide to change the investment proportions of the participants for a certain period of time (Art. 2.6).

19.    Respondent initially contributed six uncompleted wells to the Separate Balance for the Joint Activity. By April 1997, CPC had invested USD 736,320. By the end of December 1997, CPC had invested, in cash and in kind, a total of USD 3,508,870 while Respondent had invested in excess of USD 9,142,500.

20.    CPC experienced difficulty to raise the financing necessary for it to maintain the level of investment necessary to sustain its 50% interest in the project. Consequently, from 1997

---

[3] Exh. R-4.

until 2003, CPC contributed less than 50% of the investments in the Joint Activity, resulting in its Accumulated Contribution in the JAA being less than 50%. CPC's actual share in the Joint Activity over those years was reduced from 50% to ultimately 14.9% net profit interest.[4]

21.    On 26 August 1998, CPC and Respondent executed an Addendum to the JAA (hereinafter the "Addendum"). This Addendum set forth *"changes and amendments to Joint Investment and Production Activity Agreement No. 410/95 as of September 14, 1995, for Exploration and Development of the Rudivsko-Chervonozavodske Field, as restated on October 15, 1996, in Consideration of Changes and Amendments as of December 25, 1997"*[5]. Pursuant to this Addendum, Ukrnafta replaced PNG in the JAA. This Addendum contained in paras. 20.3 - 20.5 a dispute resolution clause providing for disputes to be referred to the Arbitration Institute of the Stockholm Chamber of Commerce for arbitration to be conducted pursuant to the provisions of the UNCITRAL Arbitration Rules in Stockholm.

22.    On 1 October 1999, a meeting of the Management Committee took place during which the Parties resolved that *"[d]rilling of new wells at Rudivsko-Chervonozavodsky Field shall be included into joint activity on condition, that 'Carpatsky Petroleum Corporation' shall ensure investment growth in the amount of 2,5 mln. US dollars by January 31, 2000"*.[6] Claimant did not make this investment within the agreed timeframe.

23.    On 29 December 1999, the Management Committee met again and decided *"[t]o change the Management Committee's Oct. 01, 1999 decision and postpone until March 31, 2000 the term of paying off CPC's debt concerning contributions to the Joint Activity at a sum of 12,844,978.00 UAH. The exchange rate, as of Oct. 01, 1999 should be used when contributing and registering this investment. This provision becomes effective only upon the condition that untill [sic] Jan. 15, 2000 the indicated US $ 500,000.00 will be transferred to the joint activity account and documents on payments for buying 6000 m drill pipe, tubing and bits totalling not less then [sic] US $ 500,000.00 will be submitted. [...] Taking into account the fulfilment of paragraphs 1-3, the participants will make a*

---

[4] Accordingly, in the Protocol of the Management Committee No. 4 of 16/17 December 1996, the Parties declared that CPC had unexpected difficulties in financing its projects in Ukraine. Moreover, well N° 103-R was permanently excluded from the scope of the Joint Activity. See Exh. R-5.
[5] See Exh. R-3 to Respondent's Submission dated 19 December 2008.
[6] Exh. R-8.

9

*decision on the spudding of wells No. 112 and 114."* [7] Claimant failed to make the contribution by 31 March 2000.

24.   During its meeting on 22 December 2000, the Management Committee decided that *"As CPC plans to delay investment for construction of new wells until after April 1, 2001, that drilling of new wells will continue to proceed under the direction and based on the financing provided by PNG".* [8]

25.   As of 1 April 2001, CPC had contributed 22.32% to the budget while Respondent's contribution amounted to 77.67%. By 1 July 2001, CPC's share amounted to 20.27% while Ukrnafta's share was 79.73%. By the second quarter of 2002, CPC's share of investments had further decreased to 17.09 % reflecting its decreased contributions to the exploration of the RC Field at the time.

26.   On 18 July 2001, another meeting of the Management Committee took place during which it was stated that *"[i]t is understood by both parties that the above percentage [see para. 25 above regarding the amounts as of 1 July 2001] related only to wells in-progress and completed to date. The percentage interest in new wells drilled will be based on actual contributions, and investments should be made in accordance with the original principle of contribution split equally (50:50) between both parties. [...] Mr. Bensh noted that for the fulfillment of the Work Program and Budget for the JIA for 2001-2002, financing will likely be obtained from Europe. CPC remarked, that the financing will be provided in 3-4 tranches (this will be more clearly defined in the period from August to mid-September, 2001). Mr. Bensh stated that approximately $5 -10 mln. USD will be actually received by the end of 2001. Mr. Ivanov stated that OGPD 'Poltavanaftogaz' cannot wait indefinitely for the investors to fulfill their obligations, thus, if the investor will not fulfill the program for financing for JAA, the new wells, allocated for the 2002 Work Program, should be transferred for the development to the OGPD 'Poltavanaftogaz' main activity."* [9]

---

[7] Exh. R-16.
[8] Exh. R-9.
[9] Exh. C-5.

27.    Subsequently, Respondent reminded Claimant on various occasions of outstanding payments and requested that Claimant make the promised contributions.[10]

28.    On 29 October 2001, the head of Poltavanaftogaz, Mr. Kopach stated in a letter to Respondent that

> *"According to Agreement No. 410/95 of September 14, 1995 on the joint activity between NGVU Poltavanaftogaz and Carpatsky Petroleum Corporation, proportion of contribution into the joint activity must be 50/50. As of July 1, 2001, according to Minutes No. 4/2001 of July 18, 2001, the accrued contribution of NGVU Poltavanaftogaz is 67,439.1 thousand of hryvnas (79.73%) and contribution of CPC is 17,141.1 thousand of hryvnas (20.27%), while the last contribution by CPC was made in December 2000.*
>
> *On many occasions NGVU Poltavanaftogaz raised the issue about failure by the investor to perform terms and conditions of the agreement on financing of the joint activity. At the meeting held July 18, 2001 (Minutes 4/2001) it was agreed that CPC would have to make decision between mid August to mid September of 2001 about further financing of the joint activity under Agreement No. 410/95. In the meantime no information was received by NGVU Poltavanaftogaz from CPC in respect of the aforementioned deadlines and specific amounts of financing of the joint activity and no funds were provided.*
>
> *Non-fulfillment by the investor of terms and conditions makes unreasonable carrying out joint investment activity together with CPC. When the parties of the joint activity fail to procure investment, the main goal of the joint activity, procurement of additional resources for development of the gas-condensate field, is not reached. Under these conditions, NGVU Poltavanaftogaz consider it necessary to address the issue on termination of the joint activity under Agreement No. 410/95 and application to the court in order to protect its interests."* [11]

29.    During the Management Committee meeting on 5 November 2001, the Parties stated that *"OGPD hasn't received any information from CPC regarding the determined terms and amounts of financing for JAA."* and it was decided that *"If no guarantee with regard to further funding of the JA emerge from the meeting between the management of CPC and JSC "Ukrnafta", the issue of terminating construction of new wells would be subsequently limited to wells #102, 104, 106, 109, 111, 112, 114 Rudivske and #100 Ch/Z."* [12]

---

[10] Exhs. R-17 to R-19.
[11] Exh. R-21.
[12] Exh. C-6.

30.  On 15 February 2001, a further meeting of the Management Committee took place, the minutes of which states: *"OGPD considers that the actions of CPC as non-interest in the JAA development at R-C field and considers it expedient to conduct the JAA further only on the wells 102, 104, 106, 109, 111, 112, 114 Rudovs'ki and well 100 Chervonozavods'ka"* and it was decided that *"If by June 10, 2002 CPC doesn't provide financing for covering 50% of the cost of well 121 Chervonozavods'ka or a part of this amount, agreed with OJSC 'Ukrnafta', CPC agrees to transfer in Q1/2002 the well 121 Chervonozavods'ka to the main activity of OGPD 'Poltavanaftogaz' with the corresponding adjustment".*[13] CPC did not provide the financing.

31.  During the Management Committee meeting of 22 October 2002, where Mr. Kopach of Ukrnafta stated that *"CPC should provide information regarding its readiness to restart investing into the JAA"*, the Parties decided that *"[c]onsidering the absence of financing from CPC, the main activity of OGPD 'Poltavanaftogaz' of JSC 'Ukrnafta' will independently continue to fulfill in 2003 the License activities of R-C field exploration."* [14]

32.  Finally, during the meeting of the Management Committee of 19 October 2004, it was decided that *"[a]s far as currently there are enough funds at the JIA account, there is no immediate necessity in additional investment contributions. Financing of the 2004 Work Program will be provided from the funds, accumulated at the JIA account (in accordance with the MCM Protocol #13/2004 dd. 31.03.2004). [...] By November 30, 2004 the participants should jointly work through and approve by the MCM the JIA #410/95 2005 Work Program."* [15]

33.  From early 2004, CPC actively sought to exercise the rights it considered owed to it under the JAA and to restore its interest in the Joint Activity to 50%. Thus, on 29 March 2004, it sent a letter to Respondent in which it formally advised the latter of its intention to "top up" its investment in the Joint Activity.[16] In this letter, CPC proposed to make an additional investment to cover 100% of the costs of work over on two wells on the RC Field, 100% of the costs of drilling two new wells on the RC Field, 100% of the costs of a

---

[13] Exh. C-8.
[14] Exh. C-7.
[15] Exh. R-6.
[16] Exh. C-10.

new field-wide study of the RC Field, and 100% of the costs for the work over of certain non-JAA wells on the field.[17]

34.    Claimant reiterated its offer to increase its financial contributions in a letter of 2 August 2004 to which it also attached a draft Work Program for the Joint Activity for 2005 for discussion by the Parties.[18]

35.    These and further attempts[19] by Claimant to discuss and reach an agreement with Respondent on these points remained unsuccessful so that Claimant did not "top up" its investment.

36.    Furthermore, Respondent undertook additional activities on the RC Field independently and without the approval of the Management Committee. Claimant requested to be able to participate in the drilling of new wells and further development of the RC Field[20], however, Respondent declined to permit such participation as it considered that *"as of today JSC Ukrnafta, as sole owner of license for RC Field development and being financially self-sustained company has the possibility and right to decide on the necessity to attract additional investments to realization of field development plan"*[21].

37.    Since 2003, no further investments were made by either Party to the Joint Activity as it was self-financed.

38.    On 29 March 2004, Mr. Bensh of Claimant wrote to the Chairman of the Board, Mr. Palytsya, stating that he was

> *"pleased to officially inform you that Carpatsky Petroleum Corporation's principal shareholder, Cardinal Resources Ltd. (UK), has raised an initial $ 9.5 million to be used for upstream oil and gas investments including, but not limited to, Carpatsky Petroleum's activities with Ukrnafta. [...] Carpatsky now has sufficient*

---

[17] Ibid.
[18] Exh. C-11.
[19] See Exhs. C-12, C-13 and C-14.
[20] Exh. C-13.
[21] Exh. C-15.

*capital to meet its obligations and invest further in Ukraine. More importantly, Carpatsky proposes to undertake new development and exploration projects in the Rudivsko-Chervonozavodske Field and the Bitkiv-Babchenske Field at its sole cost. As you know, Ukrnafta has paid most of the costs in the Rudivsko-Chervonozavodske Field these last four years and Carpatsky proposes to pay 100% of the costs for the following at no cost to Ukrnafta: [...] In general, we look forward to a new start on the proper development of the Rudivsko-Chervonozavodske Field and Bitkiv-Babchenske Fields. With a 'new' Carpatsky with capital to meet its obligations and the technical expertise of its management team, we look forward to working with you and others at Ukrnafta and with the government of Ukraine".[22]*

39.    Subsequently, on 2 September 2004, Mr. Bensh of CPC wrote a letter to Messrs. Palytsya and Pustovarov of Respondent stating that

*"Carpatsky Petroleum Corporation will soon present proposed work programs and budgets for 2005 for approval to the Management Committee the JAA n. 410/95 (Rudivsko-Chervonozavodske field) and to the Participants' Meeting of JV UkrCarpatOil (Bitkiv-Babchenske field). However, I would like to address this letter to you personally in order to call your attention to Carpatsky's plans regarding these fields and to provide you with our work plans.*

*As I have previously informed you in my letter of 29 March 2004, Carpatsky now has sufficient capital to meet its obligations and to make further investments in Ukraine.*

*[...]*

*I must be frank in telling that in recent months, Ukrnafta has been slow in responding to Carpatsky's proposals to re-enter or work over wells on these two fields. We proposed much work for 2004, which has not been finally approved by Ukrnafta, including the proposal to fund 100% of the works in 2004. Because our 2004 proposals have not been approved by Ukrnafta, the proposals for 2005 include the works that we had intended to conduct in 2004."[23]*

40.    According to the protocol of the meeting of the Management Committee of 19 October 2004, the total sum of the contributions made by the Parties by 1 July 2004 amounted to USD 30,678,200. Thereof, Respondent had contributed USD 24,878,620 and CPC USD 5,799,580. Hence, as of 1 July 2004, the share for Respondent amounted to 83.43% of the drilling investments and 85.09% of the profit distribution while the share for CPC amounted to 16.57% of the drilling investment and 14.91% of the profit distribution. The Management Committee decided that there was no further need for

---

[22] Exh. C-10.
[23] Exh. C-11.

14

investment contributions in the Joint Activity since the necessary financing would be provided from the funds generated by the operations.[24]

41.    In a further letter dated 9 December 2004, Mr. Bensh wrote to Messrs. Palytsya and Pustovarov pointing out that

> "As you know, Carpatsky Petroleum Corporation (CPC) has been doing numerous attempts to discuss with you and Mr. Pustovarov reinstatement of our share in Joint Activity. Agreement on Rudivsko-Chervonozavodske field. We also want to discuss joint development of all Rudivsko-Chervonozavodske field - provision, which is clearly and legally stipulated by our JAA and is commercially favourable for both parties, but is currently not shared by JSC Ukrnafta.
>
> As you understand, we are very disappointed by the fact that you have not allocated time to meet with us to discuss reinstatement of our share not only this week, but throughout the whole month.
>
> [...]
>
> While preparing to our meeting, I would like to make our position clear:
> 1.  we intend to buy out our share from JSC Ukrnafta and are ready to pay JSC Ukrnafta for "joint property" or for hand over of contractual rights (or other mutually acceptable variants).
> 2.  [...]
> 3.  we believe that you have been erroneously informed, if you think that JSC Ukrnafta has unlimited right to develop RC field outside of JAA frame. Such right exists, but only for certain wells and for limited term which has expired. This limited right of JSC Ukrnafta was noted in JIA Management Committee Meetings Protocols, not in JAA per se.
> 4.  though we are ready to protect our rights under JAA in the court, we believe that exercising our rights is fundamentally favorable for both companies. We are convinced that you will share our opinion if give [sic] your attentive consideration to our business proposal, attached in the form of presentation. [...]."[25]

42.    In two letters dated 23 December 2004 and 18 March 2005, Mr. Bensh also alerted Ms. Yulia Tymoshenko, Prime Minister of Ukraine, of the situation and CPC's position in this regard.[26]

43.    On 10 February 2005, the Management Committee held another meeting and decided that "[t]he Participants agreed to involve CPC specialists into drafting of joint decisions

---

[24] Exh. R-6.
[25] Exh. C-12.
[26] Exhs. R-25 and R-26.

15

*for the RC Field Development Plan, providing with the prior opportunity to review the information on the field. The Participants agree to take the final decision regarding the scope of further joint development of the field after the approval of the field development plan".*[27]

44.    On 3 March 2005, Mr. Bensh sent another letter to Mr. Pustovarov in which he informed Respondent that *"[...] Carpatsky hereby offers to "buy-back" [or 'purchase'] a 33.57% participation interest in the JAA from Ukrnafta (by way or [sic] assignment or otherwise) at a price to be agreed between our companies in order to restore our participation interest in the existing JAA wells to the original 50/50 proportion. The price of interest will be paid to OJSC Ukrnafta."*[28]

45.    On 24 March 2005, Mr. Palytsya of Respondent wrote to Mr. Prodan, First Deputy Minister of Oil and Power Energy of Ukraine, and set out in detail Claimant's failures to make contributions to the investment as agreed between the Parties as well as the impact this had on the Joint Activity (*"Investments were not made in required amounts and that is why the timeframe of accomplishment of the Work Program during the initial stage as it was set out in the License Agreement increased twofold: 10 years instead of five."*[29] ). It concluded that *"As of today, OJSC Ukrnafta is not bound with Cardinal Resources by any contractual relations. [...] In view of prior actions or, to be more precise, inactions of the American investor, position of OJSC Ukrnafta in respect of limitation of joint operations at this deposit by the wells, which are already on the balance of OJSC Ukrnafta, is just and lawful[30]"."*

46.    On 1 April 2005, Mr. Bensh wrote to Mr. Palytsya again, copied to Mr. Pustovarov of Respondent as well as Ms. Tymoshenko, Prime Minister of Ukraine and Mr. Plachkov, Ukrainian Minister of fuel and energy. In his letter, he stated *"I have not yet received a response from OJSC "Ukrnafta" $ 6.5 mil. USD to return our interest in our Joint Activity Agreement (No. 410/95) to its original 50/50 level in the JAA wells. [...] Cardinal is committed to working with OJSC 'Ukrnafta' to jointly develop the Rudivsko-Chervonozavodske Field (R-C Field) as contemplated by our Joint Activity Agreement*

---

[27] Exh. C-31.
[28] Exh. C-30.
[29] Exh. R-27, p. 1031.
[30] Exh. R-27, pp. 1030, 1038.

*No. 410/95, and to increase our investments in our Joint Activity to their original 50/50 level. This is our clear objective, our legal right, as well as our obligation; one that we have always taken seriously and acknowledged. [...] Carpatsky Petroleum Corporation is prepared to invest in cash (by wire transfer) into the account of the Joint Activity by 1 May 2005 the USD dollar equivalent of 69,173,800 UAH (approximately 13 million USD at today's official exchange rate) in order to restore our 50/50 proportions in the Joint Activity as contemplated by Art. 2.1 of our Agreement. [...] Alternatively, we are also prepared to pay the 6.5 million USD directly to OJSC 'Ukrnafta' as Cardinal offered on 3 March 2005."* [31] (emphasis omitted)

47.    On 18 April 2005, Mr. Pustovarov responded to Mr. Bensh stating, inter alia, *"[t]hat taking into account the above-mentioned, we consider your demands to JSC Ukrnafta, which is legal user of subsurface without limitation of its rights, in this respect, by the JAA # 410/95 and which contributed considerable sums, to provide with the 'report' and/or 'confirmation' as to its activity on the field in exchange of 'forgiveness' and/or 'approval' from your company, which during 10 years of JAA was able to take part in drilling of 9 wells and contribute only 17% of their construction cost, to be tactless. We can guarantee that, JSC Ukrnafta has been fulfilling and will fulfil its license commitments. The actual situation to date has objective and, we believe, fair grounds. That is why we believe it to be unreasonable to execute reallocation of shares as per Agreement # 410/95. [...] As the effectiveness of JA appeared to be low because of untimely and insufficient contributions of CPC, lack of possibilities to introduce modern foreign equipment and technologies, JSC Ukrnafta, while not seeing any other perspectives of cooperation development under JAA # 410/95 suggests to buy CPC's 16.57% share (equalling 17 141 100 UAH) and terminate JAA # 410/95 of September 14, 1995."* [32]

48.    On 13 December 2005, Mr. Bensh on behalf of Claimant submitted to Respondent a proposal for an additional agreement to the JAA No. 410/95 (Addendum 1)

> *"as a result of execution of which Carpatsky Petroleum Corporation will be able to make contribution into joint activity in the amount required to renew the actual share up to the amount of the initial contribution which is 50%. Since all prior contribution to joint activity were approved not by a resolution of the Management*

---

[31] Exh. C-13.
[32] Exh. C-15.

> *Committee but by Additional Agreements, and now we deem it appropriate to sign such Agreement."*[33]

In particular, the draft provided that

> *"1.    The Participants agree to amend the existing text of Article 2.6 of the Joint Activity Agreement by adding the following paragraph: 'The Participant who has not provided its respective 50% share of Investments in full has the right to restore its Actual Participation Interest at any time through cash Investments to the Separate Settlement Account. In such case the other Participant shall not have the right to object to such contribution by the Participant making the Investments, and the Actual Participation Interest of the Participant making the Investments shall be automatically restored to its Initial Participation Interest of 50% when the cash Investments are received in the Separate Settlement Account.*
> *[…]*
>
> *2.    Bearing in mind Article 7.6 of the Joint Activity Agreement, the Participants agree to amend the existing text of Article 6.2.2 of the Joint Activity Agreement by adding the following phrase:*
>
> > *'… and not to engage in activity on the field without the consent of the Management Committee (unless required to maintain the License and the Joint Activity is unable to do so).'"*[34]

49.    Also on 13 December 2005, a meeting took place between Mr. Bensh of CPC and Mr. Pustovarov of Ukrnafta, the outcome of which is disputed between the Parties.

50.    On 19 December 2005, Mr. Bensh wrote a letter to Mr. Palytsya, copied to Mr. Pustovarov, of Respondent, where he stated:

> *"As you are well aware, last week, on 13 December, 2005, we had a meeting with Mr. Pustovarov, where we have agreed the term in principle of the recovery of 50% participation interest to Carpatsky Petroleum Corporation (CPC) under JAA # 410/95 ('JAA') through further direct investment. We have also provided Mr. Pustovarov with our propositions in respect of draft Supplementary Agreement to JAA, which regulates CPC's investment terms.*
>
> *Although we were reassured that OJSC 'Ukrnafta' would respond promptly, we have received neither comments nor remarks to our proposition yet. Therefore, you are kindly requested to send us written comments (if any) to our Supplementary Agreement till tomorrow, 20 December. We would like to sign*

---

[33] Exh. R-33.
[34] Exh. R-34.

> *Supplementary Agreement as soon as possible so that we can make corresponding investment to JAA bank account before Christmas holidays." [35]*

51.    The issues remained unresolved between the Parties.

52.    As since 2003 no further investments were contributed by either Party and the Joint Activity was self-financed, the total amount of the contributions made by the Parties per 31 December 2006 remained at USD 30,678,200, as indicated in the protocol of the Management Committee of 28 February 2007.[36]

53.    The minutes of the meeting of 28 February 2007 constitutes the last resolution approved by both Parties. Subsequent minutes sent to CPC were not signed by it. Consequently, the profits generated from the Joint Activity starting from 2007 remain undistributed.

## D.    THE ARBITRATION CLAUSE

54.    Claimant commenced these proceedings based upon the arbitration agreement contained in paragraphs 20.3 – 20.5 of the consolidated version of the JAA.[37] The consolidated version of the JAA is a version of the agreement which comprises all final changes made to the initial JAA by way of the Restated JAA and the Addendum. Thus, the arbitration agreement of this consolidated version is the same as the one in the Addendum of 26 August 1998. This is the clause mentioned in para. 21 above and reads as follows:

> *"20.3    The Participants have agreed to take all actions to settle any disagreements between them by means of negotiation.*
>
> *20.4    Should the Participants reach no consent on disputable issues by means of negotiations within 60 (sixty) days from the day of providing notice of the dispute by one of the Participants to the other Participant, such dispute shall be transferred for resolution to and finally settled by the Arbitration Institute of the Stockholm Chamber of Commerce. The Participants have agreed that the arbitration shall be performed according to the UNCITRAL Rules of Arbitration. The place of arbitration shall be Stockholm,*

---

[35] Exh. C-32.
[36] Exh. R-7.
[37] See Request for Arbitration of 28 September 2007, para. 10.

*Sweden. The resolution of disputes shall be governed by the substantive laws of Ukraine - the country, where the performance of this Agreement takes place. Arbitration proceedings may be conducted in the Ukrainian and English languages.*

20.5    *The arbitration shall consist of three arbitrators who shall be appointed as follows: the plaintiff and defendant shall appoint one arbitrator each and these arbitrators will jointly appoint a third arbitrator. If within 30 days following the notice of commencement of arbitration proceedings, the defendant should fail to appoint the arbitrator, then such arbitrator, upon request of the plaintiff, shall be appointed by the Institute. If two arbitrators should fail to appoint the third arbitrator within 30 days following the appointment of the second arbitrator, then such third arbitrator shall be appointed by the Institute from among three arbitrators offered by the plaintiff."*

## E.    SUMMARY OF THE ARBITRAL PROCEEDINGS

55.    These proceedings commenced on 28 September 2007 when Claimant filed its Request for Arbitration with the SCC. On 28 November 2007, Respondent filed its Answer in which it stated:

*"Through negotiations between counsels, UKRNAFTA and CPC have agreed to proceed with the arbitration on the following premises.*

*The arbitration may proceed in English only, however, on the condition that all submissions to the arbitrators, the Institute and the other party including exhibits are also simultaneously produced and submitted in the Ukrainian language. However, the arbitrators need not speak Ukrainian and need not communicate or render an award or decisions in the Ukrainian language.*

*The arbitration may proceed under the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce including the Schedule of Costs therein.*

*The party appointed arbitrators are entrusted the task of appointing a third arbitrator as chairman. If they are unable to find a chairman within 30 days from notice by the Institute that they are so requested, they shall report this to the Institute and the Institute shall appoint a chairman.*

> *For the avoidance of doubt, the governing law of the contract is the substantive laws of Ukraine."* [38]

56.    Subsequently, an Arbitral Tribunal was constituted, a procedural timetable established and Claimant submitted its Statement of Claim dated 13 May 2008 followed by Respondent's Statement of Defence and Counterclaim dated 23 June 2008. On 25 November 2008, Claimant submitted its Reply to the Statement of Defence and Answer to the Counterclaim.

57.    On 19 December 2008, Respondent submitted objections to the Arbitral Tribunal's jurisdiction based on the merger of CPC TX into CPC DE (see para.16 above).

58.    On 12 January 2009, Claimant responded to these objections pursuant to the invitation of the Tribunal.

59.    On 13 January 2009, Respondent stated in an email as follows:

> *"CPC's defence against UKRNAFTA´s objections is inadequate. CPC is confusing the chronology and seems to rely on the normal consequences of a merger and the assertion that Leslie Texas was authorised to represent the surviving entity.*
>
> *This is, however, beside the point.*
>
> *The point is that the surviving entity neither entered the Restated Agreement in October 1996, nor the agreement in 1998 under which UKRNAFTA became a party to the JAA. Instead, both those agreement were executed by the entity that did not survive, CPC TX, which legal entity at that time had ceased to exist and operate as a legal entity and hence lacked the powers to contract. This fact is - for obvious reasons - not commented on by CPC.*
>
> *UKRNAFTA reiterates and maintains all what is stated in the objection. UKRNAFTA is especially maintaining the assertion that the merger and the effects of the merger were news to UKRNAFTA in late November of 2008 and that CPC has willfully tried to hide the true facts from UKRNAFTA. Evidence to this end will be provided.*

---

[38] Respondent's Answer to the Request for Arbitration dated 28 November 2007, p. 1.

*UKRNAFTA will revert before COB this Friday with elaborated comments on CPC's defence."* [39]

60.    Thereupon, on 14 January 2009, the Arbitral Tribunal sent a letter to the Parties in which it invited Respondent to submit its comments by latest 16 January 2009 and Claimant to submit a response thereto by 21 January 2009. It also clarified that no further submissions on this issue were to be filed by either Party thereafter.

61.    On 16 January 2009, at 7.03 p.m., Respondent informed the Arbitral Tribunal per email that due to an interruption of the electricity supply in the Kiev office of Baker & McKenzie, it needed more time to complete its submissions and requested an extension until 19 January 2009.

62.    On 19 January 2009, the Arbitral Tribunal confirmed that it had taken note of Respondent's email and that it looked forward to receiving Respondent's submission on the same day. Thus, the Arbitral Tribunal granted the extension requested by Respondent.

63.    Later that same day, Respondent filed comments on Claimant's response of 12 January 2009. It also filed a submission which explicitly did "not constitute UKRNAFTA's Rejoinder" due on this date, since it contended that "before ordering the parties to proceed with the merits of the case, the Tribunal must resolve the issue of jurisdiction".[40] In this submission, Respondent nevertheless withdrew its counterclaim and addressed both liability and quantum of the matter.

64.    On 20 January 2009, Claimant, in light of the extension granted to Respondent, applied for a short extension of the initial deadline of 21 January 2009 for filing its comments until 23 January 2009. In its letter of 21 January 2009, the Tribunal granted this extension. Thereupon, Claimant responded to Respondent's comments regarding jurisdiction on 23 January 2009.

---

[39] Email from Respondent's Counsel Mr. Benedictsson to Claimant's Counsel Ms. Horrigan and the Members of the Arbitral Tribunal and its Administrative Secretary.
[40] Respondent's Submission regarding Rejoinder on Claimant's Reply and Defense to the Counterclaim dated 19 January 2009, pp. 1,2.

65.    On 29 January 2009, the Arbitral Tribunal issued Procedural Order N° 5 in which it
       decided, *inter alia,* to continue the proceedings concerning the issue of jurisdiction and
       the merits in parallel and that consequently the hearing scheduled to commence on
       2 March 2009 in Stockholm would allow for the Parties to address both jurisdiction and
       merits of the arbitration. In preparation of this hearing, the Tribunal also invited both
       Parties to specifically take position on the principles of the autonomy and separability of
       the arbitration clause, as well as the law governing the latter, by 20 February 2009.

66.    On 18 February 2009, Respondent submitted a further submission on jurisdiction which
       included two fact witness statements. On the same day, Respondent filed a challenge
       against the Chairman of the Arbitral Tribunal with the SCC, alleging bias and a lack of
       impartiality towards Respondent.

67.    On 19 February 2009, the SCC invited Claimant and the Chairman to comment on the
       challenge by 26 February 2009.

68.    On 20 February 2009, Claimant filed its comments on the law governing the arbitration
       agreement as requested by the Arbitral Tribunal.

69.    On 24 February 2009, Respondent filed a further submission on the issue of the alleged
       lack of jurisdiction of the Arbitral Tribunal, including a request for production of
       documents as well as a request for the stay of these arbitration proceedings due to a
       court action filed against Claimant in Texas. Claimant also submitted a further fact
       witness statement.

70.    In the email covering the above-mentioned submission, Claimant's counsel,
       Mr. Benedictsson announced that Mr. Kaj Hobér had joined as counsel. By letter of the
       same day, Mr. Hobér confirmed that he had been retained as co-counsel. He submitted a
       power of attorney on 11 March 2009.

71.    On 25 February 2009, the Arbitral Tribunal invited Claimant to address Respondent's
       latest submission by 27 February 2009. It furthermore announced that in light of the

23

circumstances and Respondent's submission, the Tribunal had decided to hear the Parties only on jurisdiction during the upcoming hearing in Stockholm, re-scheduled to commence on Wednesday, 4 March 2009 instead of Monday, 2 March 2009 and to last two days, i.e. 4 and 5 March 2009.

72.    On 26 February 2009, both Claimant and the Chairman submitted their respective comments on Respondent's challenge to the SCC.

73.    On the same day, Respondent replied to the Tribunal's letter dated 25 February 2009 by stating that it had understood this letter to reject both Respondent's request for production of documents and stay of the proceedings. It stated that this dismissal of further production of documents would prevent Respondent from adequately presenting its defence with regard to the issue of jurisdiction and that therefore Respondent had "*decided not to attend the hearing and not to participate further in the arbitration*".

74.    Also on 26 February 2009, Claimant sent a letter to the Arbitral Tribunal in which it, *inter alia*, objected to Respondent's requests for the production of documents as set out in the latter's submission of 24 February 2009 and submitted two fact witness statements.

75.    On 27 February 2009, the Arbitral Tribunal replied to Respondent's 26 February 2009 letter, pointing out that in its letter dated 25 February 2009, it had invited Claimant to take position on all points raised by Respondent in its submission dated 24 February 2009, including the requests for production of documents, and that thus it had not yet taken any decision in this regard. It also clarified that it intended to hold a hearing on jurisdiction as scheduled, during which it would discuss with the Parties all outstanding issues concerning jurisdiction, including the requests for production of documents and that it furthermore was willing to consider the possibility of a further hearing on jurisdiction, if necessary. The Arbitral Tribunal ordered both Parties to appear at that hearing and requested the Parties to confirm their presence by 6 p.m. of the same day.

76.    By letter of the same day, Claimant confirmed its presence at the hearing on jurisdiction.

77.  On 2 March 2009, Respondent stated that the approach of the Tribunal consisting in first hearing witnesses before discussing Respondent's request for production of documents and for a stay of the arbitration was unacceptable. More generally, Respondent indicated that hearing witnesses before the production of documents had taken place with regard to the issue of jurisdiction undermined Respondent's ability to defend its case. It stated again that it would not attend the hearing. Furthermore, it reiterated *"its requests for production of documents and for a stay of the proceedings as set out in its letter to the Arbitral Tribunal dated 24 February 2009."* At the same time, Respondent informed the Arbitral Tribunal that on the same day, it had filed an application with the Stockholm District Court requesting a declaratory judgment confirming that the Arbitral Tribunal lacks jurisdiction to decide the present dispute.

78.  On the same day, the Arbitral Tribunal wrote to the Parties stating that it considered that hearing the witnesses on jurisdiction would, *inter alia,* be useful in order to decide Respondent's requests for the production of documents and that the Tribunal's previous letter did not fix the order in which it intended to conduct the hearing, i.e. it did not stipulate that witness testimony had to occur prior to the discussion of the request for production of documents. In particular, the Arbitral Tribunal wrote:

> *"As previously indicated, the Arbitral Tribunal intends to hear the Parties and their witnesses on the issue of jurisdiction during this week's hearing. The issue of Respondent's requests for production of documents dated 24 February 2009 will also be discussed. The Arbitral Tribunal has taken note of Claimant's position to reject the requests for document production. The Tribunal will give the Parties the opportunity to address this issue with regard to both admissibility and content of the production requests as well as the issue of a stay of these proceedings as requested by Respondent.*
>
> *With respect to Respondent's email message of today, the Tribunal again notices a misunderstanding on Respondent's side. The hearing of the witnesses this week is independent of Respondent's application regarding the production of documents. The hearing of the witnesses will ensure that the Tribunal is well informed when it proceeds to decide whether or not to order the production of the documents requested. The hearing of the witnesses does therefore not "undermine the Respondent's ability adequately to prepare and articulate its defence with respect to the jurisdiction" (Respondent's email, page 2). Hence, the Tribunal wants to hear Respondent's witnesses and reiterates its Order of 27 February 2009 pursuant to which both Parties shall appear at the forthcoming hearing. Furthermore, and for the avoidance of*

25

> *doubt, the Arbitral Tribunal did not fix a sequence of events whereby it will first hear the witnesses and then have a discussion concerning Respondent's requests for the production of documents. The Tribunal simply informed the Parties about the items which form part of the agenda of this hearing."*

79.    In replying to the foregoing on the same day, Respondent confirmed that despite the clarifications of the Arbitral Tribunal in its previous letters concerning the hearing on jurisdiction, it would not attend this hearing. In this communication Respondent did not state the reasons underlying its decision.

80.    Also on 2 March 2009, the SCC invited both co-arbitrators to submit comments on the challenge to the Chairman as well as the responses received thereto both from Claimant and the Chairman. The co-arbitrators commented on 2 and 9 March 2009, respectively, stating that they were in agreement with the Chairman's response to the challenge.

81.    On 4 March 2009, a hearing on jurisdiction took place in Stockholm. Claimant was represented by Ms. Brenda Horrigan and Ms. Alison Pearsall of Salans. Mr. Vladimir Zakhvatayev, attorney from Salans Kiev also attended the hearing along with Mr. Ray Leonard, Vice President of Kuwait Energy and Mr. Daniel White, General Counsel of Kuwait Energy. Respondent did not participate. The witnesses Robert Bensh and Zoya Frolova were heard.

82.    On 19 March 2009, the Arbitral Tribunal issued Procedural Order N° 6 providing both Parties with the transcript of the hearing on jurisdiction. It set out the Procedural Timetable to be adopted in case the Tribunal should confirm its jurisdiction and confirmed that the Arbitral Tribunal did not intend to stay these proceedings. The Order did not address the issue of document production.

83.    Thereupon, on 24 March 2009, Respondent sent a letter to the Arbitral Tribunal in which it confirmed that it had taken note of the Tribunal's latest order and stated that

> *"as far as we understand the above-mentioned procedural order, the Arbitral Tribunal has rejected the Respondent's request for the production of documents concerning the jurisdiction of the Arbitral*

26

> *Tribunal. This means not only that the Respondent has not had the benefit of these documents when preparing and articulating its case on jurisdiction, but also that the Respondent has not been given an opportunity to cross-examine the Claimant's witnesses on the basis of such documents. Consequently, the Respondent has not been given the opportunity adequately to prepare and articulate its case with respect to the jurisdiction of the Arbitral Tribunal. The Respondent reserves all rights in this respect."*

84.    On 25 March 2009, the SCC informed the Arbitral Tribunal as well as the Parties that no ground for the disqualification of the Chairman had been found and that consequently Respondent's challenge was dismissed.

85.    On 22 April 2009, the Arbitral Tribunal rendered a decision on jurisdiction confirming that it was competent to decide the dispute between the Parties.

86.    On 24 April 2009, the Arbitral Tribunal requested Respondent to state by latest 1 May 2009 whether it intended to participate in these proceedings. If so, it was requested to submit its rejoinder and counterclaim by 15 June 2009.

87.    On 29 April 2009, Respondent's counsel wrote to the Tribunal stating:

> *"[...] The Arbitral Tribunal's decision on jurisdiction dated 22 April 2009 rests on the erroneous assumption that OJSC UKRNAFTA was aware of the fact that Carpatsky Petroleum Corporation (Texas) and Carpatsky Petroleum Corporation (Delaware) were two separate legal entities and that the former had ceased to exist. There is no evidence that supports this conclusion. On the contrary, all available evidence - in particular the witness statement of Mr. Leslie Texas - indicates not only that OJSC UKRNAFTA was completely unaware of these circumstances, but also that OJSC UKRNAFTA was misled about the fact that Carpatsky Petroleum Corporation (Texas) has ceased to exist. Thus, it is very likely that the Stockholm District Court will issue a judgment to the effect that the Arbitral Tribunal lacks jurisdiction to try the dispute brought by Carpatsky Petroleum Corporation (Delaware). Any such judgment will of course be binding upon the Arbitral Tribunal. In view thereof, and for the purpose of avoiding unnecessary legal costs, OJSC UKRNAFTA hereby requests that the Arbitral Tribunal stay the arbitration pending the judgment of the Stockholm District Court."*

88.    On 30 April 2009, the Arbitral Tribunal confirmed receipt of Respondent's letter and invited Claimant to comment on the content thereof by 5 May 2009. It also reiterated that

27

Respondent should indicate by 1 May 2009 whether it intended to participate in these proceedings if the Tribunal were to continue the proceedings. Respondent did not do so.

89.   On 5 May 2009, Claimant urged the Tribunal to reject Respondent's request.

90.   On 6 May 2009, the Arbitral Tribunal wrote to the Parties, upholding and confirming its decision on jurisdiction as well as denying Respondent's request for a stay of the proceedings. The Tribunal also noted that Respondent had not informed it whether it wished to further participate in the proceedings and thus granted the latter time until 7 May 2009 to do so. It pointed out that thereafter the Arbitral Tribunal would assume that Respondent no longer wished to participate and that the Tribunal would make the necessary arrangements to hold the hearing on the merits commencing on 8 June 2009.

91.   On 7 May 2009, Respondent confirmed that it intended to participate in the arbitration and requested to be granted until 15 July 2009 to submit its Rejoinder and Reply on the Counterclaim. It also informed the Tribunal that Respondent's counsel, due to previous engagements, would not be available for a hearing on 2-4 September 2009, with 5 September as a reserve day and proposed alternative dates in September 2009.

92.   On 8 May 2009, the Arbitral Tribunal confirmed receipt of Respondent's letter stating that it would not be able to change to hearing dates fixed in the Procedural Order N° 6 on 19 March 2009, and to which neither Party had objected, due to other commitments of members of the Arbitral Tribunal, which would result in a hearing not being possible before late 2009 or even early 2010. It also informed the Parties that it would not take issue with minor changes of the date for the submission of Respondent's Rejoinder if the Parties so agreed.

93.   On 28 May 2009, the SCC confirmed, following a request of the Arbitral Tribunal dated 14 May 2009 in this regard, that the deadline for rendering the final award in this matter was extended until 16 November 2009.

94.   On 2 June 2009, Respondent's counsel Kaj Hobér informed the Arbitral Tribunal of his withdrawal as counsel in this arbitration and announced that Steven Philippsohn and

Trevor Mascarenhas of PCB Litigation LLP in London, England would henceforth represent Respondent in these proceedings.

95. On the same date, the Tribunal wrote to the Parties acknowledging Mr. Hobér's letter and stating that it would be grateful to receive confirmation – due to the absence of any information on this point - whether Baker & McKenzie would continue to act in this matter. It did not receive any information on this point from Baker & McKenzie, neither from Mr. Benedictsson nor from anybody else.

96. On 15 June 2009, Respondent's new counsel informed the Tribunal that "we are hopeful that we will be able to reach agreement shortly with Claimants Lawyers in relation to an extension of time for service of our Client's Rejoinder and Witness Statement".

97. On 16 June 2009, having received neither Respondent's submission nor a confirmation regarding an extension agreed with Claimant, the Tribunal wrote to the Parties stating that it expected to be informed by 17 June 2009 whether an agreement on an extension had been reached and drew counsel's attention to the fact that it did not intend to get the timetable disrupted at this late of the proceedings due to Respondent's decision to change counsel.

98. On 17 June 2009, both Parties informed the Tribunal of their agreement regarding the timing for the submission of further pleadings and witness statements.

99. On 18 June 2009, Respondent's new counsel submitted a power of attorney.

100. Also on 18 June 2009, the Tribunal confirmed the Parties' agreement regarding the timetable for the remainder of the proceedings.

101. On 24 June 2009, Respondent submitted its rejoinder enclosing exhibits and witness statements.

102. On 6 July 2009, Respondent submitted three expert reports.

103. On 7 August 2009, Claimant submitted its Response to Respondent's Rejoinder enclosing exhibits and witness statements.

104. On 21 August 2009, Claimant filed three expert reports as well as exhibits.

105. On 27 August 2009, Respondent filed an unsolicited witness statement, the third witness statement of Mr. Texas in these proceedings, to which Claimant objected on the same day.

106. Also on the same day, the Tribunal stated that it did not consider this filing to be in accordance with the procedural rules applicable in these proceedings. It also pointed out that Respondent had neither asked for leave to file this witness statement nor had it explained why this was necessary at this stage. Consequently, the Tribunal did not accept the submission of the witness statement and struck it off the record.

107. Also on 27 August 2009, Respondent filed a submission entitled "Respondent's Reply to the Response to the Rejoinder" and accompanying exhibits.

108. On 28 August 2009, Claimant objected to this new submission by Respondent and requested the Tribunal to reject it.

109. Thereafter, on the same day, Respondent applied to the Tribunal that it reconsider its decision regarding the third witness statement of Mr. Texas and permit both the statement and Respondent's latest submission onto the record of these proceedings.

110. On the same day, Claimant sent a letter to the Arbitral Tribunal in which it objected to Respondent's application.

111. On 30 August 2009, the Arbitral Tribunal rejected Respondent's Reply to the Response to the Rejoinder and struck it off the record. It also did not reconsider its decision regarding the third witness statement of Mr. Texas.

112.   The hearing on the merits took place in Stockholm between 2 and 5 September 2010. Claimant was represented by Ms. Brenda Horrigan, Ms. Anne-Sophie Dufêtre and Mr. Jonathan Barnett of Salans. Mr. Vladimir Zakhvatayev, attorney from Salans Kiev also attended the hearing. Furthermore, Mr. Daniel White of Carpatsky Petroleum Corporation was present. Respondent was represented by Messrs. Trevor Mascarenhas, Steven Philippsohn and Vyacheslav Tretyak of PCB Litigation LLP as well as Mr. Clive Freedman QC of Littleton Chambers and Mr. Anthony Trace of Maitland Chambers. Furthermore, Ms. Irina Khvingiya as well as Messrs. Viacheslov Kartashov and Roman Matskevych attended the hearing on behalf of Ukrnafta. The Arbitral Tribunal heard fifteen factual and expert witnesses over the duration of four days.

113.   On 8 September 2009, the Arbitral Tribunal wrote to the Parties confirming again the timetable agreed with the Parties regarding the final phase of the proceedings.

114.   In accordance with the Tribunal's request at the end of the hearing, on 18 September 2009, Claimant submitted its final prayers for relief.

115.   On 30 October 2009, both Parties submitted their respective first post-hearing briefs enclosing additional exhibits.

116.   On 13 November 2009, Respondent submitted a motivated request for submission of four additional exhibits into these proceedings.

117.   By letter of the same day, the Arbitral Tribunal invited Claimant to take position on this issue by 18 November 2009.

118.   On 16 November 2009, the SCC extended the deadline for rendering the final award until 30 April 2010 following a request of the Tribunal in this regard.

119.   On 18 November 2009, Claimant submitted its response to Respondent's motivated request for submission of four additional exhibits into these proceedings.

120.    On 26 November 2009, the Arbitral Tribunal wrote to the Parties directing them to submit their second round of post-hearing briefs as scheduled on 30 November 2009 whereby Respondent was to include the four new documents with its brief. Thereupon, Claimant was granted a deadline until 4 December 2009 by which date it should indicate whether it wished to submit a further brief specifically limited to the new documents at issue.

121.    On 30 November 2009, both Parties submitted their respective second post-hearing briefs, supplemented in Respondent's case by new documents.

122.    On 4 December 2009, Claimant indicated that it did wish to file a brief in response to the new documents introduced by Respondent with its second post-hearing brief and requesting that it be given until 14 December 2009 to do so.

123.    On 7 December 2009, Respondent requested that the deadline for Claimant's submission not be granted beyond 9 December 2009 and that Respondent be given an opportunity to respond to this submission by 11 December 2009.

124.    By letter dated 8 December 2009, the Arbitral Tribunal granted Claimant until 14 December 2009 to file its further submission regarding Respondent's new documents. It also confirmed that it did not see a need for a further response of Respondent thereto, however, any further submission should be preceded by a reasoned application in this regard. Finally, the Arbitral Tribunal determined that cost submissions were to be filed by 18 December 2009, and any reply thereto by 8 January 2010.

125.    On 14 December 2009, Claimant filed its response to the new documents submitted by Respondent.

126.    On 15 December 2009, Respondent filed an application to serve a short reply to Claimant's submission of the previous day.

127.    On the same day, Claimant requested that the Tribunal deny Respondent's application.

128. On 16 December 2009, the Tribunal wrote to the Parties permitting Respondent to file a short reply to Claimant's submission of 14 December 2009 and granted Claimant the opportunity to respond thereto, if it considered it necessary to do so by 22 December 2009. The Tribunal also determined that cost submissions had to be made by 15 and 29 January 2010.

129. On 17 December 2009, Respondent submitted its response to Claimant's submission of 14 December 2009.

130. On 22 December 2009, Claimant filed a final reply on this issue.

131. On 15 January 2010, both Parties submitted their respective first submissions on costs.

132. On 29 January 2010, both Parties submitted their respective reply submissions on costs. Respondent's submission comprised two new exhibits.

133. On 2 February 2010, Claimant requested that those two new exhibits be excluded from the record and the proceedings closed.

134. On the same day, the Tribunal granted Respondent until 3 February 2010 to respond to Claimant's request.

135. On 3 February 2010, Respondent filed its response on this matter.

136. On 4 February 2010, the Arbitral Tribunal informed the Parties that it decided not to exclude the new documents submitted by Respondent from the record, and to permit Claimant to address them, if it wished to do so, by 12 February 2010.

137. On 12 February 2010, Claimant filed a submission addressing the new documents filed with Respondent's second cost submission.

138. On 26 April 2010, the SCC informed the Tribunal that the deadline for rendering the final award had been extended until 30 July 2010.

139. On 22 July 2010, the SCC informed the Arbitral Tribunal that the deadline for rendering the final award was extended until 15 September 2010, following a request from the Tribunal dated 16 July 2010. Eventually the SCC extended the time limit until 30 September 2010.

140. On 26 July 2010, Respondent requested to be permitted to file new documents and a submission on the issue of gas price control due to recent developments in this area in Ukraine.

141. On 28 July 2010, the Arbitral Tribunal confirmed receipt of Respondent's correspondence of 26 July 2010 and stated that it did not consider it necessary to receive any more information at this point but might revert on this issue at a later stage should it consider this necessary.

## F.    RELIEF SOUGHT

142. As both Parties' prayers for relief have changed over the course of this arbitration, the relief set out in the two rounds of pre-hearing as well as in the two rounds of post-hearing briefs will be set out. The relief requested in relation to the issue of jurisdiction will be set out elsewhere in this Award.

## I.    Claimant

143. In its Request for Arbitration, Claimant sought the following relief:

> "A.    *Declaratory Relief*

> 47.    *An award of the Tribunal:*

(1)    *declaring that CPC has a contractual right under the JAA to increase its investment to 50%;*

(2)    *ordering Ukrnafta to take all necessary measures to permit CPC to make such investment and to fully participate in the development and exploration of the RC Field; and*

(3)    *declaring that the Joint Activity covers the entirety of the RC Field, with the exception of wells Number 108 Rudivs'ka, 110 Rudivs'ka, 122 Chervonozavods'ka, and 118 Chervonozavods'ka, which were excluded from the scope of the Joint Activity by mutual agreement of the parties.*

48.    *In the alternative, CPC seeks an award of the Tribunal terminating the JAA on account of breach thereof by Ukrnafta.*

A.    *Damages*

49.    *Claimant further seeks an award of damages, in an amount to be quantified, arising as a result of Ukrnafta's breaches of its obligations under the JAA, plus accrued interest as from the date of the loss.*

B.    *Costs*

50.    *Claimant seeks recovery of all of the costs of the arbitration.*

C.    *Interest*

51.    *Claimant seeks interest on any monetary award from the date of the award until the date of final payment, at the applicable rate as may be determined by the Tribunal."* (emphasis omitted)

144.    In its Statement of Claim, Claimant sought

"49.    *An award of the Tribunal:*

35

(1) *Ordering Ukrnafta to comply with the JAA and to take all necessary measures to permit CPC to participate fully in the exploration and development of the RC Field and to participate fully in the JAA as an equity partner, including in respect of management, decision making and profit sharing, all as of the date of the Tribunal's award;*

(2) *Declaring that CPC has a contractual right under the JAA to 'top up' its interest in the JAA by increasing its Accumulated Contribution in the JAA to 50%, thus increasing its Actual Share in the JAA (as defined therein) to 45%;*

(3) *Ordering Ukrnafta to take all necessary measures to permit CPC to increase its Accumulated Contribution in the JAA to 50% and to increase its Actual Share in the JAA to 45% within three months from the date of the award or such other period as determined by the Tribunal;*

(4) *Declaring that the Joint Activity covers the entirety of the RC Field with the exception of (i) certain pre-existing wells not included in the JAA at the time of its formation, and (ii) wells Number 108 Rudivs'ka, 110 Rudivs'ka, 122 Chervonozavods'ka, and 118 Chervonozavods'ka, which were excluded from the scope of the Joint Activity by mutual agreement of the parties; and*

(5) *Ordering Ukrnafta to pay CPC damages, in an amount to be determined following the document discovery phase of this arbitration, equal to the losses suffered by CPC as a result of Ukrnafta's failure to respect the JAA and as a result of Ukrnafta's refusal to allow CPC to 'top up' its interest in the JAA, plus accrued interest as from the date of the loss.*

50.    *In the alternative, CPC seeks an award of the Tribunal:*

(1) *Terminating the JAA on account of breach thereof by Ukrnafta; and*

(2) *Ordering Ukrnafta to pay CPC damages, representative of its 45% Actual Share interest in the JAA, arising as a result of Ukrnafta's breaches of its obligations under the JAA.*

51.  *CPC maintains its claim for costs, namely the costs of this arbitration including all expenses that CPC has borne or will bear in respect of the fees and expenses of the arbitrators, the SCC Institute, legal counsel, experts and consultants, and its own internal costs.*

52.  *CPC further maintains its claim for interest on any monetary award prior to and/or from the date of the award until the date of final payment, at the applicable rate as may be determined by the Tribunal.*

53.  *CPC reserves the right to amend or supplement the present Statement of Claim, and to make additional claims and to request such additional or different relief as may be appropriate, including conservatory, injunctive or other interim relief. CPC in particular notes that the breaches by Ukrnafta are ongoing and are part of a continuous pattern of misconduct, and further that Ukrnafta has prevented access by CPC to information concerning the RC Field necessary for the development of CPC's case and for calculation of damage amounts. This is all the more so since Ukrnafta has not yet given any indications whatsoever of its defense to the claims set forth in the Request and restated and expanded herein. For all of these reasons, CPC specifically reserves its right to supplement its claims to incorporate any additional information, claims and damage amounts which may arise in that connection and to seek injunctive relief on an interim basis if circumstances continue to deteriorate."* (emphasis omitted)

145.  In its Reply and Defence to Counterclaim, Claimant sought the following relief:

"82.  *An award of the Tribunal:*

1.  *Terminating the JAA on account of breach thereof by Ukrnafta; and*
2.  *Ordering Ukrnafta to pay CPC damages in the amount of USD 215 million representative of the net present value of CPC's 45% Actual Share interest in the JAA for the term of the JAA, arising as a result of Uknafta's breaches of its obligations under the the JAA.*

83.    *CPC maintains its claim for costs, namely the costs of this arbitration including all expenses that CPC has borne or will bear in respect of the fees and expenses of the arbitrators, the SCC Institute, legal counsel, experts and consultants, and its own internal costs.*

84.    *CPC further maintains its claim for interest on any monetary award prior to as well as from the date of the award until the date of final payment, at the applicable rate as may be determined by the Tribunal.*

85.    *CPC reserves the right to amend or supplement the present Reply, and to make additional claims and to request such additional or different relief as may be appropriate, including conservatory, injunctive or other interim relief. CPC in particular notes that the breaches by Ukrnafta are ongoing and are part of a continuous pattern of misconduct, and further that Ukrnafta has prevented access by CPC to information concerning the RC Field necessary for the development of CPC's case and for calculation of damage amounts. For all of these reasons, CPC specifically reserves its rights in all respects."* (emphasis omitted)

146.    In its Response to Rejoinder, Claimant requested as follows:

*"145.    An award of the Tribunal:*

1.    *Terminating the JAA on account of breach thereof by Ukrnafta; and*
2.    *Ordering Ukrnafta to pay to CPC damages in an amount representative of the net present value of CPC's 45% Actual Share interest in the JAA for the term of the JAA, arising as a result of Ukrnafta's breaches of its obligations under the JAA.*

146.    *CPC maintains its claims for costs, namely the costs of this arbitration including all expenses that CPC has borne or will bear in respect of the fees and expenses of the arbitrators, the SCC Institute, legal counsel, experts and consultants, and its own internal costs.*

147.    *CPC further maintains its claim for interest on any monetary award prior to as well as from the date of the award until the date of final payment, at the applicable rate as may be determined by the Tribunal."* (emphasis omitted)

147.    Upon invitation by the Arbitral Tribunal in its letter of 8 September 2009, on 18 September 2009, Claimant clarified its Prayers for Relief and requested as follows:

"3.    *An award of the Tribunal:*

1.  *Terminating the JAA on account of breach thereof by Ukrnafta; and*
2.  *Ordering Ukrnafta to pay to CPC damages in the amount of USD 454.9 million. Such damages consist of:*

a.  *Damages in the amount of USD 436.3 million arising from Ukrnafta's breach of CPC's right under the JAA to participate in new wells developed on the RC Field on a 50:50 basis, plus*

b.  *Damages in the amount of USD 18.6 million arising from Ukrnafta's breach of CPC's right under the JAA to 'top up' to 50% in nine existing wells.*

4.    *CPC maintains its claim for interest on any monetary award prior to as well as from the date of the award until the date of final payment, each at a rate of one month LIBOR + 2%, compounded monthly, or such other applicable rate as may be determined by the Tribunal.*

5.    *CPC further maintains its claims for costs, namely the costs of this arbitration including all expenses that CPC has borne or will bear in respect of the fees and expenses of the arbitrators, the SCC Institute, legal counsel, experts and consultants, and its own internal costs. These claims will be further addressed in Claimant's submissions for costs."* (emphasis omitted)

148.    In its first and second post-hearing briefs, Claimant repeated these prayers for relief.

## II.    **Respondent**

149.    In its Statement of Defence, Respondent requested as follows:

> "61.    The claim 49 (1) must be rejected. CPC has no right to participate beyond its current share in the Joint Activity.
>
> 62.    The claims in 49 (2) and 49 (3) must be rejected. The JAA entails no right for CPC to 'top up' its investment.
>
> 63.    The claim in 49 (4) must be rejected. By competent decisions, the Joint Activity is limited to the eight wells currently operated and one well under construction.
>
> 64.    The claim in 49 (5) must be rejected. CPC has suffered no damage. CPC has received revenues in accordance with its investments. CPC is also not entitled to seek lost profit due to the limitation of damages established by Article 20.1 of the JAA.
>
> 65.    The claims in 50 (1) and 50 (2) must be rejected. UKRNAFTA is not in breach of the JAA and there is no right for CPC to terminate the JAA.
>
> D.    Counterclaims
>
> D.1.    Relief sought
>
> 66.    UKRNAFTA seeks a declaration that it is entitled to terminate the JAA due to CPC's non-performance to date and 'substantial change in circumstances'.
>
> 67.    In addition, UKRNAFTA seeks a declaration that CPC is liable to compensate UKRNAFTA for damages, due to its non-performance of the JAA as well as for moral damages caused to the good-standing of Ukrnafta."

150.    In its Rejoinder, Respondent submitted the following request for relief:

> *"In all the circumstances, it is denied that that the Claimant is entitled to any relief."*

151.    In its first post-hearing brief, Respondent sought the following relief:

> *"603.    The primary case is that there are complete defences as to liability as above, and so the Tribunal need not consider or rule on the question of damages at all.*
>
> *604.    The secondary case is that in any event for the numerous reasons set out above, CPC has failed to establish that any loss flows from any breach of the JAA."*

152.    Respondent's second post-hearing brief does not contain any prayers for relief.

## G.    APPLICABLE LAW

153.    The penultimate sentence of Art. 20.4 of the Consolidated JAA[41] – set out in detail in para.54 above – reads:

> *"The resolution of disputes shall be governed by the substantive laws of Ukraine – the country, where the performance of this Agreement takes place."*

---

[41] Exh. C-1.

## H.    JURISDICTION OF THE ARBITRAL TRIBUNAL

154.    On 22 April 2009, the Arbitral Tribunal rendered a decision on jurisdiction in which it determined that it was competent to decide the dispute which is the subject of this arbitration. It confirmed its jurisdiction based on the fact that by engaging in these arbitration proceedings prior to 19 December 2008 without reservation, Respondent entered into an arbitration agreement with Claimant which serves as an independent basis for the jurisdiction of this Tribunal.[42] Respondent's objection to jurisdiction was rejected based on the fact that it "was untimely in light of Art. 24(2)(ii) SCC Rules" and that "Respondent's objection against the existence, validity and applicability of the arbitration agreement has consequently been made too late to be successful"[43]. However, the Tribunal also stated that it "does not find it necessary or appropriate at this stage to address Respondent's further jurisdictional objections, based on the alleged absence of any arbitration agreement with Claimant"[44]. Consequently, the question which company concluded the JAA and subsequent amendments with Ukrnafta and whether they are valid has not been previously decided and will thus – in light of Respondent's assertions in this regard – be addressed below.

## I.    THE PARTIES TO THE JOINT ACTIVITY AGREEMENT

155.    As mentioned above, the Arbitral Tribunal rendered a decision on jurisdiction in this matter on 22 April 2009 confirming its jurisdiction in this matter. Nevertheless, and independently of this confirmation, Respondent maintains that Claimant today has no rights under the JAA against Respondent since the contracting party to the JAA was CPC as a company incorporated in Texas. However, since this party ceased to exist on 22 July 1996, a different company, namely CPC incorporated in Delaware ("CPC-DE") is now Claimant, asserting to be the successor to the business of CPC-TX by way of merger. Respondent states correctly that *"[w]hilst the Tribunal has ruled on the question of its jurisdiction, that is not the same issue as the Contracting Party issue. [...] It follows*

---

[42] See Decision on Jurisdiction dated 22 April 2009, para. 74.
[43] Ibid., para. 75.
[44] Ibid., para. 76.

*that the Tribunal has not ruled on the defence as to whether CPC-DE was a party to the JAA in its original form or as amended (within which was contained the original arbitration provision)"* [45]. The Arbitral Tribunal will address the identity of the Parties to the JAA below.

1.    Respondent's Position

156.    Respondent points out that the issue is whether or not CPC-DE is able to sue upon the JAA as amended. The Parties to the JAA on 14 September 1995 were CPC-TX and PNG. On 18 July 1996, CPC-DE was incorporated whereupon on 22 July 1996, CPC-TX ceased to exist by way of its merger with CPC-DE. As a result, so Respondent asserts, CPC-TX ceased to exist as a legal entity and to possess the powers granted to corporations under Texas law, including the power to sue and to be sued, complain and defend under its corporation name as well as the power to contract or incur liabilities. Nevertheless, on 15 October 1996, PNG and a company which was referred to as the "Company", defined as Carpatsky Petroleum Corporation of "3000 Richmond Ave, Suite 100, Houston, Texas 17098, USA", registered at the State of Texas, USA, allegedly entered into the JAA.[46]

157.    Respondent furthermore contends that insofar as the amended JAA contains a term, namely clause 17.3, to the effect that there could be a transfer of rights to a successor in the event of reorganization, this term did not exist at the time of the merger. Accordingly, it could not be of any effect since the merger had taken place prior to the execution of the amended JAA so that no rights could be acquired on the basis of clause 17.3. Such a term did not exist at the time of the cessation. Thereafter, between 17 December 1996 and 31 March 1997 six Supplementary Agreements were executed as well as various amendments between 14 April 1997 and 23 April 1999, all of which purported to be executed by Leslie Texas as the President of CPC-TX using the seal of CPC-TX and its registration number despite CPC-TX's non-existence. Similarly, on 26 August 1998, CPC-TX as a company which had ceased to exist, executed an Additional Agreement providing for the replacement of PNG by Ukrnafta.[47]

---

[45] Respondent's PHB I, paras. 271 - 272.
[46] Ibid., paras. 275.1 - 275.4.
[47] Ibid., paras. 276 et seq..

158.    Concerning the legal aspects, Respondent relies upon decisions rendered by the courts of Ukraine, in particular that of the Commercial Court of the City of Kiev of 27 May 2009, which was upheld on appeal: the amendments to the JAA were void because they were not properly executed. Respondent contends in this regard that it would not be right, whether as a matter of the Tribunal's discretion, international arbitral comity or otherwise, if the Tribunal in this arbitration reached a different and necessarily conflicting decision. The decision reached by the Ukraine courts should be accorded the highest evidential weight.[48]

159.    Respondent furthermore relies on the evidence of Prof. Kuznietsova who stated that, under Ukrainian law, the amendments to the JAA are null since CPC-DE is not a party to them and that no effective and binding assignment of the rights under the JAA of 1995 took place.[49]

160.    Respondent asserts also in this context that the unamended JAA of 1995 was merely a framework agreement not containing the essential conditions of a binding agreement. Thus, at the time CPC-TX ceased to exist, the above-mentioned details remained to be fixed so that the unamended agreement was not enforceable. As a consequence, CPC-DE cannot enforce the JAA as it was concluded with CPC-TX and no valid assignment has taken place.[50]

161.    Finally, Respondent also contends that although from 2000 the corporate seal of CPC-DE may have been used in respect of protocols and amendments to the JAA, this does not fulfill the requirement of a formal written notice under Ukrainian law. Further, information given concerning the existence of CPC-DE years after the amendments were signed cannot retrospectively make actions effective which were a nullity. Respondent emphasizes in this regard also, that it is irrelevant whether CPC actively misled or intended to mislead Ukrnafta.[51]

---

[48] Ibid., paras. 279 et seq..
[49] Ibid., paras. 287 et seq..
[50] Ibid., paras. 294 et seq..
[51] Ibid., paras. 297 et seq..

2.     Claimant's Position

162.   Claimant opposes Respondent's assertions on this issue based on the contentions that Respondent was informed of the merger of CPC-TX and CPC-DE, that it knew that it was dealing with a Delaware corporation, and that the post-merger amendments to the JAA were executed by Mr. Texas on behalf of CPC-DE. Also, so it asserts, CPC-DE validly succeeded to CPC-TX's rights under the JAA, and Ukrainian law, as in force at the time, did not require any kind of formalities to be complied with for the merger and legal succession to take effect.[52]

163.   In particular, Claimant asserts that it is simply false that it deliberately failed to notify Respondent that CPC-TX had ceased to exist and had been replaced by CPC-DE. Relying upon various occasions on which Respondent could have become aware of who its counterparty in the JAA was, as well as upon Mr. Texas' testimony during the hearing, Claimant contends that Respondent was well informed both of CPC-DE's existence and its merger with CPC-TX. In addition, Mr. Texas, called by the Respondent,  testified that there was never any intention on CPC's part to deceive Respondent. He explained that the change of CPC's state of incorporation from Texas to Delaware was mostly done for tax and corporate law reasons. However, the merger had no impact on outstanding rights and obligations of CPC vis-à-vis Respondent and the business dealings continued without any change as before.[53]

164.   Moreover, Claimant contends that Ukrnafta did not appear to take issue with the merger, or to think that it would affect the Parties' rights and obligations under the JAA. Ukrnafta did not require any formalities to be complied with, nor that CPC formally notify the merger. Hence, Respondent was fully informed and willing to continue doing business with CPC-DE under the JAA after the merger.[54]

---

[52] Claimant's PHB I, para. 550.
[53] Ibid., paras. 553 et seq. quoting in particular the following passage of Mr. Texas' testimony: "Ms. Horrigan: *Are you aware that in this arbitration, Ukrnafta is claiming that you deliberately deceived Ukrnafta by hiding the fact that there has been a change from Texas to Delaware.?* Mr. Texas: *I am surprised to hear that because I didn't deceive anybody nor try to deceive. In fact, I clearly explained to, at that time, the foreign relationship department chief, Mr. Kusch, that we changed the corporate structure just simply because of these advantages what the Delaware set-up means. And nothing changed: the same people he personally met before, he knew the key shareholders, nothing changed.*" Transcript, Day 2, 136:13-24.
[54] Ibid., paras. 557 et seq. with reference to Mr. Texas' testimony during the hearing.

165.    Claimant contends that extensive contemporaneous documentary evidence exists which shows that Respondent knew well before November 2008 that it was dealing with a Delaware corporation.[55]

166.    Claimant furthermore asserts that CPC-DE validly executed the amended and restated JAA in 1996 and all subsequent amendments thereto in its own right. CPC-DE is the signatory to the amended and restated JAA as well to the amendments thereto. It is untrue that CPC-TX and not CPC-DE signed those as claimed by Respondent. Although Respondent does not dispute that Mr. Texas was the President of CPC-DE or that he was duly authorized to enter into agreements on behalf of CPC-DE, it nevertheless contends that the amendments concluded after July 1996 were signed by Mr. Texas on behalf of CPC-TX rather than CPC-DE and that, as a consequence they should be void since CPC-TX had ceased to exist. Mr. Texas himself however never testified that he entered into the post-merger agreements on behalf of CPC-TX, on the contrary.[56]

167.    Furthermore, so Claimant argues, the fact that CPC's former address in Texas was mentioned in the amendment to the JAA signed on 15 October 1996 and that the term "Company" was defined as Carpatsky Petroleum Corporation, registered at the State of Texas is not sufficient to conclude that Mr. Texas signed this agreement on behalf of a company which had technically ceased to exist since the reference section of the JAA cannot be controlling as to the identity of a party. This is particularly true in circumstances where this section of the 1996 amended version of the JAA was drafted by Mr. Peday, a non-lawyer, in a rush.[57]

168.    Also, the fact that Mr. Texas executed subsequent agreements and amendments as well as an addendum by using the seal and registration number of CPC-TX until 2000 does not support Respondent's position. The use of a wrong seal does not invalidate a contract under US law and does not change the identity of the contracting party. Agreements do not have to be sealed to be valid under Delaware law at all.

---

[55] Ibid., paras. 561 et seq. with references to numerous pieces of correspondence between the Parties as well as documents, for example powers of attorney.
[56] Ibid., paras. 585 et seq..
[57] Ibid., paras. 593 et seq. with particular reference to the testimony of Mr. Peday during the hearing, Transcript, Day 2, 58: 22-24 and 62: 7-13.

169.  Claimant contends furthermore that it was neither obliged to notify Respondent – although it did do so – of the merger nor to seek its consent thereto. By reason of the merger alone, CPC-DE automatically succeeded to the rights and obligations of CPC-TX including those under the JAA and such succession was effective vis-à-vis Ukrnafta. This conclusion, so Claimant contends, also prevails under Ukrainian law.[58]

170.  It is not disputed between the Parties that under Ukrainian law the legal capacity of a foreign company shall be governed by the laws of the country where such legal entity is established. Furthermore, it is not disputed that CPC-TX was merged into CPC-DE and that thus CPC-DE automatically succeeded to CPC-TC rights and obligations. Finally, it is not disputed that under the JAA, CPC-DE was not required to notify Ukrnafta of its corporate reorganization. To the contrary, in Art. 17.3, the Parties confirmed that they did not intend to impose any notice requirement in case of succession under the JAA.[59]

171.  Claimant contends that also under Ukrainian law, it was not required to give notice to Respondent concerning this merger. Art. 37 of the Civil Code of Ukraine which was in force at the time of the merger in 1996, provides that the rights and obligations of a merged company devolve to the surviving company automatically in case of a merger.[60] Although Respondent's legal expert argued that this Art. 37 did not apply to non-Ukrainian companies, she emphasized that the provisions of Art. 576 of the CC of UkSSR stated that the legal capacity of foreign companies shall be determined according to the law of a country where such a company or an organization was incorporated. Thus, Respondent's legal expert confirms that the consequences of the merger are governed by US law as argued by Claimant and that the present merger was valid under US law. Ukrainian law also does not contain any provisions which apply by analogy and thus require the notification as argued by Respondent.[61]

---

[58] Ibid., para. 600; Respondent simply states in relation to this position of Claimant, that it is irrelevant, however, it does not contest it. See Respondent's PHB II, paras. 627 et seq.; Respondent's expert, Prof. Kuznietsova also did not disagree. See expert report of Prof. Kuznietsova dated 6 July 2009, para. 6.1.
[59] Ibid., paras. 602 et seq..
[60] Ibid., paras. 610 et seq. with reference to Art. 37 of the "old" Ukrainian Civil Code which reads *In the event of the merger and splitting up of legal entities, the property (rights and obligations) shall pass on to the newly emerged entities. In the event where a legal entity joins another legal entity, its property (rights and obligations) shall pass to the latter. The property shall pass as of the day when the transfer balance sheet is signed, unless a law or the resolution, providing for reorganization, envisages otherwise.*
[61] Ibid., paras. 614 et seq..

172.    Claimant also contends in relation to this issue that Respondent is time-barred from raising the "contracting party issue" since the latter cannot legitimately argue that it was unaware of CPC-DE's succession to rights and obligations under the JAA until 2008. The period of limitations for contractual claims of this nature is three years from the date when the injured party knew or should have known of the facts giving rise to its claims. Here, the record shows, so Claimant asserts, that Respondent has known or should have known at least since 2000 that CPC was a Delaware company. Respondent's argument in that regard, that the statute of limitation does not apply to its "contracting party claim" since the latter is made in defence, violates the basic principles of fairness, due process and equality of arms applicable in any legal system. Accordingly, so Claimant asserts, the statute of limitations applies to both claims and counterclaims.[62]

173.    With regard to Respondent's contention that the JAA is merely a framework agreement and thus not detailed enough to create enforceable rights and obligations for the Parties concerning the RC Field, Claimant asserts that the concept of such a framework agreement does not exist under Ukrainian law. Respondent has not pointed to any definition of a framework agreement under Ukrainian law, or to any provision required under Ukrainian law that the JAA fails to include which would result in its invalidity. Respondent's position regarding the "framework agreement" does neither reflect the current state of Ukrainian law nor the intention of the Parties who clearly accepted to be bound by the JAA.[63]

174.    Claimant finally contends that the JAA is a contract which binds both Parties. It is quite normal for the constituent documents of a joint venture or joint activity to set up the base structure of the company or project and to envisage that specific corporate organs, such as the management committee, will adopt certain decisions such as annual budgets and resolutions on the day-to-day management of the company or project. In those circumstances, the constituent documents of the joint venture or joint activity are not considered mere "framework agreements" but are instead binding contracts with full force and effect. Under Respondent's theory, however, no shareholders' agreement or corporate charter could ever create any rights and obligations.[64]

---

[62] Ibid., paras. 625 et seq..
[63] Ibid., paras. 631 et seq. with particular reference to the testimony of Prof. Kuznietsova (Transcript, Day 4, 43:4-9) and Mr. Peday (Transcript, Day 2, 58:7-9).
[64] Ibid., paras. 636 et seq..

### 3.     Decision of the Arbitral Tribunal

175.     Having duly considered the evidence before it in relation to the positions of the Parties on this issue, the Arbitral Tribunal is of the view that Claimant is a proper party to the JAA which is a full agreement, not a mere framework agreement.

176.     The Arbitral Tribunal notes that the Parties appear to agree with regard to the so-called contracting-party issue: first, it is not disputed that under Ukrainian law the legal capacity of a foreign company shall be governed by the laws of the country where such legal entity is established.[65] Second, it is not disputed that CPC was originally incorporated in the state of Texas on 17 November 1992, that on 18 June 1996, a new CPC was incorporated in Delaware and immediately thereafter a Certificate of Merger of CPC Texas into CPC Delaware was filed stating that CPC-DE was the "surviving corporation" of the merger.[66] Thus, on 22 July 1996, Articles of Merger were also filed in Texas. It is furthermore not disputed that under Delaware law, CPC-DE automatically succeeded to CPC-TX's rights and obligations.[67] Respondent appears to concur with this analysis as it submitted a legal opinion which reads in material part:

> "Upon the filing of the Articles of Merger with the Secretary of State of the State of Texas on July 22, 1996, Carpatsky (TX) was merged with and into Carpatsky (DE), with Carpatsky (DE) as the surviving corporation, and that, as of such date, Carpatsky (TX) ceased to exist as a legal entity, separate or otherwise; all rights, title and interests to all real estate and other property owned by Carpatsky (TX) were allocated to and vested in Carpatsky (DE) without reversion or impairment, without further act or deed, and without any transfer or assignment having occurred, but subject to any existing liens or other encumbrances thereon; and all liabilities and obligations of Carpatsky (TX) were allocated to Carpatsky (DE) in the manner set forth in the Articles of Merger, and Carpatsky (DE) became the primary obligor therefore and, except as otherwise set forth in the Articles of Merger or as otherwise provided by law or contract, no other party to the merger, other than Carpatsky (DE) became liable therefore."[68]

---

[65] Art. 567 of the Civil Code of Ukraine of 1963, Exh. C-154.
[66] See Exh. C-83.
[67] Indeed, Art. 259 of the Delaware General Corporation Law provides that upon the adoption of the Agreement of Merger by the constituent corporation, the surviving corporation succeeds to all rights, privileges, powers, debts and duties of the constituent corporation and that such debts, liabilities and duties shall attach to the surviving corporation and "may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it". At the same time, pursuant to Art, 5.06 of the Texas Business Corporation Act, the Articles of Merger filed in Texas on 22 June 1996 took effect upon their certification by the Secretary of State of the State of Texas that same day. As soon as this step had occurred, "all liabilities and obligations" of CPC-TX were automatically acquired by the entity surviving the merger, i.e. CPC-DE, as a matter of Texas law as well.
[68] Legal Opinion prepared by Baker & McKenzie, Dallas, Texas dated 9 December 2008, Exh. 2 to Respondent's Submission dated 19 December 2008, p. 2.

177.  Consequently, and on the basis of the aforesaid, CPC-DE was the successor of CPC-TX and with the merger acquired all of the latter's rights and obligations. However, it could only be the successor to those rights and obligations which existed at the time when CPC-Texas ceased to exist, i.e. on 22 July 1996. At that time, the Parties had concluded the original JAA, but the subsequent Restated JAA was concluded on 15 October 1996 and further addenda were concluded thereafter. Hence, while Claimant could, due to the succession in rights and obligations, execute the subsequent agreements, it only became a party to those agreements if they were validly concluded on its part.

178.  However, Respondent asserts that it was in fact CPC-TX and not CPC-DE that entered into the Restated JAA and further addenda although CPC-TX had ceased to exist. This lack of legal capacity led in Respondent's opinion to the result that the Restated JAA as well as further addenda were never validly concluded. Respondent relies in this regard on the argument that the mentioned agreements, signed by Mr. Leslie Texas as President of CPC, were stamped with a seal carrying the registration number of CPC-Texas which, at that time, did no longer exist.

179.  Claimant concedes that until the year 2000, the agreements at issue carry a seal with the registration number of CPC-TX although this company no longer existed. It was only from 2000 that CPC used a seal indicating the proper identity of CPC-DE.[69] It contends however that as a matter of Delaware law, under which CPC operated from July 1996, the signature of an authorized officer of the corporation is in itself sufficient to bind the corporation. In particular, Sections 103(a)(2)(a) and (b)(2) of the General Corporation Law of the State of Delaware provide that such an authorized signature *"shall constitute the affirmation or acknowledgement of the signatory under penalty of perjury that the instrument is [...] act and deed of the corporation, and that the facts stated therein are true."* All that is necessary for a document to be enforceable is *"the signature, without more, of the person signing the instrument"*[70]. Hence, the use of a seal, be it the right or wrong one, is irrelevant as a matter of Delaware law.

---

[69] See Claimant's PHB I, para. 599 which has not been disputed by Respondent.
[70] General Corporation Law of Delaware, Annex 7 to Claimant's Submission of 12 January 2009.

180. Furthermore, Claimant asserts that pursuant to Art. 8.01 of the Bylaws of CPC, the President of CPC has the authority to execute contracts on behalf of the company.[71] Since both the restated JAA and the Addendum were signed by Mr. Leslie Texas as President of CPC-DE, these agreements are valid and legally binding.

181. The Arbitral Tribunal considers Delaware law as the law relevant to determine whether CPC-DE could validly enter into a contract even though the seal wrongly indicated CPC-TX. Although Ukrainian law is the law governing the merits of the contractual dispute between the Parties, the issue of capacity and authority of a company incorporated in Delaware to validly enter into a contract is governed by Delaware law.

182. Similarly, the Arbitral Tribunal is of the view that the issues of CPC-DE's capacity and authority to enter into an arbitration agreement are governed by the law of Delaware. Concerning the choice-of-law question relating to the law applicable to issues of authority and capacity to enter into an arbitration agreement, the majority of commentators and decisions has come to the conclusion that the law at the place of incorporation governs these issues. The Arbitral Tribunal follows this approach, therefore applying the law of Delaware.[72]

183. As explained by Claimant and not disputed by Respondent, the law of Delaware stipulates that the signature of an authorised officer is sufficient to bind the company. Mr. Texas as President of CPC-DE was such an authorised officer. This is also reflected in Art. 8.01 of CPC-DE's Bylaws. Both the restated JAA of 1996 and the further addenda referred to by Respondent, in particular the Addendum of 1998 containing the arbitration clause, carry his signature. Therefore, the Tribunal concludes that pursuant to Delaware law, CPC-DE was bound by and party to these agreements.

184. The Tribunal's analysis is supported by the testimony of Mr. Texas himself who stated during the hearing that he acted as President of CPC:

---

[71] Bylaws of CPC, Annex 4 to Claimant's Submission of 12 January 2009.
[72] See G. Born, *International Commercial Arbitration*, 2009, Volume I, pp. 552 et seq..

> "*Mr. Texas:*   *Yes, that's my signature.*
>
> *Ms. Horrigan:*  *And you were signing this document as president of Carpatsky Petroleum?*
>
> *Mr. Texas:*   *Yes, ma'am.*
>
> *Ms. Horrigan:*  *The new Delaware company?*
>
> *Mr. Texas:*   *Whatever, I didn't pay attention. It was continued the same entity, it was just what we considered a minor formality change, no whatsoever any other reason.*" [73]

185.  Respondent has argued that because the seal on the relevant agreements was the seal of CPC-TX  it was CPC-TX which entered into these agreements. The Arbitral Tribunal does not share this view. As set out above, pursuant to Delaware law, the signature of an authorised officer of the company was decisive in order to enter validly into an agreement. The seal of the company is not a criterion which carries weight in this regard. Therefore, the fact that the agreements at issue carry a seal showing the registration number of CPC-TX, a company no longer in existence at the time, does not legally establish that the agreements were concluded by CPC-TX. Mr. Texas was the authorised officer of CPC-DE and not of CPC-TX when he signed the restated JAA and the Addendum. Thus, CPC-DE has become a party to these contracts. The use of a wrong seal is legally irrelevant regarding an agreement validly signed. [74]

186.  Respondent places emphasis on the fact that Claimant should have notified it about the merger and the fact that CPC-TX ceased to exist when it was merged into CPC-DE. [75] The Arbitral Tribunal notes that the JAA does not contain a requirement according to which Claimant needed to notify Respondent of its corporate reorganization. The Tribunal shares Claimant's view that if the Parties had intended that a corporate reorganization and succession in interest under the JAA should be notified to the other

---

[73] Transcript, Day 2, 141:7-14.
[74] In addition to the case law cited in Claimant's submissions on this point (see fn. 1 above), the Arbitral Tribunal questioned Claimant on this point intensively during the hearing on jurisdiction, see Transcript, pp. 21: 9 - 23:10, in particular p. 22:17-22 of the Transcript of the hearing on jurisdiction. Respondent has not submitted any legal authorities to the contrary.
[75] Mr. Freedman, Counsel for Respondent stated : "*The position is that we say that under Ukrainian law, even if there is a valid merger according to foreign law, what is required is that notice of that must be given to the counterparty in Ukraine.*"Transcript, Day 1, 56: 22-25.

side, they could have stipulated to that effect.[76] Instead, Art. 17.3 confirms the Parties' intention that in the event of a reorganization of a party, the rights and obligations of that party under the JAA will pass to its successor – without the requirement of notice to or even consent of the other party. Respondent rightly points out that this provision is only contained in the Restated JAA – which is void in Respondent's view - but not in the initial JAA. However, also the initial JAA contained a provision in its 'Definitions' pursuant to which "Parties shall mean Poltavanaftogaz and Carpatsky Petroleum Corporation, the original parties hereto, and any legal entities and individuals that will further join this Agreement".[77] These several provisions demonstrate in the eyes of the Tribunal the clear intent of the Parties to not restrict the concluded agreements to the initial parties. They clearly envisaged circumstances in which the parties to these agreements might change without also stipulating that in those circumstances a special notification was required.

187.    The Tribunal is also not convinced that Claimant was required to notify Respondent about its reorganization as a matter of Ukrainian law as is asserted by Respondent. Under Art. 37 of the Civil Code of Ukraine, in effect at the time of the merger in 1996, the rights and obligations of a merged company devolve to the surviving company automatically in case of a merger. The article reads:

> "In the event of the merger and splitting up of legal entities, the property (rights and obligations) shall pass on to the newly emerged entities. In the event where a legal entity joins another legal entity, its property (rights and obligations) shall pass to the latter. The property shall pass as of the day when the transfer balance sheet is signed, unless a law or the resolution, providing for reorganization, envisages otherwise." [78]

188.    Also, Respondent's legal expert Prof. Kuznietsova agreed that under Ukrainian law in force at the time of the merger, no provision required notice in case of such a merger, however, she attempted to establish such a requirement by way of analogy:

> "The CC of UkSSR did not provide for the certain procedures that pertained to the reorganization (winding up) of legal entities and the ensuing succession, but a general conclusion as regards these procedures can be drawn on the basis of the analogy of laws, which is being considered as one of the mechanisms for eliminating gaps in legal regulation." [79]

---

[76] See Claimant's PHB I, para. 608.
[77] See Exh. R-2 to Respondent's Statement of Defense dated 23 June 2008.
[78] Legal Opinion of Prof. Kryvolapov dated 20 August 2009, p. 7, not disputed by Respondent.
[79] Legal Opinion of Prof. Kuznietsova dated 6 July 2009, p. 37.

189.    In order to construe an analogy, Prof. Kuznietsova relied in particular upon Art. 198, 199 and 200 of the Old Civil Code as well as 105 and 107 of the New Civil Code.[80] However, as pointed out by Claimant's legal expert:

> "[…] none of these Articles contains provisions to the effect that any additional agreements must be entered into or other steps taken in order to implement legal succession for a contracting party in an agreement. Articles 198, 199, 200 of the Old Civil Code […] generally govern the matters of replacing parties to an obligation through the assignment of claim and transfer of debt. This is no way related to the legal succession to the rights and obligations upon reorganization of a legal entity that takes place not as a result of an agreement or assignment of claim and transfer of debt […] but rather by a decision of respective owners on reorganization."[81]

He expressed similar reservations regarding the provisions cited from the New Civil Code in analogy by Prof. Kuznietsova.[82] In relation to Art. 37 cited above, Prof. Kuznietsova observed that this provision did not apply to foreign entities.[83] Claimant's expert Prof. Kryvolapov asserted that this was also the case for the other provisions Prof. Kuznietsova relied upon.[84]

190.    The Arbitral Tribunal is not convinced by Respondent's arguments in this regard and the attempt to construe a notice requirement by analogy to other provisions. In considers the arguments raised against this approach in relation to the specific provisions referred to above as powerful. Moreover, it considers that in order for an analogy to be properly justified, the Tribunal would need to be shown that the Ukrainian law contains *lacunae* in this regard, i.e. concerning corporate reorganization, merger and succession into rights and obligations. The evidence before it has not satisfied the Arbitral Tribunal that this is the case. It rather has come to the conclusion that Ukrainian law intentionally does not contain a notice requirement so that the Tribunal will not construe one by analogy.

---

[80] Ibid.
[81] Legal Opinion of Prof. Kryvolapov dated 20 August 2009, p. 8.
[82] Ibid. He stated : *"Similarly, Articles 105, 107 of the Civil Code dealing with termination of a legal entity (which in any event, do not apply to relations that occurred back in 1996) do not require execution of any additional agreements with respect to legal succession upon reorganization".*
[83] Legal Opinion of Prof. Kuznietsova dated 6 July 2009, p. 36.
[84] Legal Opinion of Prof. Kryvolapov dated 20 August 2009, p. 8.

191.    Other provisions which Prof. Kuznietsova considered applicable to the JAA, namely Art. 6 of the Foreign Economic Activities Law[85] and Art. 567 of the Old Civil Code[86], do not contain notice requirements either.

192.    Even if the Arbitral Tribunal had arrived at a different conclusion on this issue, i.e. found that Claimant was legally required to inform Respondent of its reorganization, the Arbitral Tribunal has serious doubts regarding Respondent's assertion that it was not notified. During the hearing in September 2009, Respondent's witness Mr. Texas confirmed that he had informed Mr. Kusch, the deputy  head of Ukrnafta's board of foreign economic relations, accordingly:

> "Ms. Horrigan: Are you aware that in this arbitration, Ukrnafta is claiming that you deliberately deceived Ukrnafta by hiding the fact that there has been a change from Texas to Delaware?
>
> Mr. Texas:    I am surprised to hear that because I didn't deceive anybody nor try to deceive. In fact, I clearly explained to, at that time, the foreign relationship department chief, Mr Kusch, that we changed the corporate structure just simply because of these advantages what the Delaware set-up means. And nothing changed: the same people he personally met before, he knew the key shareholders, nothing changed."[87]

193.    Furthermore, upon being questioned by the Chairman on this point, Mr. Texas confirmed that Mr. Kusch did not require that Claimant make any formal notification concerning its changes to Respondent or that any other formalities of the JAA or Ukrainian law be observed.[88]

194.    During the hearing Respondent did not contest Mr. Texas's testimony. It submitted in its post-hearing brief however that if Mr. Texas had informed Mr. Kusch about the change, Ms. Vasylets, who worked with him, would have also heard about it, which she did not.[89] Respondent also pointed out that Mr. Kusch was working for Ukrnafta and not PNG which was the Party to the JAA at the time. Consequently, even if Mr. Texas spoke to Mr. Kusch about CPC's reorganization, this would not amount to a notification of PNG.[90]

---

[85] Legal Opinion of Prof. Kuznietsova dated 6 July 2009, p. 35; Exh. C-121.
[86] Ibid., Exh. C-154.
[87] Transcript, Day 2, 136: 13-24.
[88] Transcript, Day 2, 157 : 21 - 158 : 9; 158 : 19 - 22.
[89] Respondent's PHB II, para. 651 c.
[90] Ibid., para. 651 b.

195.    Mr. Kusch died in 2000[91] and thus it can no longer be established what he was informed about and what not. However, the Arbitral Tribunal has no reason to doubt Mr. Texas' testimony or even suspect that he was not telling the truth. In view of the fact that the merger took place in 1996, Mr. Texas had the opportunity to speak to Mr. Kusch about this prior to the year 2000. Moreover, there could be many reasons why Mr. Kusch did not pass this information on to Ms. Vasylets. One of them might be that he simply did not think this was anything important, which would be compatible with the statement that he did not think it necessary to submit a formal notification about this. Concerning Respondent's argument, that even if Mr. Texas told Mr. Kusch about the change of CPC's place of registration, this amounted in fact to a notification of Ukrnafta, and not of the Party to the JAA, PNG,. the Arbitral Tribunal considers this a rather formalistic approach. Obviously, already before Ukrnafta officially became a party to the JAA, Mr. Kusch had business dealings with Claimant in his capacity as deputy head of foreign economic relations.  Otherwise Mr. Texas would not have had contact with him. It is hence to be assumed that close relations existed between PNG and Ukrnafta before the Addendum to the JAA was entered into on 26 August 1998, making  Ukrnafta  a formal party to the JAA.

196.    In relation to CPC's change of registration, Respondent has not only asserted that it was not informed thereof but also that Claimant, by not informing Respondent, by using the incorrect seal and by other actions which will be addressed below, misled Respondent on Claimant's proper identity when it concluded the Restated JAA and other addenda., Considering the evidence before it, the Arbitral Tribunal finds, however, that Respondent knew, and in any event could have known, about the change of CPC's place of registration, and there is no evidence of intentional misleading by the Claimant.

197.    The Tribunal finds that Mr. Texas credibly confirmed during the hearing that Respondent was informed about the merger and CPC-DE's existence[92] and that there was never any intention by Claimant to deceive Respondent[93]. In fact, Mr. Texas explained that for him this issue was not of particular importance as in his view, essentially, everything

---

[91] Testimony of Ms. Vasylets, Transcript, Day 3, 21:1 - 2.
[92] Transcript, Day 2, 136: 17 - 24.
[93] Ibid.

remained the same.[94] This explains why during the first years Mr. Texas did not consider it important to use a new seal for CPC-DE:

> "Ms. Horrigan: Did you make a new seal for the company?
>
> Mr. Texas: I don't recall now.
>
> Ms. Horrigan: Did you think it was necessary?
>
> Mr. Texas: No. I tried to be always present, so was everybody else, doing the various trips with Ukrnafta personnel. I met all the shareholders, directors, so nothing changed. I mean, I didn't pay any attention to it. Everything was the same."[95]

Mr. Bensh confirmed that the change in CPC's structure did not affect the business dealings at all because nothing had changed but for CPC's place of incorporation.[96]

The Tribunal notes in this context that whether Mr. Texas considered everything to remain the same, and whether he thought it was important to use a new company seal or not, is not decisive for our finding relating to the issue of corporate identity. It merely shows Mr. Texas' understanding of the situation; an understanding that could be erroneous from a strictly legal point of view.

198.    A further point which Respondent views as proof of Claimant's incorrect conduct in this context concerns the documents Respondent received and which were attached to a letter sent by Ms. Zoya Frolova on 11 November 2006.[97] The letter was sent in response to Respondent's request to CPC's representative office in Kiev of 19 September 2006 to provide documents confirming the authority of Mr. Bensh to act as the president and chief executive of CPC. CPC responded to this request with its letter dated 11 November 2006. With its submission of 12 January 2009, Claimant filed a copy of this letter together with a copy of the certified certificate of incorporation of CPC- DE, a certified copy of the

---

[94] « Ms. Horrigan: Once the change of registration to Delaware had occurred, was there any practical difference in the day-to-day operations of the company?
Mr. Texas: No.
Ms. Horrigan: You were president of the re-registered company?
Mr. Texas: The same thing, absolutely no change.
Ms. Horrigan: So you were still president of the re-registered company?
Mr. Texas: Yes, the same thing.
Ms. Horrigan: And the same board members?
Mr. Texas: Yes, the same thing. The whole corporate entity and operations was the same. The only change was: not Texas but Delaware incorporated."; Transcript, Day 2, 135:15 - 136:2.
[95] Transcript, Day 2, 140 : 12 - 19. Similar: « [...] I didn't pay much attention to the importance of the seal that I put in this document [the Supplementary Agreement of 25 February 1997]. » Transcript, Day 2, 152 : 10 - 12.
[96] Transcript of the Hearing on Jurisdiction, 64 : 20 - 21.
[97] Exh. R-69.

articles of incorporation showing its registration in Delaware, under the seal of Delaware of September 2000, as well as a copy of the resolution of the board of directors of CPC appointing Robert Bensh as president of CPC and enumerating the powers given to him.[98]

199.    Respondent however asserts that it never received the documents Claimant now contends to have sent, but instead the certificate of incorporation and articles of incorporation for CPC-TX from 1992, certified under the seal of the State of Texas of September 1993.[99] Based on the quality of the paper of the documents submitted now by Claimant, certain copying marks as well as the fact that no translations were attached, Respondent also asserts that these documents were not previously sent to Respondent, but only now in the course of these proceedings. Claimant denies these allegations.[100]

200.    The Arbitral Tribunal notes that Claimant admits that it cannot exclude the possibility that wrong documents, i.e. articles of incorporation certified in Texas, were sent to Respondent on 11 November 2006. However, Claimant's witness Ms. Frolova confirmed that if this turned out to have been the case, it would have happened unintentionally and merely by mistake.[101] The Tribunal accepts Ms. Frolova's testimony. Furthermore, Respondent appears not to dispute that it received in 2006 the certificate concerning the role of Mr. Bensh as president, CEO and chairman of the board of directors of CPC, "a company organized and existing under the laws of the State of Delaware, USA" [102]. Hence, the Tribunal finds that Claimant submitted documents which were contradictory and could have raised questions from Respondent as to the former's identity, if this was an issue. Moreover, with respect to the situation in 2006, Claimant's conduct is not compatible with the alleged deliberate attempt to hide the facts from Respondent as the mere reading of the certificate of incorporation allowed Respondent to see that CPC had become a Delaware company.

---

[98] Exh. 9 to Claimant's Submission dated 12 January 2009.
[99] See Respondent's PHB I, paras. 298 - 299.
[100] Claimant submitted a certified translation of 2006 with the same physical characteristics Respondent asserts to be missing in the documents submitted in Exh. 9, see Exh. 36 to Claimant's Submission dated 23 January 2009.
[101] Second Witness Statement of Zoya Frolova dated 26 February 2009, para. 10. See also testimony of Zoya Frolova on this issue during the hearing on jurisdiction, Transcript p. 83:16 - 87:19. She confirmed in her testimony that no copies were kept of the documents sent at the time and that Respondent did not raise any concern at the time.
[102] Exh. 6 to Respondent's Submission dated 19 January 2009.

201.   Moreover, the testimony of Ms. Vasylets, head of Respondent's protocol division as well as deputy head of the external affairs and corporate relations department, revealed to the Arbitral Tribunal that Respondent was more aware of the fact that CPC had changed its place of incorporation than it cares to admit. Ms. Vasylets initially stated that she first learned in November 2008 about the existence of CPC-DE and the fact that CPC-TX had ceased to exist and that these facts very much surprised her.[103] During the course of her examination, it became clear however that she had knowledge about the fact that CPC changed its registration to Delaware already in 2005[104] since on 24 March 2005, she prepared and sent - together with Mr. Drogan - a letter to Mr. Prodan, First Deputy Minister of Oil and Power Energy of Ukraine in which the cooperation with "Carpatsky Petroleum Cooperation (Delaware, USA)" is addressed[105]. The letter further states

> "In 2000, Bellwether Exploration Company, an American entity, became the owner of the company owner of the majority stock in Carpatsky Petroleum Corporation, changed management and appointed Mr. Robert J. Bensh on the position of President of the Company. Carpatsky Petroleum Corporation was re-registered in the sate [sic] of Delaware, USA." [106] (emphasis added)

202.   The record shows numerous additional documents which indicate that from July 1996, CPC was a company incorporated in Delaware. These documents include powers of attorney issued by CPC-DE[107] and letters to the US Embassy in Ukraine in support of visa applications of Ukrnafta's staff[108]. Moreover, the protocols of the Joint Management Committee Meetings regularly carry the seal of CPC-DE which started being used as soon as Mr. Bensh took office in 2000.[109]

203.   **In conclusion**, the Arbitral Tribunal finds that, governed by the law of Delaware, CPC-TX was merged into CPC-DE and ceased to exist on 22 July 1996. With that merger CPC-DE succeeded into all rights and obligations of CPC-TX and thus both became a party to the initial JAA and acquired the legal capacity to enter into the Restated JAA as well as other addenda concluded with Respondent. Therefore, also due to the automatic

---

[103] Transcript, Day 3, 8: 7 - 19.
[104] Transcript, Day 3, 14: 11 - 20:3, in particular when she stated: *"The Chairman: [...] When did you know that there was a registration in Delaware? When? I want the date. Ms. Vasylets: I don't know the exact date, I would assume that it was somewhere in the year 2005 [...]."*15:25 - 16:3.
[105] Exh. R-27, p. 1030.
[106] Ibid., p. 1032.
[107] See Exhs. C-32 - C-34.
[108] See Exh. C-35.
[109] See Exhs. C-5 - C-9.

succession of rights, no issues of assignment arise in this context. Further, there was no contractual or statutory requirement for CPC to notify Respondent of this reorganisation. In any event, it appears very likely that Respondent was informed about this merger at the time. In light of the evidence before it, the Arbitral Tribunal cannot agree with Respondent's assertion that it was misled by Claimant regarding these changes, but, in any event, no relevant conclusion depends on a finding of misleading. Consequently, Claimant validly concluded the Restated JAA as well as the subsequent addenda which are not null and void.

204.    For the sake of good order, the Arbitral Tribunal is not merely considering the legal positions on the validity of the various agreements but also notes that Respondent has not asserted that it suffered harm from the fact that its contractual partner was no longer CPC-TX, but CPC-DE. It notes that since the merger was carried out in 1996, the Parties have actively continued their contractual relationship. The Tribunal further notes that Respondent has not alleged that any particular harm could arise from the merger, or from the alleged absence of information regarding the occurrence of the merger. Finally, and as will be shown below, the Tribunal has not identified any such possible harm.

205.    The fact that CPC was no longer incorporated in Texas had merely legal and tax implications for CPC itself. Nothing in relation to the way that business was conducted with the partners of CPC changed, and even the business address and the staff remained the same, see paras.184, 192 and 197 above.

206.    Moreover, due to the legal nature of the merger, with the newly formed company completely acquiring the rights and obligations of the initial party, the change from CPC-TX to CPC-DE had no impact on Respondent as a creditor of Claimant. For all of Respondent's purposes, it was still dealing with a contracting partner with the same rights, obligations, liabilities and assets.[110] Claimant's financial status under the balance sheet resulting from the merger was unchanged. Thus, Respondent had no reason to believe that the mere change in the state of incorporation of Claimant could have any negative impact on their common project.

---

[110] Hearing on Jurisdiction, Transcript, 112:19 et seq..

207.   Finally, the Arbitral Tribunal notes that in case of bankruptcy proceedings, Respondent would not have suffered any disadvantage as the United States bankruptcy legislation is federal and therefore, if a company ceases its existence in one state, this does not affect the liability for its debts as this liability arises under the federal bankruptcy statute.[111]

208.   The Arbitral Tribunal is aware that its decision is different from the conclusions apparently reached by the Ukrainian Courts. It has taken note of the Parties' assertions and the evidence introduced in this regard. However, it does not consider itself bound by the decisions of a national court. There exists no system of precedence in international commercial arbitration which makes it necessary for one arbitral tribunal to follow the decision reached by another arbitral tribunal on a certain issue. Further, the present Arbitral Tribunal is not bound by the decision of a national court made in circumstances of which the present tribunal is not fully informed. Here, the present Tribunal is faced with allegations that the proceedings Respondent relies upon were conducted in a way which "raises serious questions of due process and equality of arms"[112]. It does not know what claims and  evidence were before the courts, but it takes note of Claimant's assertion that all decisions were reached without the testimony of Mr. Texas.[113] Consequently, the Arbitral Tribunal will not adopt the decisions reached by the Ukrainian courts as to whether CPC-DE validly entered into certain agreements with Respondent.

209.   Finally, the Tribunal has taken note of Claimant's assertion that Respondent's so-called contracting-party claim is time-barred since it falls under the statute of limitation of three years under Ukrainian law (see para.172 above). It has equally taken note of Respondent's defence that this limitation period only applies to rights of action, but not to defences (see para. 172 above). In light of the fact that Respondent did not prevail with the arguments upon which its defence was built, the Tribunal does not consider it necessary to decide this issue.

210.   In relation to its so-called contracting-party defence, Respondent not only contended that CPC-DE did not validly conclude the Restated JAA and subsequent addenda, but also asserted that the initial JAA was a mere framework agreement, thereby submitting that the JAA is not detailed and precise enough to create binding rights and obligations which

---

[111] Hearing on Jurisdiction, Transcript, 101:8 - 24.
[112] Claimant's PHB II, para. 643.
[113] Ibid.

could be transferred to CPC-DE. The Arbitral Tribunal does not share this view for reasons set out below.

211.    Respondent has not pointed the Tribunal to a definition of the concept of framework agreement permitting the conclusion that it actually exists under Ukrainian law:

> *"Ms. Horrigan: Is there a definition of 'framework agreement' under Ukrainian law?*
> *Prof. Kuznietsova: No. A framework agreement is one of the agreements that is not described by Ukrainian law."* [114]

Also, the Parties themselves did not refer to the JAA as a framework agreement by using this term in the Agreement itself. Hence, no support for Respondent's assertion is to be found either in Ukrainian law or in the Agreement reflecting the Parties' intentions. Moreover, Respondent's own witnesses confirmed that they considered the JAA as binding on the Parties.[115]

212.    The Arbitral Tribunal, having studied the JAA, is of the opinion that it meets the criteria of a proper agreement binding the Parties and creating rights and obligations. In particular, it contains the *essentialia negotii* which make it in the Tribunal's eyes an effective and workable contractual instrument. None of Respondent's witnesses identified any essential element, the absence of which prevented this agreement from becoming binding and enforceable. The fact that it might be changed and amended as the Parties went along in order to reflect a progressing business relationship and potentially changing conditions does not change this conclusion. Neither is it unusual for a Management Committee to exist, meeting on a regular basis in order to observe the execution of the agreement on an ongoing basis and passing resolutions which reflect the progress made - or not made - in the Joint Activity.

---

[114] Transcript, Day 4, 43:4 - 7.
[115] For example:
*"Ms. Horrigan: But you wouldn't dispute, would you, that the Joint Activity Agreement created obligations and had legal effect?*
*Mr. Peday: No, I don't believe that anyone would disagree with this. But I believe that the JAA also provided for the fact that in the future there might be new obligations and new legal effects related to new supplements or new agreements that would be adopted within the course of work, implementing the JAA."* Transcript, Day 2, 69:12 - 20.
Similarly:
*"Ms. Horrigan: [...] You mention that you considered the Joint Activity Agreement to be a framework agreement. Did you mean by that that the agreement was not a standalone contract or did you mean simply that there would be additional management functions fulfilled by a management committee?*
*Mr. Texas: No, I simply as an operational person, non-legal minded person, albeit keenly aware of the necessary legal procedures and formats needed, I considered it to be a good working agreement to start with, with the understanding with all partners that as we go on and if changes of certain type is needed, not change the agreement but elements of the agreement, considering working operations and operating issues, we could change it, and we did on several occasions."* Transcript, Day 2, 137: 11 - 25.

J.    CLAIMANT'S CLAIMS

I.    **Limitation of Claimant's Claims**

213.    Before addressing Claimant's claims below, the Arbitral Tribunal will first address Respondent's defence alleging that Claimant's claims are time-barred.

1.    Respondent's Position

214.    Respondent asserts that Claimant's claims are barred by reason of limitation under Ukrainian law since the limitation period is three years from the date when CPC learned or could have learned of the alleged violation of its rights. The loss Claimant asserts to have suffered is lost profits as from 1 April 2004, i.e. the moment it could have invested if it had been permitted to do so. Therefore, and considering the way in which these damage claims are formulated, so Respondent asserts, Claimant must have learned about the alleged violation of its rights latest by 1 April 2004, i.e. more than three years prior to the commencement of these proceedings.[116]

2.    Claimant's Position

215.    Although Claimant concurs that the limitation period for civil claims of this kind pursuant to Art. 257(1) of the Civil Code of Ukraine is three years and that it starts to run as from the date when the claimant knew or should have known of the breach complained of, Claimant disagrees as to when the statute of limitation started running in practice. Respondent has not offered any evidence that CPC actually knew – or should have known – of Ukrnafta's breaches of the JAA as from 1 April 2004. In fact, so Claimant asserts, it did not. Only on 18 April 2005, Respondent informed Claimant about its position regarding CPC's additional investment in new wells and the nine existing wells. It could not have acquired this knowledge before then. Consequently, the statute of limitations did not start to run before that date.[117]

---

[116] Respondent's PHB I, paras. 263 et seq..
[117] Claimant's PHB I, paras. 639 et seq..

216.  Claimant emphasizes that it was only on 18 April 2005 that Respondent informed it that Respondent "believe[d] it to be unreasonable to execute reallocation of shares as per Agreement # 410/95 [the JAA]". Respondent uses the term "reasonable", however, it does not clearly state that Respondent considers that Claimant has no right under the JAA. In addition, in this letter, Ukrnafta proposed to terminate the JAA and buy out CPC's shares. It is thus questionable whether CPC knew or should have known, upon receipt of this letter, that Respondent would not respect its obligations under the JAA. In any event, so Claimant asserts, this was the first time that Respondent formally informed it that it was opposed to CPC exercising its right to further invest in the JAA.[118]

217.  Claimant relies in this regard on the testimony of Mr. Pustovarov who confirmed that it was only in April 2005 that Ukrnafta took a clear position vis-à-vis CPC's repeated demands to bring back its investment in the JAA to 50%.[119] It confirms that one may accept that it was only on 18 April 2005 that Claimant learned about Respondent's position that Claimant could no longer invest in the Joint Activity. Similarly, Mr. Bensh confirmed that CPC did not know in April 2004 that Respondent would deny CPC's right to further invest in the JAA on a 50:50 basis.[120]

218.  Claimant furthermore contends that it could not have known about this before April 2005 since Respondent did not take a clear stance before then. When Claimant offered to contribute new funds to the JAA in March 2004, there was no firm and definitive answer from Respondent. It only responded one year later. Following Claimant's letter, Claimant asserts, the managers of Ukrnafta had undertaken to respect Ukrnafta's obligations towards CPC under the JAA, i.e. in March 2004 Ukrnafta gave assurances that it would abide by the JAA. Also, between March 2004 and April 2005, there were ongoing discussions between the Parties about CPC's additional investment in the JAA in order to bring its interest back to 50%. Consequently, the statute of limitations could not have started running prior to 18 April 2005.[121]

---

[118] Ibid., para. 643 with reference to Exh. C-15.
[119] Ibid., paras. 644 et seq. with reference to Mr. Pustovarov's testimony who stated: *"Up until this stage, Ukrnafta has sought to avoid being openly confrontational with CPC. We were in constant contact with CPC's representatives in respect of the large numbers of matters that had to be dealt with under the JAA. However, at this time, we felt we had no alternative and set out Ukrnafta's position in our letter to them of 18 April 2005. [...] In this letter on behalf of Ukrnafta I explained very clearly to CPC that they did not have the right anymore to invest in the RC Field, though this provision for them to invest in the RC Field had been present in the original agreement."* WS Pustovarov, para. 22; Transcript, Day 2, 116:16-20.
[120] Ibid., paras. 648 et seq. with reference to the testimony of Mr. Bensh, Transcript, Day 1, 76:7-16.
[121] Ibid., paras. 650 et seq. with reference to the testimony of Mr. Bensh who stated: *"[T]he new managers [of Ukrnafta] stated that Ukrnafta would not undertake any actions contradicting the JAA or applicable law, and acknowledged that Ukrnafta would respect decisions as to Joint Activity on the RC Field made by the JAA's Management Committee."* Third WS, para. 47.

219.    Finally, Claimant asserts that it would not have continued sending letters if it had known Respondent's position since April 2004. After its initial offer on 29 March 2004, Claimant kept sending numerous letters to Respondent about its intention to bring its investment back to 50%.[122] Thus, for instance, on 2 September 2004, Claimant wrote that it "had sufficient capital to meet its obligations and to make further investments in Ukraine" and enclosed a work program for 2005 for the RC Field.[123] Similarly, on 9 December 2004, CPC insisted on the "reinstatement of [its] share in the JAA" and "joint development of all Rudovsko-Chervonozavodske field", pursuant to its "contractual right under [the JAA]."[124] Similar letters were sent by CPC on 3 March 2005 and 1 April 2005.[125]

3.    Decision of the Arbitral Tribunal

220.    Having duly considered the positions of both Parties on the issue, the Arbitral Tribunal has arrived at the conclusion that Claimant's claims are not barred by the statute of limitation for reasons as set out here-below.

221.    The Parties agree that this issue falls under Ukrainian law and that the relevant period after which a claim is barred is three years from the moment when the party knew or should have known about the event giving rise to the claim.

222.    Having looked at the evidence before it, the Tribunal is of the view that it is not clear beyond doubt that Claimant knew or could have known on 1 April 2004, or even prior to 28 September 2007, i.e. when the Request for Arbitration was filed, that Respondent denied Claimant the rights Claimant now asserts in these proceedings.

223.    During 2004, Claimant sent several letters to Respondent with detailed proposals for its investments in the RC Field on the basis of the JAA.[126] These letters did not receive a written answer from Respondent. At the same time, during the meeting of the Management Committee of 19 October 2004, the Parties agreed to "jointly work through

---

[122] Ibid., paras. 659 et seq..
[123] See Exh. C-11.
[124] Exh. C-12.
[125] Exhs. C-30 and C-13.
[126] See letters of 29 March 2004 (Exh. C-10), 2 September 2004 (Exh. C-11) and 3 December 2004 (Exh. C-12).

and approve by the MCM the JIA #410/95 2005 Work Program"[127]. Similarly, during the Management Committee Meeting of 10 February 2005, the Parties decided "to approve 'Work Program of JIA in the wells of Rudivsko-Chervozavodske field under the JIA Agreement #410/95 dd. 14.09.1995 for the year 2005' attached as Annex 2 to the Protocol"[128], i.e. during these meetings Respondent did not refuse to allow Claimant to invest.  Only on 18 April 2005, Respondent finally responded to Claimant and stated – as mentioned in para. 47 above - that it considered Claimant's "demands [...] to be tactless" and added that "we believe it to unreasonable to execute reallocation of shares as per Agreement # 410/95"[129]. Hence, although this letter indicates Respondent's position, it still does not take an unequivocal stance rejecting Claimant's alleged rights.

224.    Consequently, and in light of the aforesaid, the Arbitral Tribunal finds that there is at least ambiguity with regard to the position taken and expressed by Respondent. The Arbitral Tribunal does not find any evidence that Claimant knew or could have known prior to 28 September 2007 that Respondent refused its proposed investments into the RC Field. Finally, the fact that Claimant bases the calculation of its losses on the date of 1 April 2004 is in the Tribunal's view not related to this issue, but is rather a problem of quantum in these proceedings and thus will be addressed there. The Tribunal will now address in turn the two claims advanced by Claimant.

## II.    Respondent's asserted breach of the JAA through unilateral exploitation of the RC Field and preventing CPC from participating in the development of new wells on the field on a 50:50 basis

### 1.    Claimant's Position

225.    The basis of this claim is Claimant's contention that the JAA by its express terms covers the entire RC Field, with the exclusion only of a limited number of specifically identified wells. Thereby, the JAA prohibits either party from undertaking unilateral action on the field outside of the confines of the JAA, and provides each party with a right to participate on a 50% basis in each new well drilled on the field. In that regard, the Parties never

---

[127] See Protocol, Exh. R-6, p. 1008.
[128] See Protocol, Exh. C-31, p. 1023.
[129] Exh. C-15; see also Mr. Pustovarov's testimony on this point who confirms that only in spring 2005, Respondent replied to Claimant. Transcript, Day 2, 113:12 - 116:20.

agreed to limit the scope of the JAA to eight or nine wells. Nevertheless, Respondent engaged in unilateral exploitation of the RC Field and thus breached the JAA.[130]

226.   The terms of the JAA clearly stipulate that it extends to the entire RC Field and that they prohibit unilateral development of the RC Field outside of the parameters of the JAA. In this regard, Claimant refers specifically to the definition of the "Joint Activity" as set out in para. 11 above.[131] Claimant contends that the Parties agreed under the JAA to *"pool their money, material, labour resources, technological and economic potential in order to achieve the objectives of the Joint Activity".[132]* These objectives include, inter alia, *"implementation of join* [sic] *investment activity to build the necessary production capacities for utilization of the Rudivsky-Chernovodskaya gas condensate field"* and *"implementation of joint production and commercial activities related to the production of gas and condensate in the process of exploration and development of the Rudivsky-Chernovodskaya gas condensate field".[133]*

227.   Claimant also points out that the JAA refers to investments under the JAA as being used *"in the process of development of the Rudivsky-Chervonozovodsky oil and gas condensate field"*, that it talks of "Exploration", "Development" and "Prospecting" of "the Rudivsky-Chervonozavodsky gas condensate field" as a whole and that the Parties are to share through the JAA in all *"Hydrocarbons of the Joint Activity"* other than those volumes which are produced *"from wells constructed prior to the conclusion of this agreement on condition that at such wells no work will be performed at the expense of Joint Funds for the purpose of intensifying the inflow of hydrocarbons".[134]*

228.   Claimant refers further to the Joint Activity Programs (also called Work Program), adopted on an annual basis to carry out the Joint Activity, which are to cover all planned activities with regard to the RC Field and each of which constitutes a *"[...] work program for a fiscal year, based on projects of exploration and utilization of the field, which shall include industrial and geophysical exploration of wells and layers, a complex of works to drill operational wells, capital repairs of wells, construction and operation of facilities for*

---

[130] Claimant's PHB I, para. 57.
[131] Ibid., para. 58.
[132] Ibid, para. 59, with reference to Exh. C-1, Art. 1.3.
[133] Ibid, with reference to Exh. C-1, Art. 1.2.
[134] Ibid, para. 60, with reference to Exh. C-1, pp. 123, 124, 127.

*gathering, transportation and preparation of the products*".[135] Only to the extent that the Parties have certain disagreements with regard to the principal positions of the Joint Activity Programs, then those works "may be singled out as Higher Risk Operations […]" which may be performed unilaterally by a participant at its own expense and risk, however, if such operations are profitable, then the Hydrocarbons produced from such wells are nevertheless to be included within the scope of the JAA after recovery by the initiator of twice the value of its incurred costs for such wells.[136] Consequently, Claimant refers to Art. 7.6 of the Consolidated JAA which reads:

> "The Participants shall have no right to perform at the Rudivsky-Chervonozavodsky field any work not stipulated by the Joint Activity Programs and not allocated as Higher Risk Operations."

Similarly, the JAA specifically obligates Ukrnafta *"[t]o use the license for the development of the Rudivsky-Chervonozavodsky field in the interest of the Joint Activity".*[137]

229.   Claimant also contends that the JAA provides that participants have the right to participate in all investments in new wells on the field on a 50:50 basis, irrespective of their actual share at the time the investment was made, thereby relying upon Art. 2.6 which states:

> "In future, investments of the Joint Activity will be extended by the Participants in compliance with the Joint Activity Programs [Work Programs] subject to the portions indicated in Section 2.1.

Art. 2.1 referred to states in turn:

> "The Participants have intentions to invest into the Joint Activity concerned with the exploration and development of the Rudivsky-Chervonozavodsky gas condensate field in the following proportions:
> -   PJSC Ukrnafta - 50%
> -   Carpatsky Petroleum Corporation - 50%."

---

[135] Ibid, para. 61 with reference to Exh. C-1, p. 124.
[136] Ibid, para. 63 with reference to Exh. C-1, Art. 7.5.
[137] Ibid, para. 67 with reference to Exh. C-1, Art. 6.2.2.

230.    Furthermore, Claimant refers to witnesses which confirm that the JAA was intended to cover the entire RC Field, in particular Mr. Texas[138], Mr. Pustovarov[139], both for Respondent, and Mr. Bensh[140] for Claimant.

231.    Moreover, Claimant denies that the Parties subsequently agreed to limit the scope of the JAA to nine wells. First, Claimant contends that such a change to the JAA required an amendment signed by both Parties, which never occurred. Second, the scope of the JAA was not changed through decisions of Management Committee Meetings. The Management Committee simply did not have the power to do so and, in any event, there was never any decision by the Management Committee to limit the scope of the JAA to nine wells.[141]

232.    With regard to its assertion that the Parties never amended the JAA to reflect a limitation to nine wells, Claimant refers to Art. 22.1 of the JAA which reads:

> *"By mutual consent of the Participants, this Agreement may be amended and supplemented, including, but not limited to, the involvement of other Participants to the Joint Activity."*

At the same time, Ukrainian law provides that any amendment to an agreement must be executed in the same form as that in which the original agreement was executed, i.e. an agreement in writing can only be amended in writing.[142] Claimant asserts that since the Parties never signed any amendment in writing, the scope of the JAA was never amended in a form that could be binding upon the Parties. Consequently, the JAA continues to cover the entire RC Field.[143]

---

[138] Horrigan: *Do I correctly understand that the intention on execution of the joint activity was that it would cover the entire field?* Mr. Texas: *Yes, that's correct.* Transcript, Day 2, 138: 14 - 18.
[139] Pustovarov : *From the beginning, yes, the JAA envisaged cooperation over the R-C field. There was no limitation whatsoever in it.* Transcript, Day 2, 125: 14 -18.
[140] Bensh : *Oh, absolutely, it [the JAA] covered the whole field. […] The JAA is very specific; it covers the RC Field. There were wells that existed prior to the development of the RC Field. Those wells are excluded.* Transcript, Day 1, 65:24; 81: 2-4.
[141] Claimant's PHB I, para. 76 et seq.
[142] Claimant's PHB I, para. 80 - 81, with reference to Art. 654 of the Civil Code of Ukraine, Exh. C-65, and the Expert Report of N. Kuznietsova dated 6 July 2009, p. 20.
[143] Claimant's PHB I, para. 82.

233.  Claimant disagrees with Respondent with regard to the latter's argument that the Management Committee had exclusive competence over amendments and additions to the JAA, and thus had the power to amend the JAA through Management Committee decisions. It relies in particular upon the Addendum of 26 August 1998, describing the powers of the Management Committee. Claimant asserts in this regard, that the Addendum did not entrust the Management Committee with the power to approve/adopt amendments to the JAA, but merely to prepare such amendments. In particular, item 16 of the item provides in relevant part:

> *"16.1 Coordination of Joint Operations and management of the joint Production shall be carried out on grounds of resolutions of the Management Committee. The following belongs to exclusive competence of the Management Committee: preparation of amendments and additions to this Agreement..."* [144]

234.  Furthermore, Claimant relies in this regard upon Art. 15.6 of the JAA which states

> *"Should a decision be made by the Management Committee requiring that this Agreement be amended, such amendments shall be executed by additional agreements."* [145]

as well as the testimony of Ms. Kuznietzova, Respondent's legal expert who stated in her opinion that

> *"In case the parties have agreed to conclude an agreement in a specific form, it shall be deemed concluded from the moment the agreement is drawn up in this form even if the law does not require this form for this type of agreements."* [146]

235.  Additionally, Claimant asserts that even if the JAA could have been amended by decisions of the Management Committee, Respondent has not met its burden of proof showing that the Parties in fact reached an agreement to limit the scope of the JAA to nine wells during the meetings of the Committees. [147]

---

144 Claimant's PHB I, paras. 83 et seq..
145 Ibid., para. 85.
146 Ibid, para. 87 with reference to Prof. Kuznietsova's Export Report dated 6 July 2009, p. 25.
147 Ibid, para. 96.

236.   Thus, and as set out in para. 22 above, during the Meeting on 1 October 1999 the Parties "resolved" that

> *"Drilling of new wells at Rudivsko - Chervonozavodsky Field shall be included into joint activity on condition, that "Carpatsky Petroleum Corporation" shall ensure investment growth in the amount of 2,5 mln. US dollars by January 31, 2000."*

237.   Claimant asserts in this regard that this decision was made in the context of discussion of the Work Program for the year 2000 and did not extend beyond that year. Therefore, it would have been impossible for the Parties to make a permanent change to the scope of the JAA via any Work Program.[148]

238.   Moreover, Claimant relies on the wording of the December 1999 Management Committee Meeting resolution, see para. 23 above, by which Claimant's investment contributions had to be made by 31 March 2000 and thus the previous resolution was not final. Claimant also points out in this regard that the Parties agreed that the March 2000 deadline was conditional upon the introduction of certain changes and amendments in either the licence or the licence agreement:

> *"Poltavanaftogas' Management will carry out the necessary work so that JSC Ukrnafta on February 15, 2000 at the latest will deliver an application to the committee of Geology of Ukraine for replacement of the R-Ch license indicating the agreement No. 410/95 or the project of the licensing agreement. If until March 1, 2000 the indicated changes in the license will not be made or the licensing agreement will not be signed, terms of fulfillment of paragraph 1. (1st sentence) [about the date and amount of investment] and paragraph 2. [about further investments] of this decision will be revised." [149]*

239.   Claimant furthermore asserts that the fact that the Parties neither in October nor December 1999 reached an agreement regarding the limitation of the scope of the JAA, is reflected by the commencement of the drilling of new wells N° 112 and 114 later in 2000. These wells were included within the JAA and entered commercial production in 2001.[150]

---

[148] Ibid, paras. 103 et seq..
[149] Ibid, paras. 117 et seq. with reference to R-16.
[150] Ibid, paras. 125 et seq..

240.   Respondent's contention that all new wells were automatically and definitely excluded from the JAA as from March 2000 is also belied by the fact, so Claimant contends, that the Parties continued to discuss CPC's participation in new wells after this date.[151] Claimant refers specifically to the Management Committee Meeting of 15 November 2000 and the minutes thereof which state:

> *"The parties decided:*
> *(...)*
> *It is understood by both parties that the above percentage interests relate only to wells in-progress and completed to date. The percentage interest in new wells drilled will be based on actual contributions, and investments should be made in accordance with the original principle of contributions split equally (50:50) between both parties."[152]*

241.   Claimant furthermore contends that the language of the minutes of the management committee meetings of May and July 2001 confirmed Claimant's ongoing right to participate in new wells on the RC Field[153] and that the meeting minutes of November 2001, February 2002 and October 2002 show that there was no agreement to exclude new wells from the scope of the JAA[154].

242.   Claimant also contends that Respondent's conduct as of March 2004 shows that the latter did not consider the JAA to be confined to nine wells. In particular Respondent's silence, so Claimant asserts, to Claimant's proposal to invest expressed in its letter dated 25 March 2004, followed by a letter dated 29 March 2004 (see paras 33 and 38 above) confirms that Respondent did not hold a position as now asserted at that time. Similarly, Claimant would not have made such a proposal if it had believed that it did not have the right to participate.[155] Similarly, there was no answer from Respondent concerning Claimant's proposal for the work program of September 2004.[156]

243.   Claimant contends in that regard that during a meeting in early December 2004 (see para.49 above), Mr. Pustovarov and Mr. Kartashov of Respondent confirmed that if Claimant had the necessary financing, Respondent accepted CPC's right to buy back its

---

[151] Ibid, paras. 130 et seq..
[152] Ibid, para. 134. See also para. 135 with reference to further management committee meeting minutes, e.g. of 18 July 2001, Exh. C-5.
[153] Ibid., paras. 141 and 147 et seq..
[154] Ibid., paras. 152 et seq..
[155] Ibid., paras. 186 et seq..
[156] Ibid., paras. 199 et seq..

interest in the JAA and to participate on a 50:50 basis in new wells.[157] Also, during the meeting of the Management Committee of 10 February 2005, the Parties "decided that we [were] going to work together on an RC development plan".[158] Claimant points out that it was only on 18 April 2005 that Respondent answered Claimant's letters of March and April 2005 which followed up on the management committee meeting of February 2005, and that this response did not contain a denial of Claimant's rights in this regard.[159]

244.    Finally, Claimant asserts that in December 2005, after it sent two unanswered letters to Respondent, the Parties arranged a meeting during which Respondent confirmed Claimant's right to participate in all new wells drilled on a 50:50 basis on the entirety of the RC Field. Claimant's letter of 19 December 2005, so it asserts, proves that this meeting took place and that an agreement as alleged was reached.[160]

2.    Respondent's Position

245.    Respondent asserts with regard to this issue that Claimant's default in making contributions to the Joint Activity means that the Parties agreed that all new wells should be outside the JAA so that Respondent could exploit them at its own risk and for its own benefit. In the context of Claimant's chronic non-payment and Respondent's obligation as licensee to exploit the RC Field, both Parties agreed that, in the event that Claimant failed to make its contribution on time, Respondent should be free to drill and exploit new wells at the RC Field at its own risk and for its own benefit. In any event, and as a matter of construction and in light of Claimant's failure to discharge its obligations, Respondent could proceed with the drilling of new wells outside the JAA.[161]

246.    More particularly, Respondent asserts that the JAA was never intended to cover the whole RC Field. At the time of the execution of the JAA, certain specified existing wells which were already in operation at the time were expressly excluded from the Joint Activity, as further stipulated in Art. 7.2 of the JAA. By contrast, there were wells which had been developed but not completed and which were transferred into the Joint Activity and recorded as initial contribution of Respondent. Since the JAA did not apply to all

---

[157] Ibid, para. 211 with reference to Mr. Bensh's First WS, para. 36 and Third WS, para. 48.
[158] Ibid., paras. 216 et seq. with reference to Mr. Bensh's testimony, Transcript, Day 1, 102: 11 -12.
[159] Ibid., paras. 234 et seq..
[160] Ibid., paras. 250 et seq..
[161] Respondent's PHB I, para. 187 - 188.

wells, so Respondent contends, it is not remarkable that the Parties would agree from time to time to exclude certain wells, especially if the funding party was not willing or able to fulfill its financial obligations.[162]

247.    Respondent asserts furthermore that during the Management Committee Meeting of 1 October 1999, the Parties reached an explicit agreement whereby new wells should be outside the Joint Activity unless CPC would make an increased investment by 31 January 2000. Since this investment was neither provided on that date, nor on the extended date of 31 March 2000, the agreement took effect that the drilling of new wells would not be within the Joint Activity. This deadline was unconditional. Similarly, this agreement was not limited to the year 2000.[163]

248.    Respondent also asserts that its subsequent willingness to discuss bringing new wells into the JA did not affect the above-mentioned agreement. Respondent was prepared to agree at the Management Committee Meeting of 15 November 2000 to bring new wells into the Joint Activity if certain contributions were made for the next year 2001. However, these contributions were not made by Claimant. Moreover, this willingness of Respondent to afford Claimant this opportunity is not contradictory to the earlier exclusion of new wells as suggested by Claimant. The Parties agreed to exclude the new wells subsequently in the context of CPC's failure to take advantage of this opportunity.[164]

249.    Respondent furthermore contends that during the Management Committee Meeting of 22 December 2000, the Parties decided and agreed *"as CPC plans to delay investment of new wells until after 1 April 2001 that drilling of new wells will continue to proceed under the direction and based on the financing provided by PNG (Ukrnafta)"* which is to be considered confirmation of the existing agreement that new wells would proceed outside the Joint Activity.[165]

---

[162] Ibid., paras. 192 et seq..
[163] Ibid., paras. 200 et seq. with reference to witness testimony of Mr. Texas (Second WS, para. 22), Mr. Machuzhak (paras. 22-23) and Mr. Peday (Second WS, paras. 27 - 29).
[164] Ibid., paras. 210 - 211.
[165] Ibid., para. 212.

250.    Similarly, it was further agreed and decided during the Management Committee Meeting of 16 May 2001 that Claimant would share in new wells if it performed its financial obligations. However, CPC did not do so and, consequently, the new wells remained outside the Joint Activity.[166] It was further decided at the Management Committee Meeting of 18 July 2001 that in the event that CPC did not meet its payment obligations, the new wells would be transferred for development to Ukrnafta. In this regard, the fact that the minutes specifically refer to the 2002 Program did not limit the wells taken out of the JAA to those wells. Rather, in case of Claimant's non-payment, all new wells, whether in respect of 2002 or later, were and remained outside the Joint Activity.[167]

251.    Respondent asserts with regard to the Management Committee Meeting of 5 November 2001 that on that occasion, it was decided and agreed that if no guarantees were given by Claimant concerning the funding of the project "the issue of terminating construction of new wells would be considered and the JAA would be subsequently limited to the 8 existing wells". This decision has to be regarded as one meaning that no further chance would be given in the event that the guarantees were not produced and that the issue would be considered by Respondent alone. Accordingly, as no such guarantee was produced by Claimant, at the Management Committee Meeting of 15 February 2002 it was understood and agreed that the JAA remained limited to the eight existing wells. This was a confirmation of what had already been agreed in 1999 and 2000 consequent upon the contribution not being provided and/or it was the corollary of the above-mentioned Management Committee Meeting of 5 November 2001.[168]

252.    Alternatively, so Respondent argues, if there was no agreement reached to limit the JAA to eight wells, such an agreement was made on 5 November 2001 and/or 15 February 2002. This agreement was effective since it was made in writing by the combination of the minutes of the Management Committee Meeting of 5 November 2001 and 15 February 2002. Even if it should be considered that the agreement was not recorded in writing, this would not give rise to invalidity (clause 46 of Civil Code of the UkrSSR of 1963, clause 218 of the Civil Code of Ukraine). Moreover, Claimant's conduct induced Respondent to believe that the exclusion of new wells was agreed so that there was no

---

[166] Ibid., para. 213.
[167] Ibid., para. 214.
[168] Ibid., paras. 215 et seq. with reference to Testimony of Mr. Machuzhak, WS, paras. 30 - 31.

need to record this again in the protocol for the Management Committee Meeting of 15 February 2002 beyond what was actually done.[169]

253.   Respondent asserts furthermore that CPC's subsequent conduct showed that the scope of the JAA had been confined. Thus, for example, Respondent refers to Cardinal's letter dated 16 May 2005 in which it offered USD 15,000,000 in return for Ukrnafta's confirmation that the JAA – per its current terms – applies to the entire RC Field in addition to the USD 6,800,000 Cardinal was willing to pay to increase its interest in the JAA to 50%. This premium would have been unnecessary if CPC had the right to participate in new wells. Similarly, on 13 December 2005, CPC proposed an addendum to the JAA (see para. 48 above) which sought to confirm that Respondent did not have the right to undertake activities at the RC Field without consent of the Management Committee except in cases where such an activity was required to maintain the license. This would have been unnecessary if such a right of participation existed already.[170]

254.   Respondent also denies that at the meeting of 13 December 2005 between Mr. Bensh and Mr. Pustovarov an agreement was reached whereby Claimant was entitled to participate in all new wells on a 50:50 basis on the entire RC Field. The allegation that such an agreement was made would be entirely inconsistent with the previous offer of May 2005 entailing the payment of USD 15 million and with the Management Committee Meeting of 15 December 2005 the protocol of which makes no reference to such an agreement and how it would be implemented.[171]

255.   Respondent also rebuts Claimant's contention that the failure to pay the agreed contributions does not amount to a breach of the JAA. The repeated and persistent failures to provide the agreed contributions could not prevent Respondent from continuing to move towards the drilling of new wells, especially in view of Respondent's obligations as a licensee to exploit the RC Field, if necessary with financial backing of parties other than CPC.[172]

---

[169] Ibid., para. 219.
[170] Ibid., paras. 220 et seq..
[171] Ibid., paras. 223 et seq..
[172] Ibid., paras. 231 et seq..

256. Respondent contends furthermore that the JAA was only intended to be a framework agreement. It stipulated general terms and conditions that formed the basis on which the Parties would cooperate in financing the development of the RC Field. The decisions of the Management Committee, including the decision to exclude new wells, were contemplated from the very start as the mechanism to convert a framework agreement into a dynamic evolution of the Parties' wills in practice. The obligations of the Parties would then be set out in further agreed documents including the work programs, the approved budgets of Joint Activity and the approved minutes of the Meetings of the Management Committee.[173]

3.     Decision of the Arbitral Tribunal

257. Having duly studied the evidence before it, the Arbitral Tribunal has come to the conclusion that Respondent breached the JAA by preventing Claimant from participating in the RC Field on an equal basis from 2004, which became clear with Respondent's letter dated 18 April 2005. The scope of the JAA initially covered the entire RC Field[174] and was not subsequently limited by the Parties to nine wells. The reasons for the Tribunal's decision will be set out here-below.

258. The wording of the JAA does not support Respondent's assertion whereby it limits the Parties' Joint Activity at the outset. There was a limited exception as the Parties agreed to exclude 14 pre-existing wells at the outset, referred to specifically in Art. 10.2 of the JAA. Apart from that, the JAA does not contain any wording limiting its scope. On the contrary, several clauses indicate that the Parties envisaged the exploration of the entire field. Thus, the definition of the Joint Activity - see para. 11 above - does refer to "*exploration and development of the Rudivsky-Chervonozavodsky field*". The JAA refers to 'Investments' under the JAA as made "in the process of development of the Rudivsky-Chervonozavodsky gas condensate field"[175]. It furthermore talks of "Exploration", "Development" and "Prospecting" of "the Rudivsko-Chervonozavodsky gas condensate field".[176] These provisions refer to the RC Field without any limitation, i.e. the RC Field as a whole. Similarly, the JAA also provides that the parties are to share through the JAA in

---

[173] Ibid., paras. 256 et seq..
[174] There was a limited exception as the Parties agreed to exclude 14 pre-existing wells at the outset, referred to in Art. 12.2 of the JAA.
[175] See Exh. C-1, p. 123.
[176] Ibid., "Exploration of the Rudivsko-Chervonozavodsky field ", p. 124; "Development of the Rudivsko-Chervonozavodsky field ", p. 124; "Exploration of the Rudivsko-Chervonozavodsky field areas", p. 126.

all "Hydrocarbons of the Joint Activity", which are defined as all "Hydrocarbons" ("free and diluted (oil) gas, condensate and oil, which are produced or will be produced at the Rudivsko-Chervonozavodsky field")[177] other than those volumes which are produced "from wells constructed prior to the conclusion of this agreement on condition that at such wells no work will be performed at the expense of Joint Funds for the purpose of intensifying the inflow of hydrocarbons"[178]. The Arbitral Tribunal was furthermore guided by Art. 2.1, 2.6 and 7.6 in this regard, the wording of all of which makes reference to the RC Field without confining language.

259.    This wording of the JAA, which does not appear to limit the scope of the JAA, indicates the Parties' intention. It is also supported by their subsequent conduct. The protocols of the Management Committee Meetings show that the Parties discussed the transfer of further wells from the ambit of the JAA. Thus, the protocol of the Meeting of 16 May 2001 shows in point 8 that the Parties were to *"discuss the transfer of 4 wells, no. 108, 110, 122, 118 from the balance of JIA Agreement to OGPD "Poltavanaftogaz" in February 2001".*[179] These discussions between the Parties about the transfer of certain wells out of the JAA would only have been sensible and necessary if the RC Field was initially unlimited. The Arbitral Tribunal is not able to follow Respondent's position to the contrary on this point as stated in para. 246 above.

260.    Moreover, this understanding was confirmed by Respondent's witness Mr. Pustovarov, First Deputy on Financial and Economic Affairs of Respondent, who stated during his testimony:

> *"From the beginning, yes, the JAA envisaged cooperation over the RC Field. There was no limitations whatsoever in it."*[180]

Messrs. Texas and Bensh confirmed this understanding.[181]

261.    Further, as will be shown below, the Parties did not subsequently agree to confine the JAA to the existing nine wells. Undisputedly, the Parties never amended the JAA to that

---

[177] Ibid., p. 127.
[178] Ibid.
[179] Exh. C-4.
[180] See fn. [ ] above.
[181] See fn. [ ] and [ ] above.

effect. And they did not reach a conclusion in that regard at any of the Management Committee Meetings.

262.    As set out in para. 232 above, the procedure for amending the JAA is laid down in Art. 22.1:

> *"By mutual consent of the Participants, this Agreement may be amended and supplemented, including but not limited to, the involvement of other Participants to the Joint Activity."*

263.    Moreover, and apparently not disputed by Respondent, under Ukrainian law, any amendment to an agreement must be executed in the same form as the original agreement in question, unless legislation or accepted business practice permit otherwise.[182] Hence, if the original agreement, such as the JAA, is in writing, the amendment must also be in writing. Here, no amendment of the JAA, directly in writing, limiting the scope of the RC field, was ever executed by the Parties.

264.    Respondent contends however that the JAA was amended and supplemented by the decisions of the Management Committee which were recorded in writing (see para. 247 above). In particular, it contends that during the Management Committee Meeting of 1 October 1999, the Parties reached an explicit agreement whereby new wells should be outside the Joint Activity unless CPC would make an increased investment by 31 January 2000. As the investment was not made by that date, nor by the extended deadline of 31 March 2000, the agreement to limit the Agreement thereafter took effect (see para. 248 above). The Arbitral Tribunal does not share the view that such an agreement was reached on 1 October 1999, nor during any other Committee Meeting thereafter as will be explained in further detail here-below.

265.    As mentioned in para. 22 above, the minutes of the Management Committee Meeting of 1 October 1999 contain under point 3 of the heading "Resolved" the words:

> *""Drilling of new wells at Rudivsko-Chervonozavodsky Field shall be included into joint activity on condition, that 'Carpatsky Petroleum Corporation' shall ensure investment growth in the amount of 2,5 mln. US dollars by January 31, 2000."* [183]

---

[182] Exh. C-65, Civil Code of Ukraine (2003), Art. 654.
[183] Exh. R-8, p.741.

As such payment was not forthcoming, this deadline was extended during the 29 December 1999 Management Committee Meeting until 31 March 2000.

266. The Arbitral Tribunal has taken note of the wording as set out above, however, it is of the view that it is to be seen within the context of the work program for the year 2000 and does not deploy any force beyond that. Consequently, it does not indicate that the Parties agreed to amend the JAA with unlimited effect.

267. Indeed, the agenda for the meeting specifies that the items to be discussed at the meeting consisted of "1. Status of work under Agreement No. 410/95. 2. Discussion of work plan for 2000."[184] Summarising the discussion of the Work Plan for 2000 under the header "on the second point"[185], the Parties are reported to have had the following discussion:

> "[S]cope of joint activity depend [sic] on two factors - investment by 'Carpatsky Petroleum Corporation' and volumes of production of sale of gas. If by January 30, 2000 'Carpatsky Petroleum Corporation' ensures growth of investment [...] in the amount of more than 2,5 mln. US dollars, new collaring [sic] shall be made as part of joint activity.
>
> Otherwise, joint activity shall contribute only to funding of drilling well No 100 Chervonozavodskaya."[186]

268. Respondent's witnesses who attended the meeting in question confirmed that the discussion took place in relation to the work program for the year 2000. Mr. Texas:

> "Ms. Horrigan: The agenda for this meeting set out here is the status of work for the agreement and to discuss the work plan for 2000; is that right?
> Mr. Texas: That's correct.[187]
>
> [...]
>
> Ms. Horrigan: Am I correct that the two paragraphs beginning "On the second point" are discussion of the second item of the agenda, namely the work programme for 2000?

---

[184] Ibid., p. 740.
[185] Ibid., p. 741.
[186] Ibid.
[187] Transcript, Day 2, 141 : 22-25.

> *Mr. Texas: Yes, it was a work programme and the financing of that work programme."* [188]

269.   Similarly, Mr. Machuzhak, who was Respondent's chief geologist until May 2005 and a member of the Management Committee until 2003, confirmed that the discussion referred to the year 2000:

> *"Ms. Horrigan: If we turn the page we see a discussion. The numbering seems to be odd in the English. It's the second point 2. It's the third paragraph in the Ukrainian version, counting down the page. It starts: 'On the second point was heard …' Now that's a discussion of the second agenda point, correct, discussion of the work programme?*
>
> *Mr. Machuzhak: Of course, yes."* [189]

270.   Additionally, the JAA expressly provides that each Joint Activity Program is "a work program for a fiscal year"[190]. This limited duration was confirmed by the witnesses Mr. Bensh[191] and Mr. Machuzhak[192].

271.   Based on the afore-said, the Arbitral Tribunal fails to see any evidence which credibly supports Respondent's assertion that during the 1 October 1999 Management Committee Meeting, the Parties agreed to confine the Joint Activity in relation to the RC Field on a permanent basis. The documents as well as the testimony of the people who attended this meeting do not support this position.[193] The evidence to the contrary of witnesses who were not present does not carry the weight to change this conclusion.[194]

---

[188] Ibid., 142 : 23 - 143 : 2.

[189] Transcript, Day 2, 11: 12-19.

[190] Exh. C-1, p.124.

[191] He stated : « *Yes, when I was involved we just worked on the year, the one-year period of time, and that was it ; unless we proposed and we mutually agreed to an amendment, and that never occurred.* » Transcript, Day 1, 142 : 23 - 143 : 1.

[192] He confirmed : « *The programme would be adopted along with the lines of the agreement. That is, we had to find an agreement to that issue 30 days before the end of the year before, and also along with the budget which had to correspond to the programme.* » Transcript, Day 2, 8 : 6-10.

[193] Mr. Machuzhak, when questioned by Respondent's counsel also stated: "*Mr. Freedman: Was that a general discussion as to what would happen in the event of non-payment of the $2.5 million, or was it only confined in 2000? Mr. Machuzhak: We were talking about the plan of work for the year 2000.*" Transcript, Day 2, 41:7-11. "*Mr. Freedman: I'll say it again. In the event that there was a failure to pay the $2.5 million by the end of January 2000, was the consequence, as you said in paragraph 22 of your witness statement, that no new wells could be drilled within the scope of the JAA? Mr. Machuzhak: It's hard to tell now because at that time we were talking about the year 2000 [...].*" Transcript, Day 2, 41:19 - 42:1. Only when explicitly asked again by Mr. Freedman concerning the consequences if CPC failed to make the investment by the end of January 2000, and whether this would bring CPC's participation in new wells to an end, Mr. Machuzhak responded: "*Yes, of course.*" Transcript, Day 2, 42:7. The last statement is in direct contradiction to Mr. Machuzhak's earlier statements on this point (see above) and is thus not persuasive.

[194] Mr. Peday stated that "*if he [Mr. Texas] would not pay the remainder then he would not participate in drilling further wells.*" Transcript, Day 2, 70: 7-8. In fact, Mr. Peday does not clarify whether he considers that this exclusion from the drilling would go beyond the year 2000.

272.   This understanding of the Arbitral Tribunal is confirmed by the minutes of the subsequent Management Committee Meetings. As will be set out in more detail below, they confirm that the Parties re-discussed the issue of financing and potential exclusion of Claimant in the participation of the drilling of new wells. This would not have been necessary if an agreement as asserted by Respondent would have been reached during the 1 October 1999 meeting. As will also become apparent, the Parties did not agree to confine the Joint Activity in the RC Field on a permanent basis during one of the meetings after 1 October 1999 either.

273.   On 22 September 2000, a meeting of the representatives of both Parties took place, the protocol of which – prepared on 27 September 2000 – contains the following passage:

> "CPC will do everything needed to increase its share in JIA (cash or equipment) up to planned 50% and "Ukrnafta" immediately after APD [Agreement of Product Distribution] comes into legal force will transfer 50% of "Ukrnafta" share in APD (according to existing JIA Agreement) to CPC company. "Ukrnafta" will execute everything which might be needed to transfer its 50% share in APD to CPC." [195]

274.   Similarly, on 15 November 2000, a Management Committee Meeting took place the protocol of which indicates that

> "It is understood by both parties that the above percentage interests relate only to wells in-progress and completed to date. The percentage interest in new wells drilled will be based on actual contributions, and investments should be made in accordance with the original principle of contributions split equally (50:50) between both parties." [196]

275.   Also, on 18 July 2001, Mr. Ivanov of Respondent stated during a Management Committee Meeting that

> "[…] OGPD 'Poltavanaftogaz' cannot wait indefinitely for the investors to fulfill their obligations, thus if the investor will not fulfill the program for financing for JAA, the new wells, allocated for the 2002 Work Program, should be transferred for development to the OGPD 'Poltavanaftogaz' main activity." [197]

---

[195] Exh. C-25, para. 1(b).
[196] Exh. C-3, para. 4.
[197] Exh. C-5, p. 827.

276.  These discussions concerning the aim of an equal split of contributions and Claimant's contribution to the financing of new wells in 2002 evidence clearly that the Parties did not reach an agreement on 1 October 1999 whereby Claimant would be permanently excluded from participating in the drilling of new wells.

277.  The Respondent asserts further that the parties agreed at management committee meetings on 5 November 2001 and 15 February 2002 to limit the JAA to the existing 8 wells if no financing was forthcoming as promised. More precisely, Respondent alleges that the 5 November 2001 meeting confirmed what had in fact been agreed at earlier management committee meetings, alternatively that a fresh agreement was made at the 5 November 2001 and 15 February 2002 meetings. For the following reasons the Arbitral Tribunal cannot accept Respondent's argument.

278.  The 5 November 2001 meeting resolved that the issue of terminating construction of new wells would be considered, as would the possibility to limit the JAA to certain indicated wells, but at that meeting no decision to actually terminate constructions of new wells or to limit the JAA to certain wells was made. At the 15 February 2002 meeting no such decision was taken either. At that meeting (see exhibit 75 of the common bundle, pages 873, 874), Respondent expressed discontent with CPC's broken promises, and Respondent considered CPC's action as "non-interest in the JAA development" and that it was "expedient to conduct the JAA further  only on the wells 102, 104, 106, 109, 111, 112 and 114 Rudovski and well 100 Chervonozavods'ka". But the decision taken at the 15 February 2002 meeting was not to that effect, the decision was that, unless CPC provided financing by 10 June  2002 for covering half of the cost of well 121, then CPC agreed to transfer the well 121 to Respondent's activity. Consequently, at these two meetings there was no agreement to limit the scope of the JAA in the way Respondent alleges.

279.  Nor did the Parties reach an agreement in this respect after 2002. Thus, during the 19 October 2004 Management Committee meeting, the Parties decided that there was *"no immediate necessity in additional investment contributions. Financing of the 2004 Work Program will be provided from the funds, accumulated at the JIA account (in accordance with the MCM Protocol #13/2004 dd. 31.03.2004)".*[198] However, at the same

---

[198] Exh. R-6, p. 1008.

time, the Parties also decided that *"[b]y November 30, 2004 the participants should jointly work through and approve by the MCM the JIA #410/95 2005 Work Program"*.[199]

280.    Hence, even in the end of 2004, the Parties agreed that a joint work program for the next year should be approved which would not be necessary if both Parties agreed that Claimant would no longer participate in the drilling of new wells.

281.    As the Parties through their Management Committee Meetings did not agree to amend the JAA, it is not necessary for the Tribunal to decide whether the Committee had the power to do so by way of their resolutions.

282.    Respondent has also argued in this regard that CPC continuously failed to assert its rights, which must be understood as an indication that CPC knew well that it does not have a basis to assert the rights it now claims in this arbitration. The Tribunal refers in this regard to the letters mentioned in paras. 38, 39, 41, 44 and 46 above in which, starting in 2004, Claimant asserted its rights vis-à-vis Respondent with increasing intensity. However, for a long time, the latter did not receive a response from Respondent. The Tribunal also notes that prior to that time, Claimant did not "slam its fist on the table" when dealing with Respondent. However, it does not conclude that Claimant was aware that it did not have those rights it claimed. Rather, the fact that the Parties were in a joint venture together explains that one party does not seek conflict with the other, but seeks to cooperate as well as possible. As reflected in the minutes of the Management Committee Meetings referred to above, it was not apparent to CPC for several years that the right to participate in new wells was contested by Respondent. Given that Claimant only in April 2005 became fully aware of the fact that Respondent considered this cooperation no longer desirable, the Tribunal is of the opinion that prior to that, Claimant – by constantly seeking communication on this point – did enough to be regarded as diligent on this point.

283.    The same reasoning the Arbitral Tribunal applies concerning the offers made by Cardinal on 16 May 2005 and CPC on 13 December 2005 (see para. 48 above). The Tribunal understands Respondent's logic that no one confident of owning those rights would need to pay for them again and in a considerable amount. However, Respondent blocked

---

[199] Ibid., p. 1008/1009.

Claimant from participating in the drilling of new wells so that the latter could not exercise its right. In this situation, where Claimant's main aim was to secure this right, it is understandable that Claimant did not simply attempt to persuade Respondent to cooperate in this regard rather than seek conflict (see previous paragraph), but also that it offered additional money if that would have been necessary in order to exercise its right. Presumably, in Claimant's opinion, the sums to be earned from the exploitation of the RC Field by far outweighed what it had to invest, even if it required an additional investment such as offered in Cardinal's respectively Claimant's letters mentioned above. Consequently, the Tribunal interprets Claimant's approach as that of a desperate investor willing to go above and beyond the usual in order to secure its right.

III.    **Respondent's asserted breach of the JAA by unduly preventing CPC from exercising the right to top-up**

1.    Claimant's Position

284.    Claimant contends that in addition to the right to participate on a 50:50 basis in all new wells going forward, it also had the right to top up its current investment percentage in the nine existing wells which Respondent accepts are within the JAA, by making additional investments to increase its existing investment participation level from its current 14.91% back up to 50%.[200]

285.    Claimant asserts that the JAA contemplates such a right, as can be seen from provisions such as Art. 2.1 (see para. 229 above), 2.6 (see para. 229 above) and 7.6 (see para. 228 above). These provisions show, so Claimant contends, that the Parties expressly acknowledged in the JAA that the investment proportions could vary over time, and that if one of the participants was unable to fund its contributions, the Parties could agree that the other would do so for a certain period of time.[201]

286.    Claimant furthermore contends that it was always understood by the Parties and reflected accordingly in the JAA that the intention was for the Parties to reach a 50:50 ownership ratio within the Joint Activity, even though they might not necessarily do so

---

[200] Claimant's PHB I, para. 281.
[201] Ibid., paras. 282 et seq.,

immediately or stay static at that level at all times. Claimant relies in this regard upon Art. 13.2 which reads:

> "The Participants of this Agreement have agreed that when the Accumulated Contributions of the Participants have reached the 50:50 ratio, as stipulated in Section 2.1 ... of this Agreement, the Actual Share of OJSC "Ukrnafta" shall be 55%, and the Actual Share of the Company [CPC] shall be 45%."[202]

287.    Claimant points out that this language, which specifically looks forward in time to a date when the contributions have reached 50:50, was added to the JAA by way of amendment dated 26 August 1998. Previously, the JAA had stated that "[i]f the Parties comply with the Participatory Shares envisaged by Clause 2.1 hereof, constituting the ratio of 50:50, the Share of the Enterprise [Ukrnafta] in the Profit shall constitute 60% and, accordingly, the Share of the Company [CPC] shall constitute 40%"[203]. At the time when this provision was amended, the respective contributions of the Parties already varied from the initially-contemplated 50:50 ratio. The reference to a future date when the Accumulated Contributions would "reach" 50:50 thus clearly indicates that the Parties, in this case Claimant, had a right to top up their existing investments. Absent such a right, there would be no way in which the Parties could ever re-attain 50:50, and the provision would be meaningless.[204]

288.    Moreover, so Claimant contends, this right was not limited in time. The Parties' respective interests in the JAA were to be recalculated each quarter and the profit share adjusted based upon the actual amounts contributed. Articles 13.3 and 13.4 provide that the Accumulated Contributions of each Party are to be recalculated quarterly. Second, Art. 13.2 specifies that

> "[i]n the event of deviation from the indicated ratio of the Accumulated Contributions, the Actual Share of the Company [CPC] shall be determined as a product of the percentage share of its Contribution in the total amount of the Contributions by 0.9 ... The Actual Share of Ukrnafta shall be determined as 100% minus the Actual Share of the Company [CPC]."[205]

289.    Thus, since undistributed profits are to be treated as contributions of the participants, adjustments in the Parties' actual shares were clearly envisioned to be possible through

---

[202] Ibid., para. 288.
[203] Exh. R-54, para. 13.8.
[204] Claimant's PHB I, paras. 289 et seq..
[205] Ibid., paras. 292 et seq..

the entire duration of the JAA, even after the joint activity ultimately was to become self-financing.[206]

290.    Claimant contends furthermore that even if the provisions of the JAA were deemed to be ambiguous, rules of contract interpretation also lead to the conclusion that the JAA should be interpreted as creating such a right. A contract should be interpreted so that each and every provision can be given effect. Therefore, if the Parties did not have the right to top up their investment, then Art. 13.2 of the JAA described above would have no meaning because the respective interest of a party holding less than 50% could never be increased back up to the 50% level, which cannot be in accordance with Ukrainian law or general principles of contract interpretation.[207]

291.    The mechanics of the additional investment for the top up needed to be agreed between the Parties in the context of approval of that year's Joint Activity Program. Claimant could only propose additional investments in excess of the 50:50 ratio in order to bring its interest back up to that level. These investments required Respondent's approval, including its signature, in order for CPC to be allowed to deposit money into the Joint Activity's account which is a joint account run by Respondent. Nevertheless, Claimant asserts that Respondent cannot arbitrarily withhold its consent to reducing its actual share and increasing that of Claimant through a top up. This would be contrary to the Parties' intent, the overall purpose of the JAA as well as a violation of the principle of good faith.[208]

292.    As set out in para. 50 above in more detail Claimant asserts that the top-up right in question was also confirmed during a meeting of Mr. Bensh of CPC with Messrs. Pustovarov and Kartashov of Respondent on 13 December 2004.[209]

293.    Claimant further contends that the Parties' conduct after 2004 confirms that Claimant has the right to top up under the JAA. Starting from March 2004, it consistently asserted this right (see paras. 33 et seq. above), whereas Respondent never clearly stated that such a right does not exist. Rather, it created a deadlock by withholding its consent for

---

[206] Ibid., para. 295 with reference to Art. 13.5 of the JAA.
[207] Ibid, paras. 298 et seq. with reference to, *inter alia*, Art. 213 of the Ukrainian Civil Code.
[208] Ibid., paras. 309 et seq..
[209] Claimant's PHB II, paras. 337 et seq.

Claimant to pay its contributions into the joint account. Therefore, Claimant proposed to amend Art. 2.6 by addendum (see para. 48 above) in an attempt to confirm its preexisting right and to resolve the deadlock with Respondent. This proposed addendum can however not be seen as an acknowledgement by CPC that it did not have a right to top up.[210]

294.  Claimant contends further that the alleged right to top up would not be contrary to commercial sense, as alleged by Respondent. This argument, based upon the premise that the project entailed considerable risks in the early years, does not reflect the commercial reality of the JAA. Claimant asserts that, since the RC Field was already a producing reservoir in 1995, the JAA was a low-risk project from its inception. The Parties knew that the field contained reserves and would be profitable.[211]

295.  Claimant asserts finally that its funding shortfalls did not justify Respondent's breaches of the JAA as such funding shortfalls were dealt with precisely in the manner provided for by the JAA. Thus, Art. 2.6 of the JAA permits temporary and proportional reductions in CPC's share of profit and investment in the JAA. This provision directly contradicts Respondent's allegation that CPC's funding deficits constitute breaches of the JAA and/or justify breach of the other party. Moreover, contrary to Respondent's assertions, there was no persistent failure on Claimant's part to honour its obligations, and Claimant always made best efforts to raise funds. However, by withholding its consent to Claimant's payments into the joint account, Respondent breached Art. 2.1 – which provides that the Parties invest on a 50:50 basis – as well as Art. 13.2 – which looks forward in time to the date when contributions have reached 50:50.[212]

### 2.  Respondent's Position

296.  Respondent asserts that the JAA did not provide any right for Claimant to top up or otherwise re-negotiate its investments in the Joint Activity, nor did it stipulate any right for either Party to pay a contribution later than that provided for, other than by agreement of the Parties.[213]

---

[210] Claimant's PHB I, paras. 315 et seq..
[211] Ibid., paras. 329 et seq.. with particular reference to the testimony of Mr. Texas, Second WS, paras. 2, 13 and 14; Transcript, Day 2, 132:24 - 133:24.
[212] Ibid., paras. 352 et seq..
[213] Respondent's PHB I, para. 154.

297.    Respondent contends in particular that the JAA contained merely an intention that investments into the Joint Activity should be in proportions of 50:50 (clause 2.1 of the JAA as amended) both in respect of the Initial Contribution and in respect of contributions for the works to be undertaken in subsequent years which were to be undertaken in accordance with the Agreed Budget. However, CPC failed to pay its share of the Initial Contribution or 50% of the costs in subsequent years which were to be undertaken in accordance with the Agreed Budget. Accordingly, its Accumulated Contribution was lower than that of Ukrnafta (which had to pay in excess of its share of the contributions in order to enable exploration to take place and the licenses to be exploited) such that proportions contributed by the Parties became 83.43% Ukrnafta and 16.57% CPC, giving profit shares of 85.09% Ukrnafta and 14.91% CPC.[214]

298.    Respondent contends that in its attempt to construe a top up right, Claimant misconstrued the JAA. Art. 2.6 which Claimant relies upon empowers the Management Committee to make a decision to change the investment proportions of the Participants, but this was by reference to an amendment to the Agreed Budget to deal with one Participant not providing his 50%. However, it does not provide any top up right.[215]

299.    Respondent furthermore contends that the JAA contemplated expressly the covering by a participant of the deficit caused by the other on the basis of changes of the investment proportions, and without any reference to a right to subsequent top up. The provisions relating to covering deficits of contributions without reference to top up included Art. 7.9 - 7.11.[216]

300.    Moreover, Art. 13.2 of the JAA provided that there was to be distribution according to Actual Shares, such shares being dependent upon the actual contributions of the Parties, and the Accumulated Contributions being referred to in Articles 13.3 and 13.4. Contrary to the contention of CPC, Article 13.2 does not provide for a continuing right to top up investments. Respondent contends in relation to Art. 13.2 that the language

---

[214] Ibid., paras. 155 - 156.
[215] Ibid., para. 157.
[216] Ibid., para. 159.

related to the time when the JAA was amended on 26 August 1998 and referred to the time for payment having been extended by agreement of the Parties, such that the Actual Share could reach 50%. However, CPC failed to honour its promise and it is not plausible to suggest that Art. 13.2 contemplated that at any time thereafter, and notwithstanding the lapse of many years since the time for the fulfillment of the promise, Claimant was entitled to make its top up contributions. Therefore, and in light of the foregoing, it is wrong to say that no effect is given by Respondent to Art. 13.2. Rather, Claimant ignores the remainder of the clause which provided that "in the event of deviation from the indicated ratio of the Accumulated Contribution the Actual Share of the company shall be determined as a product of the percentage share of its Contribution in the total amount of the Contributions by 0.9...".[217]

301.    Respondent concludes on this point that the JAA does not contain provisions which create the right to top up for Claimant. There was no provision or intention of the Parties that, if a Party had invested less than 50%, it would have a right top up its investment in later years to arrive back at 50:50, let alone that such a right would exist at any time, i.e. irrespective of the reasons for or the consequences of the delay.[218]

302.    Respondent contends also that allowing Claimant to top up its investment at this point would be contrary to commercial sense for the following reasons: there was a commercial necessity to pay moneys promptly in order to enable the Joint Activity to perform exploration activities and to enable licenses to be fully exploited as required by their terms. Consequently, it would not compensate Ukrnafta for the large sums which it had to expend over the years in order to provide money which should have been provided from CPC, nor for the detriment to the principal business operations of Respondent or for the fact that it could not use that money. Also, the fact that Respondent during this time would have been entitled to receive a greater proportion of the profits would not be an adequate compensation as there was no guarantee that there would be any profits for distribution in these early years, let alone enough profit to compensate for loss of the use of such money including its inability to use this money for other projects or for the principal business operations of Ukrnafta. Respondent points out

---

[217] Ibid., paras. 160 et seq..
[218] Ibid., para. 163.

that the alleged top up right amounts in effect to the equivalent of an option under which Claimant can choose at any time to take the benefit of a successful field, but to walk away from an unsuccessful field. Lastly, by 2003, when the nine wells were self-financing, the JAA did not provide that the Parties were entitled to make contributions when the same were unnecessary. Yet, the top up right, if it existed, would have as a consequence that money would be introduced by way of top up when no money was needed.[219]

303.    Respondent asserts that at that time, the existing risks included for example that Respondent could only obtain a license for a limited period of time, which under Ukrainian law required strict compliance with a program of works in order to prove the economic feasibility of the full development of the field. There was no certainty that a longer license could be obtained. Moreover, the political situation in Ukraine was difficult, including the situation that there was a prohibition of the export of domestically produced gas. There were difficulties in selling gas within Ukraine, both in relation to the price at which the gas could be sold, which was much lower than in Western Europe, and in relation to recovering payment from the purchasers. It was difficult to raise large sums of money on such a long-term and, to foreign participants, remote project from investors who were put off by the political instability of Ukraine and the experience of another overseas investor in the sector who had at about the same time suffered substantial losses from an investment in the same region of Ukraine. Hence, overall, the risk did not shrink – it remained high.[220]

304.    With regard to the events of 2004 – 2005 and Claimant's conduct during this period, Respondent contends that, contrary to Claimant's assertions, it did not accept a right of top up by Claimant during a meeting in December 2004 which is supported by the evidence of Messrs. Pustovarov and Kartashov, the latter being the head of Respondent's legal department. Similarly, so Respondent contends, the subsequent correspondence is inconsistent with the alleged acceptance of Claimant's right. Respondent refers in particular to Claimant's letters dated 23 December 2004, 3 March 2005 and 18 March 2005 (see also paras. 42 and 44 above), the content of which allegedly shows that such an agreement could not have been reached between the

---

[219] Ibid., para. 164, 164.1 - 164.5.
[220] Ibid., para. 165, 165.1 - 165.2.2.

Parties in December 2004, in particular also because no reference is made to such a meeting and agreement.[221]

3.    Decision of the Arbitral Tribunal

305.    The Arbitral Tribunal is of the view that a right to "top up" as asserted by Claimant does not exist for reasons which will be explained in more detail here-below.

306.    Having studied the clauses of the JAA relied upon by Claimant, in particular Art. 2.1, 2.6 and 7.6, the Arbitral Tribunal concurs with Claimant that these provisions reflect an understanding that the investment proportions could vary over time and that if one of the participants of the JAA was unable to fund its contributions, the Parties could agree that the other would do so for a certain period of time (see paras. 228 and 229 above). However, this does not automatically imply that the Party which has not been able to make contributions as initially anticipated can do so later by way of top up and thereby increase its share to 50%.

307.    Claimant relies upon Art. 13.2 in this regard and asserts that this provision reflects the Parties' intention to reach a 50:50 ownership ration within the Joint Activity, even though they might not do so immediately, thereby asserting that any other interpretation of this provision would deprive it of any meaning and thus run contrary to Ukrainian law as well as general principles of contract interpretation (see para 287 above).

308.    The Tribunal notes first that the mentioned provision does not include any explicit right of top up for either Party. Second, the Arbitral Tribunal does not concur with the interpretation of the provision asserted by Claimant. It is correct that the clause mentions the contributions of the Parties reaching a 50:50 ratio, thereby referring also to Art. 2.1 of the JAA, however, it does not provide for the way to get there. It is therefore perfectly reasonable in the Tribunal's eyes to assume that this provision covers the scenario where this situation arises, i.e. where contributions are made on an equal basis – without however creating a right for one Party in this regard on which a claim could be based –

---

[221] Ibid., paras. 170 et seq..

and would thus remain meaningful in circumstances where a 50:50 ratio exists. The fact that this clause does not create an automatic right to top up a Party's contribution to 50% is also supported by the fact that Art. 13.2.1 addresses the situation where the indicated 50:50 ratio shall be deviated from. If the Parties wished to create a compulsory basis for a readjustment of the shares held by the Parties to the Joint Activity, they could have done so explicitly, setting out in detail the mechanics of achieving this aim, including the rights and obligations of the Parties in this specific situation. The fact that they did not do so leads the Arbitral Tribunal to its conclusions in this regard and makes it even more reluctant to interpret the JAA in a way which in the Tribunal's opinion is not warranted.

309.  In light of the above findings, the Arbitral Tribunal does not consider it necessary to address the issue in light of the risk involved to explore the RC Field raised by both Parties.

310.  Furthermore, the Arbitral Tribunal has taken note that Claimant asserts that in December 2004, a meeting between representatives of both Parties took place during which Respondent confirmed that Claimant had the right to top up its contributions to the Joint Activity. However, looking at the evidence before it, the Tribunal is not persuaded that Respondent confirmed the existence of such a right. The Parties' witnesses have given contradicting evidence on this issue.[222] There exists no written document, such as minutes of the meeting, which would establish a record of what was actually discussed and agreed upon. Furthermore, the correspondence sent by Claimant to Respondent after this meeting, i.e. letters of 23 December 2004, 3 and 18 March 2005, makes no reference at all to this meeting and the agreement allegedly reached therein. Hence, the Arbitral Tribunal finds that Claimant has failed to prove that Ukrnafta confirmed during this meeting that CPC had a right to top up its share in the Joint Activity in the RC Field.

311.  **Summing up**, Respondent is liable for breach of the JAA since it prevented Claimant from participating in the development of new wells on the field on a 50:50 basis. However, Respondent has not breached the JAA by preventing CPC from exercising the right to top-up. Moreover, neither of these two claims was time-barred. Having

---

[222] Respondent's PHB II, para. 267.

established Respondent's liability with regard to one of Claimant's claims, the Arbitral Tribunal will now address the issue of the damages resulting from this breach of the JAA.

312.    Claimant has in these proceedings not only asked for damages, which we will turn to below, but also that the Arbitral Tribunal terminate the JAA on account of breach (see para. 147 above). Claimant bases its request for this remedy on Arts. 16 and 611 of the Ukrainian Civil Code both of which provide for the right of the injured party to have the legal relationship terminated respectively the agreement at issue cancelled.[223] Respondent does not dispute that this remedy is available to Claimant.[224] Consequently, and in light of Respondent's above-described breach of the JAA, the Tribunal will grant Claimant's request to terminate the Agreement.

## K.    DAMAGES

## I.    Limitation of Liability to Direct Damages

### 1.    Respondent's Position

313.    Respondent contends that Claimant's claim for damages is one for lost profits and subject to Art. 20.1 of the JAA. Art. 20.1 limits the liability to direct damages. Art. 20.1 of the JAA reads:

> *"Each of the Participants shall bear material liability for non-performance or inadequate performance of this Agreement, and exhibits hereto and, in the event of breach thereof, shall reimburse the other Participants for their direct losses that may arise through the fault of such Participant."*

Lost profits, so Respondent asserts, are not direct damages. This distinction is also known under Ukrainian law. Claimant's attempt to "dress up" its claim as one to sell an

---

[223] Claimant's PHB I, paras. 367 - 369.
[224] Respondent's PHB II, paras. 268 et seq..

interest in a property or to claim reimbursement of a market value cannot circumvent Art. 20.1.[225]

314.    Furthermore, Respondent contends that Claimant is only entitled to claim for damages (a) in respect of breaches of contract which have taken place to the date of the claim and not in respect of any anticipated future breaches, and (b) in respect of losses actually suffered to the date of the claim, and not in respect of apprehended future losses. Thus, for example, if a Party has been prevented from participating in the drilling of one new well, it does not follow that there has been a breach in respect of participation of future new wells where drilling has not yet commenced. Indeed, there may be wells which have not even been discovered.[226]

315.    Similarly, Respondent asserts that the claim for termination of the JAA as made by Claimant will prevent any future breaches from arising and therefore no entitlement to future profits will arise.[227]

316.    In response to Claimant's contention that Art. 20.1 of the JAA is unlawful under Ukrainian law (see para 319 below), Respondent asserts that there is no restriction preventing such a limitation of liability and in fact both the old and the new Civil Code expressly permit such limitations.[228] Moreover, the reasoning alleging Art. 20.1's unlawfulness based on Art. 33 of the Ukrainian Foreign Economic Law (hereinafter "FEA Law") must fail since no claim under this Law has been pleaded or otherwise contended for.[229] Therefore, also the corresponding wording in Art. 20.1 JAA and Art. 33 of the FEA Law – both refer to 'material liability' – is irrelevant. Finally, the FEA Law does not apply to private, but only to public relations.[230]

---

[225] Respondent's PHB I, paras. 306.
[226] Ibid., para. 324-325.
[227] Ibid., para. 327.
[228] Ibid., paras. 336 et seq. with reference to Art. 22 (3) of the new Civil Code which states that *"material damages to be compensated in the full amount, if otherwise not regulated by the contract or the law, to be compensated in the bigger and smaller portion"*.
[229] Ibid., para.342.
[230] Ibid., paras. 345 et seq. with reference to Art. 190 of the new Civil Code which states: *"1. Property as a specific object shall be considered a separate thing, a set of things, as well as property rights and obligations. 2. Property rights are non-consumable things. Property rights are deemed to be proprietary rights."* and Art.3 of the law "On valuation of property, property rights and professional valuation activities in Ukraine" of 12 July 2001 which states *"Property rights, to be valued, shall be any rights which are connected with property and which are different from the ownership rights, including the rights which are constituent parts of the ownership rights (the right to possess, use and dispose) as well as any special rights (rights to effectuate activity, use of natural resources, etc.) and the rights of claim.".*

317.   Respondent finally submits that Claimant's assertion that Art. 20.1 does not apply because of intentional breach by Respondent is misconceived in that (a) it is in any event too late for this allegation to be raised, (b) this is not a case of intentional breach, and (c) Art. 20.1 does apply even if there was an intentional breach because it limits the damages rather than excludes the liability.[231]

2.     Claimant's Position

318.   Claimant asserts that it is not seeking lost profits but the value of its investment which is under any theory a direct loss. It claims compensation for the destruction of its valuable property interest in its contractual right under the JAA to participate on a 50%-basis in all wells drilled on the RC Field. CPC's rights under the JAA were property rights, the damage or loss of which is a direct damage.[232]

319.   Furthermore, and in any event, so Claimant contends, the purported contractual limitation to direct losses is ineffective in the present case for two reasons. First, because Ukrainian law specifically prohibits an attempted limitation of liability for intentional breach and, second, because the JAA is a foreign economic agreement, the breach of which entails "full material liability".[233]

320.   With regard to the first point, Claimant relies upon Art. 614 of the Civil Code which reads in material part: *"A transaction terminating or limiting the responsibility for intentional breach of obligation is null and void."* 'Transaction' in this context, so Claimant asserts, includes any types of agreements and clauses thereof, and would clearly encompass the provisions of Art. 20.1 of the JAA.[234] Consequently, if the Tribunal were to find that Respondent breached the JAA and that such breach was intentional, the provisions of Art. 20.1 of the JAA could not operate to bar CPC from recovery of its full damages (including any lost profits) as any such termination or limitation of liability would be void.[235]

---

[231] Respondent's PHB II, para. 60.
[232] Claimant's PHB I, paras. 375 et seq..
[233] Ibid., para. 393.
[234] Ibid., paras. 394 et seq. with reference to Art. 202 of the Civil Code.
[235] Ibid., para. 398.

321.   Concerning the second point, i.e. Claimant's assertion that the JAA is a foreign economic agreement, the breach of which entails "material liability", it contends that it would in any case be entitled to full damages based upon the application of relevant provisions of the FEA Law. Contrary to Respondent's understanding whereby the FEA Law does not apply to breach of contract, Claimant contends that a breach of the JAA also constitutes a breach of Art. 5 of the FEA Law.[236]

322.   Claimant also contends that even if the Arbitral Tribunal decided that liability were to be limited under the JAA, CPC is still entitled to the damages it claims because the provision does not have the meaning asserted by Respondent. Claimant contests Respondent's approach to focus only on the term "direct losses", baldly asserting that such term excludes recovery of lost profits despite the fact that Respondent's legal expert acknowledged that such term was not used in either the old or the new Civil Code. Respondent, so Claimant asserts, has ignored the term "material liability" in its analysis, despite the fact that such term is used in relevant legislation – namely the FEA Law – and encompasses a notion of recovery of all damage, including lost profits. Finally, Claimant contends that a proper interpretation of the JAA and the arbitral case law suggest that lost profits are recoverable if they are "the direct fruit of the contract" and result directly from the breach of contract. Therefore, it would be reasonable to interpret the reference in the JAA to "direct damage" as an exclusion of indirect losses, rather than as a blanket exclusion of all lost profits.[237]

3.     Decision of the Arbitral Tribunal

323.   The Arbitral Tribunal is not of the opinion that Respondent's liability for breaching the JAA is limited by Art. 20.1 of the JAA. It has taken note of both sides' arguments and does not consider it necessary to address all of them in detail as its reasoning is based on the conclusion that Respondent breached the JAA intentionally and thus Art. 20.1 does not apply.

---

[236] Ibid., paras. 399 et seq..
[237] Ibid., paras. 405 et seq..

324.    As set out in paragraphs 257 and 31 above, Respondent has breached the JAA by preventing Claimant from participating in the drilling of new wells and thus jointly exploiting the RC Field. Respondent did so intentionally as it knew that Claimant was interested in participating and nevertheless prevented it from doing so. On several occasions, Claimant notified Respondent of its willingness to invest certain sums of money for which it needed Respondent's consent to pay into the joint account. Respondent withheld this consent. It thus acted intentionally. Whether or not Respondent knew that, on a legal level, its conduct amounted to a breach of the JAA cannot be relevant. Such a legal awareness would likely be impossible to prove and furthermore disadvantage anybody with a legal education. At the same time the argument not to have known about the legal consequences of a certain conduct – very difficult to prove wrong – would likely permit the party in breach to absolve itself from any liability.

325.    The Arbitral Tribunal holds that, contrary to the testimony given by Respondent's legal expert during the hearing[238], Ukrainian law contains (in Art. 614 of the Civil Code) a provision preventing the limitation of liability in cases of intentional conduct, as do many other jurisdictions. Respondent's objections in this regard do not persuade the Tribunal. It does not find that this point has been raised too late: the Tribunal raised this point of law with Respondent's legal expert during the hearing who responded by saying that Ukrainian law does not provide for a restriction on the limitation of liability.[239] Claimant corrected this in its first post-hearing brief and Respondent responded thereto in its second post-hearing brief. Hence, both Parties had ample opportunity to set out their respective positions with regard to this legal issue. The Tribunal furthermore considers that Art. 614 of the Ukrainian Civil Code applies by its wording to the situation at hand, i.e. the attempt to limit liability to pay damages caused by the intentional breach of a contractual obligation and the responsibility of one party in this regard.

---

[238] Transcript, Day 4, 100:18 - 101:7.
[239] Transcript, Day 4, 100:18 - 101:7.

## II.   Quantum

326.   Naturally, the Parties disagree with regard to the amount of any damages.[240] An analysis of the Parties' position, in particular as expressed and submitted by their respective experts, is set out below. Before turning to the assessment of the damages the Tribunal wishes to make two observations in this regard:

327.   Respondent asserts in these proceedings that the fact that CPC and its interests in both the RC and BB Field were sold to Cardinal for US$ 11.5 million shows that the damages claimed in these proceedings are grossly exaggerated.[241] The Tribunal does not share this opinion. As Respondent's expert, Mr. Ellison pointed out, the applicable legal standard against which damages are to be calculated is "that any loss should be calculated so as to put CPC in the position in which it would have been but for the breach [...]".[242] At the time of the sale in late 2007, this arbitration had already been initiated, thus, the Claimant's rights were in dispute. The Arbitral Tribunal has no detailed information of the circumstances of this sale and therefore cannot judge the conditions in which it took place. However, the arbitration having already begun, it cannot be assumed that the amount paid by Cardinal is the amount that would have been paid in a situation where Claimant and Respondent were not involved in a dispute over Claimant's rights. In a "but-for" world, CPC would not have been in a situation requiring a distressed sale. Moreover, basing any damages on the price obtained in the sale to KEC would allow Respondent to invoke and profit from the consequences of its own breach of the JAA which affected the value of the company CPC. Hence, the price CPC was sold for is not relevant for the valuation based upon the DCF method as performed by both experts.

328.   As a second point the Arbitral Tribunal intended to point out that, in fact, both experts, Mr. Kaczmarek and Mr. Ellison, used the same methodology to evaluate the damages suffered by Claimant. Hence, it is common ground between the Parties that this method is appropriate in order to determine the loss suffered by Claimant, if any.

---

[240] Ibid., Claimant's PHB I, paras. 421 et seq., PHB II, paras. 813 et seq., Respondent's PHB I, paras. 349 et seq. and PHB II, paras. 348 et seq..
[241] Respondent's PHB I, paras. 505 et seq..
[242] Expert Report dated 6 July 2009, para. 3.7.4.

329.   On behalf of Claimant, Mr. Kaczmarek submitted a first expert report on 1 December 2008, in which he evaluated the Total Damages, historical and future, at USD 215 million (UAH 1,061 million at exchange rate 4.94).[243]  Mr. Kaczmarek's findings are supported by Claimant's petroleum consultant expert, Mr. Richard Krenek of Netherland, Sewell & Associates, Inc. (NSAI).

330.   On behalf of Respondent, Mr. Ellison submitted a report dated 6 July 2009, in which he discussed the assumptions made by Mr. Kaczmarek in his damages quantification. As part of this analysis, Mr. Ellison has summarised the impact of changing only one assumption at a time.[244] These points increase or decrease the amount of damages of UAH 1,061 million valued in Mr. Kaczmarek's model by the amounts indicated in the margin hereunder for each of these points. This analysis is particularly useful in understanding the impact on the overall valuation of a change in the specific assumptions.

UAH
Million

(a)   This point assumes CPC's position as it would exist if it would not transfer its contractual interest, i.e. Mr. Ellison established the "blue line" in figure 3 of § 3.4.1 as if CPC continues to hold its contractual position (i.e. deduction of the future actual cash flow which Claimant would receive if it does not transfer his contractual position and which therefore cannot be qualified as damage).          (43)

(b)   This point assumes that CPC would not be allowed to top up its investment on existing wells.          (110)

(c)   This point assumes a valuation of CPC's current interest in the existing JAA wells, i.e. it eliminates future wells. Only a value of UAH 44 million out of UAH 1,061 million would remain.          (1,017)

(d)   This point assumes that Decree 31 remains in place and the prices set therein perpetually exist. As a result, no value at all would be left since UAH 1,061 million corresponds to Mr. Kaczmarek's initial valuation.          (1,061)

---

[243] Expert Report, Table 7, p. 25.
[244] Expert Report, p. 56, point 11.

(e)  This point assumes certain adjustments in operating costs, production taxes and sales commissions.    (132)

(f)  This point assumes a nominal discount rate increased to 22.5% (real rate 19.0% with no inflation) compared to 15.76% (real rate 12.26% with no inflation) used in Mr. Kaczmarek's first valuation.    (261)

(g)  This point assumes a lower percentage of production costs to be attributed to CPC in order to reflect the fact that Claimant only receives a 45% share of profit and should therefore only incur 45% (and not 50%) of the production costs.    224

331.  The Arbitral Tribunal has added two further potential adjustment factors drawn from Mr. Ellison's AA and BB scenarios[245] and which the Tribunal names for convenience "h" and "i" in the present listing:

(h)  Mr. Ellison carried out a loss calculation with Larry Connor's well building programme and historical and forecast well flows, assuming Decree 31 was lifted by 1 January 2009, consistent with Mr. Kaczmarek's assumption, but with Mr. Kaczmarek's other assumptions varied.[246] Mr. Connor of Ryder Scott Company is Respondent's petroleum consultant expert. Accordingly, only a value of UAH 79 million remains out of UAH 1,061 million.    (982)

(i)  Mr. Ellison calculated a scenario BB, considering CPC's loss if the JAA is determined to consist only of the existing wells, with Mr. Kaczmarek's other assumptions varied and using Mr. Connor's well flows.[247] Accordingly, only a value of UAH 27 million remains out of UAH 1,061 million.    (1,034)

332.  Mr. Kaczmarek submitted a second supplemental report dated 21 August 2009 to review the expert report prepared by Mr. Ellison and filed on 6 July 2009. In this report, Mr. Kaczmarek assesses the Total Damages, historical + future, at UAH 3,797 million or USD 472 million.[248] Further, Mr. Kaczmarek also determined the damages if CPC was

---

[245] Expert Report of Mr. Ellison dated 6 July 2009.
[246] Expert Report of Mr. Ellison dated 6 July 2009, figure 13, p. 60; § 9.3, p. 58; scenario AA.
[247] Ibid., figure 14, p. 60; § 9.4, p. 60; scenario BB.
[248] Supplemental Expert Report of Mr. Kaczmarek dated 21 August 2009, table 1, p. 3; table 5, p. 30.

not allowed to top up its investment on existing wells. In this case, his damage calculation establishes a slightly lower result at USD 454 million.[249] Mr. Kaczmarek also valued the impact on the damages if the Decree 31 would have been repealed by 31 December 2009 instead of 31 December 2008. In this case, the revised damages would decrease by approximately UAH 144 million or USD 18 million[250] and the final figure would be USD 436 million[251] instead of USD 454 million.

333. Mr. Kaczmarek considered the issues raised by Mr. Ellison and agreed with some of Mr. Ellison's adjustments and incorporated new information and corrections in his calculation of damages: for instance, the operating costs[252] and their allocation[253], the deduction of sales commissions,[254] the updating of the reserves tax ("subsurface mineral resources use duty")[255] and the use of the current exchange rate in calculating damages[256].

334. On other points, Mr. Kaczmarek disagreed with Mr. Ellison's assumptions, for instance he disputed that Decree 31 would remain in perpetuity.[257] The experts also disagree over the price of natural gas[258], the volume of production of natural gas and gas condensate[259] the treatment of corporate income taxes in the historical period from 2004 to 2008.[260] Finally, they also disagree over the discount rate.[261]

335. Other points of disagreement have an impact which both experts appear to consider as not material, such as the depreciation method used.[262] On some other points, Mr. Kaczmarek asserts to be more conservative than the position taken by Mr. Ellison, for instance gas storage[263] and financing costs. It should however be noted that Mr. Ellison has expressed doubts that such loan based as collateral could be obtained for gas storage financing[264].

---

[249] Ibid., Table 6, p. 31.
[250] Ibid., § 20, p. 7.
[251] Transcript. Day 3, 122:1- 14.
[252] Mr. Kaczmarek's Second Supplemental Report dated 21 August 2009, B, p. 14.
[253] Ibid., A, p. 13.
[254] Ibid., C, p. 15.
[255] Ibid.,§ 50, p. 17.
[256] Ibid., X, p. 22.
[257] Ibid., IV, p. 5.
[258] Ibid., V, p. 8.
[259] Ibid., VI, p. 10.
[260] Ibid., VIII, § 51 ff, p. 17.
[261] Ibid., IX, p. 19.
[262] Mr. Kaczmarek's second supplemental report of 21 August 2009; § 48, p. 16.
[263] Ibid., D, p. 15.
[264] Ibid., D, p. 27.

336.    Mr. Kaczmarek based his valuation of damages on the legal assumption that Claimant seeks to transfer its interests in the JAA through a damage award, i.e. CPC exits the JAA, selling its interests to UKRNAFTA.[265] In this respect, the Arbitral Tribunal has closely examined Mr. Kaczmarek's second supplemental report dated 21 August 2009 and Mr. Ellison's critical views in order to determine the Tribunal's valuation of damages. The valuation of the Arbitral Tribunal is based on the final revised summary established by Mr. Kaczmarek,[266] which incorporates, where considered appropriate, certain critical views and assumptions of Mr. Ellison, as well as rectification of errors noted in previous models.

337.    On disagreed points, the Arbitral Tribunal has decided to apply the following adjustments:

USD Million

(a)  For the reasons set out in paras. 306-312 the Arbitral Tribunal rejects CPC's assertion that it was entitled to top up its investment in the JAA. The Arbitral Tribunal takes as a starting point the final figure of Mr. Kaczmarek without "top up" investment on existing wells. That figure of USD 436 million, which needs to be adjusted hereafter, considers that Decree 31 would have been repealed by 31 December 2009 instead of 31 December 2008.[267]                     436

Gas price adjustment

(b)  The Arbitral Tribunal finds that the amount of damages of USD 436 million resulting from Mr. Kaczmarek's model should first be adjusted downwards because it relies on a massive and sudden increase of gas prices which should not be projected uncritically over the entire valuation period (2008-2023).

(c)  Between his two expert reports, Mr. Kaczmarek noted that the gas price has been multiplied by 2.28, evolving in 2009 from UAH 919.50 per mcm to UAH

---

[265] Mr. Kaczmarek's second supplemental report of 21 August 2009, § 12, p. 4 and Mr. Ellison's report dated 6 July 2009, § 3.4.3.b, p. 17.
[266] Ibid., Table 1, p. 3; Table 5, p. 30; Table 6, p. 31.
[267] Ibid., Table 6, p. 31; § 20, p. 7; See Transcript, Day 3, 122:13-14.

2,095 per mcm, i.e. an increase of 128%.[268] In the meantime, the USD/UAH exchange rate has changed from 4.94 to 8.03, i.e. by 63%.[269]

(d) About the gas price, Mr. Kaczmarek said "*With regard to prices, our initial model included a price of 919 hryvnas per million cubic metres. That price is now substantially higher, as Mr. Ellison indicated in his reports. We discussed in the second supplemental report that that increase in price is different by two factors: a depreciation of the hryvna vis-à-vis the dollar, because Russia sets the price of gas in the unregulated market in Ukraine and they price gas in dollars, as well as the renegotiated terms between Russia and Ukraine regarding gas prices.*"[270]

(e) Mr. Ellison considered that if Decree 31 would be repealed, it would not be certain that the gas price would move from its present Decree 31 price of UAH 333 per mcm to reach immediately Mr. Kaczmarek's market price of UAH 2,095 per mcm. Mr. Ellison said that "*... the price set at the moment is 300 for the domestic market. It's suggested that it will go up overnight to 2'000. You are going to have a lot of pretty unhappy people if that happens. You can see the political pressures that are referred to in Mr. Pustovarov's evidence at first hand, rather than the newspaper articles Mr. Kaczmarek has come up with, as to why that will be difficult. I mean, in England there's a huge row and articles in the Daily Mail when gas prices go up 10%, not 600%*"[271] and "*What you're talking about here is domestic consumers being told: "No, you're not going to pay 300; as from Monday you pay 2'000". I just can't see any domestic consumer [accepting] that. When I discussed it with Mr Pustovarov - and I've spoken to several people in Ukraine on this, there were five of them on the conference call - they said, 'If you put up the domestic prices six fold over night, you will have a revolution'. That's their view; I don't give an opinion on that.*"[272]

(f) As to operating costs and other expenses, they are valued by Mr. Kaczmarek in UAH with the last information available including some of Mr. Ellison's adjustments. The Arbitral Tribunal notes that if the UAH should remain weak,

[268] Mr. Kaczmarek's second supplemental report dated 21 August 2009: table 2, p. 10.
[269] Mr. Kaczmarek's second supplemental report dated 21 August 2009: p. 8, note 24.
[270] Transcript, Day 3, 127:1-10.
[271] Transcript, Day 3, 216:11-20.
[272] Transcript, Day 3, 221:6-15.

the inflation in Ukraine would increase particularly for imported goods, which would cause repercussions in the costs of the JAA.

(g) The Arbitral Tribunal decides not to modify the operating costs and other expenses for the following reason: both experts agree on these costs. However, it considers that the gas price in Mr. Kaczmarek's second supplemental report dated 21 August 2009[273] should be reduced to the level of prices in USD estimated in Mr. Kaczmarek's first report dated 1 December 2008[274], thus levelling out the sudden up rise effect of gas price. Thus the Arbitral Tribunal disregards the total revenues of USD 2,452.4 million[275] and reverts to Mr. Kaczmarek's initial figure, before gas price increase, of USD 2,056.7 million[276] for the total revenues between October 2008 and February 2023. The difference amounts to USD 395.7 million. This amount needs to be VAT adjusted (16.67% according to Mr. Kaczmarek's first report dated 1 December 2008[277]), adjusted to income tax (25% according to Mr. Kaczmarek's first report dated 1 December 2008[278]) and to withholding tax on the repatriation of dividends (5% according to Mr. Kaczmarek's first report dated 1 December 2008[279]). This calculation (USD 395.7 million less 16.67% VAT, less income tax of 25%, less withholding tax on repartition of dividends 5%) results in reduced revenues of USD 234.9 million for the 2008 - 2023 period. Since USD 234.9 million is the global reduction amount of revenues, after taxes, its net present value must be determined. The Arbitral Tribunal uses to this effect the calculation basis found in table 5 on page 30 of Mr. Kaczmarek's Second Supplemental Report of 21 August 2009. It indicates a factor of 2.165 (USD 940,537 million divided by USD 434,456 million). Consequently, by dividing the amount of USD 234.9 million by 2.165, the net present value at 1 August 2009 of the gas price reduction amount is USD 108.5 million.                                                                  (108.5)

---

[273] Item "Project Future Oct 2008-Feb 2023", Table 5, p. 30.
[274] Item "Project Future Oct 2008-Feb 2023", Table 7, p. 25.
[275] Table 5, p. 30, Mr. Kaczmarek's second report.
[276] Table 7, p. 27, Mr. Kaczmarek's first report.
[277] § 116, p. 37.
[278] § 115, p. 37.
[279] § 115, p. 37.

<u>Volume of production of natural gas and gas condensate adjustment</u>

(h)  The Arbitral Tribunal also considers that Mr. Kaczmarek's USD 436 million damage figure needs to be adjusted downwards in terms of volume of production as explained hereafter. The experts disagree over the volume of production of natural gas and gas condensate. The Arbitral Tribunal notes that the volume of gas production has a major impact on revenues and cash flow.[280] In the scenario of Mr. Ellison, the application of Mr. Connor's well build programme and historical and forecast well flows reduces the revenues by 82%[281] as compared to the revenues of Mr. Kaczmarek's first report[282].

(i)  For instance, Mr. Kaczmarek's forecast peaks at 5,495 MMcf in October 2018. However, Mr. Connor stated that the current field facilities could only handle 1,648 MMcf per month, but in his second report Mr. Connor stated that the JAA's current production was increased to 2,200 MMcf per month.[283] Mr. Connor was forecasting the installation of two new wells per year[284] and Mr. Kaczmarek was forecasting four new wells per year[285]. Scott Pickford's valuation report for a placing of up to 33,000,000 new Ordinary Shares, made for Cardinal in March 2005[286], even considered the possibility of 10 wells per year[287]. In his report of 30 June 2009, Mr. Connor states that "*Ukrnafta has indicated that they do not intend to drill four wells per year. The maximum drilling schedule Ukrnafta intends to pursue is two wells per year because they are not required to do more than that under the License, and they see no technical or commercial benefits for accelerating the drilling.*"[288]

(j)  In order to take into account the diverging evaluations between Claimant and Respondent, the Arbitral Tribunal decides to reduce the result by 41%, which corresponds to half of the difference of the revenues between

---

[280] Mr. Ellison's Expert Report dated 6 July 2009, Scenario AA, page 2 of 48.
[281] See item Project Future Oct 2008-Feb 2023, Scenario AA, page 2 of 48, UAH 1,863.561 million.
[282] Mr. Ellison's Expert Report dated 6 July 2009: Scenario "Navigant", page 2 of 86, UAH 10,160.135 million.
[283] Mr. Kaczmarek's Second Supplemental Report dated 21 August 2009, § 30, p. 11
[284] Mr. Ellison's Expert Report dated 6 July 2009, § 8.14, p. 51.
[285] Mr. Kaczmarek's Expert Report of 1 December 2008, IV, p. 30 and Mr. Kaczmarek's Second Supplemental Report dated 21 August 2009, VI, p. 10.
[286] Mr. Kaczmarek's Expert Report of 1 December 2008, E, p. 43.
[287] Mr. Kaczmarek's Expert Report of 1 December 2008, § 95, p. 31.
[288] Larry Connor's Report of 30 June 2001, § 3.7.4., p. 16.

Mr. Kaczmarek's model and Mr. Ellison's scenario AA. The calculated amount
is                                                                                    (134.3)

Discount rate

(k)    The Arbitral Tribunal decides to apply Mr. Ellison's discount rate of 19.00%
       instead of Mr. Kaczmarek's discount rate of 12.26%, in order to take into
       account the wide range of technical and political risks including the issue of
       Decree 31.[289] The Arbitral Tribunal cannot accept the approach taken by
       Mr. Kaczmarek in dealing with Decree 31. However, the Arbitral Tribunal does
       not find it acceptable to apply the current effects of Decree 31 without any
       hange until the termination of the JAA in 2023. The Arbitral Tribunal notes in
       this respect the following statement of Mr. Kaczmarek "... *under a*
       *Memorandum of Economic and Financial Policies (the "Economic*
       *Memorandum") as well as the Technical Memorandum of Understanding of*
       *October 31, 2008 (the "Technical Memorandum") signed between the IMF and*
       *Ukraine in connection with stabilization credits granted by the IMF to Ukraine,*
       *Ukraine has undertaken a commitment to move to a uniform price for domestic*
       *and imported gas and to remove subsidies for imported natural gas consumed*
       *by communal heating entities by July 2010. Therefore, by no later than July*
       *2010, we understand that these commitments would require Ukraine to abolish*
       *Decree 31 and move*
       *to market prices for all natural gas supplies. Ukraine has apparently already*
       *taken steps to conform to this requirement."* [290] Until now, this view has proven
       too optimistic and no legislation lifting Decree 31 has so far been
       communicated to the Arbitral Tribunal. Therefore the Arbitral Tribunal has
       adopted Mr. Ellison's approach and factored this issue of Decree 31 into the
       discount rate.

(l)    The impact of the change of the discount rate is 24.6%.[291] The Arbitral Tribunal
       applies this percentage to reduce the amount of USD 193.2 million.

---

[289] Mr. Ellison's Expert Report dated 6 July 2009, p. 55, § 8.2.6; Transcript, Day 3, 236:12-25.
[290] Second Supplemental Report of 21 August 2009, para. 18, p. 6.
[291] See Mr. Ellison's assumption point F, page 100 here-above which indicates a reduction of UAH 261 million on UAH 1,061 million,
      i.e. a reduction of 24.6% when a discount rate of 19.0% instead of 12.26% is applied. See Mr. Ellison's Expert Report of 6 July
      2009, p. 56, figure 11.

(m) Thus the initial damage valuation of 436 million after reduction of USD 108.5 million (gas price adjustment) and USD 134.3 million (gas volume adjustment) amounts to USD 193.2 million. This amount needs to be further reduced by the afore-mentioned discount rate change. Applying a reduction of 24.6% to USD 193.2 million results in a decrease amount of USD 47.5 million    (47.5)

_____

(n) The final valuation of the damage is therefore    <u>145.7</u>

Conclusion

(o) Mr. Kaczmarek's damage model has consequently been reduced by three key amounts:

|  | Mio. USD |
|---|---|
| Damages (initial) | 436 |
| - gas price reduction | (108.5) |
| - gas volume reduction | (134.3) |
| - discount rate increase including Decree 31 effect | (47.5) |
| Final total damage | 145.7 |

## II.    Causation

### 1.    Respondent's Position

338.    Respondent denies that any loss was caused by a breach of the JAA. It contends that at any relevant point in time, Claimant failed to show that it had in fact the resources to make the investment required or desired and that even if it had those resources, it would have used them for the purpose of making the investment. Respondent asserts that Claimant did not have the necessary funds nor did it evidence that an investment would have been made.[292]

339.    Respondent asserts in particular that Mr. Bensh lied when he stated in his witness statement as well as in his testimony during the hearing that finance was available, when

---

[292] Respondent's PHB I, paras. 373 et seq..

in fact, as admitted in Claimant's expert's report, it was not. It was not true that in April 2005, CPC had US$ 14 - 16 million to exercise the "buy back".[293]

2.    Claimant's Position

340.    Claimant agrees that it is its burden to show that, but for the breach, CPC would have had the resources to invest and would have invested in the JAA. It concedes that CPC lacked financing to make its full contributions in the early years of the JAA, however, when CPC did raise the necessary funds starting in 2004, Respondent prevented it from investing these funds – which is at issue in this arbitration.[294] Claimant also refers to the 2004 Annual Report for Cardinal Resources, CPC's parent company which, so it asserts, clearly evidences that the funds were raised and available, which was also confirmed by Respondent's expert, Mr. Ellison.[295] This situation with funds being available was reinforced in 2008 when CPC was sold to KEC. It refers also in this regard to Respondent's expert, Mr. Ellison, who conceded that it was reasonable to assume that "from January 2008 onwards CPC would have access to unlimited future capital" although he questions whether these amounts would really have been invested.[296]

341.    Claimant contests Respondent's assertion regarding the non-availability of funds in April 2005 as set out in para. 339 above and points out that, blocked by Respondent from investing in the JAA, in October 2005 CPC instead acquired a new asset in Ukraine, Rudis Drilling Company, for US$ 14.8 million.[297] It refers to Cardinal's Annual Report of 2005 which states in material part: *"It is Cardinal's intention to reinstate its interest in the field by settling the unpaid balance of the JAA account and paying the additional costs associated with four new wells currently being drilled by Ukrnafta. The $38 million financing secured in December was obtained primarily for this purpose. [...]."[298]* Hence, so Claimant asserts by citing Mr. Kaczmarek, by the end of 2005 *"Cardinal not only demonstrated an ability to raise funds for the JAA in 2004 and 2005, but it also demonstrated the ability to raise funds for a variety of other projects in significant sums".[299]*

---

[293] Ibid., paras. 393 et seq. with particular reference to Expert Report of Mr. Kaczmarek, para. 81.
[294] Claimant's PHB II, paras. 882, 887.
[295] Ibid., para. 905 with reference to Exh. R-30 and Expert Report of Mr. Ellison dated 6 July 2009, para. 5.2.2.
[296] Ibid., para. 990 et seq. with reference to Expert Report of Mr. Ellison dated 6 July 2009, para. 5.4.2.
[297] Claimant's PHB II, para. 939.
[298] Ibid., paras. 943 with reference to R-31, p. 1168.
[299] Ibid., para. 948 with reference to Expert Report of Mr. Kaczmarek dated 1 December 2998, para. 84.

3.      Decision of the Arbitral Tribunal

342.    The Arbitral Tribunal, having duly considered the positions of both Parties, first notes that Respondent's breach of the JAA occurred on 18 April 2005, i.e. when Respondent declared that Claimant would not be permitted to exercise its rights under the JAA, and, therefore, Claimant needs to show that funds were available and would have been invested into the JAA at that point in time.

343.    In light of the evidence before it, the Arbitral Tribunal is satisfied that in 2004/2005 Claimant had the necessary funds which would have permitted it to invest in the JAA. Respondent's expert does not dispute this fact. It is also illustrated by Table 8 contained in para. 90 of Mr. Kaczmarek's Export Report dated 1 December 2008 which shows the monies available at each point during the Parties' cooperation. The Tribunal has no reason to doubt the accuracy of this table which was not disputed by Respondent's expert.

344.    Furthermore, the Arbitral Tribunal has no reason to doubt that these available funds would have been invested by Claimant in the JAA. This is supported by documents such as the minutes of the Management Committee Meeting of 10 February 2005[300] during which the Parties agreed upon the work program for the year 2005, thus reflecting that Claimant did have the intention to invest and expressed that intention to its business partner. This intention is, moreover, reflected in Claimant's internal documents, respectively those of its parent company, such as Cardinal's Annual Report of 2005 referred to in para. 342 above. Claimant did not get the opportunity to implement its intention, due to Respondent's conduct described above. The latter, however, has not offered any evidence to rebut the proof offered by Claimant by showing that, even in case Claimant had the opportunity, it still would not have used the funds available to invest in the JAA.

---

[300] See Exh. C-31.

### III.    Interest

#### 1.    Claimant's Position

345.    Claimant requests payment of interest on any monetary award prior to as well as from the date of the award until the date of final payment at the rate of LIBOR + 2%, compounded monthly, or such other applicable rate as may be determined by the Tribunal and refers in this regard in particular to Mr. Kaczmarek's expert report dated 1 December 2008 and Table 18 attached thereto.[301]

346.    Claimant furthermore asserts that there is no statutory interest in Ukraine or other Ukrainian regulations respectively restrictions that would mandate a particular interest rate in a case of this type. At the same time, there are no provisions under either Ukrainian or Swedish law that would preclude an award of interest. In these circumstances, so Claimant contends, it is entitled to both pre-award and post-award interest.[302] There is nothing preventing the Tribunal from awarding interest under either Ukrainian or Swedish law.[303] An interest rate of LIBOR + 2% has to be considered reasonable.[304]

#### 2.    Respondent's Position

347.    Respondent has developed its position expressed during the hearing[305] and objects to a payment of interest as claimed by Claimant on the following grounds:

-    since – as conceded by Claimant – Ukrainian law does not contain any provisions regarding interest, no interest whatsoever should be paid;

-    interest should only be paid to a person respectively entity which had to borrow money and Claimant has not submitted any proof in that regard;

---

[301] Claimant's PHB I, paras. 534 et seq..
[302] Ibid., para. 538.
[303] Ibid., para. 541.
[304] Ibid., para. 543 with reference to M. Kantor, *Valuation for Arbitration, Compensation Standards Valuation Methods and Expert Evidence*, Kluwer 2008, p. 270: *"Even outside the international financial community, though, interest rate provisions in sophisticated business transactions are more precise than most arbitration awards. For instance, the default interest rate provisions for one oil concession joint bidding agreement called for LIBOR + 2% compounded monthly."*
[305] Transcript, Day 4, 121 : 8 - 22.

-    if interest were to be awarded, it should be at a rate of not more than simple LIBOR.[306]

3.    Decision of the Arbitral Tribunal

348.    Having duly considered the positions of both Parties on this issue, the Arbitral Tribunal rejects the claim for pre-award interest due to the fact that Ukrainian law, which is applicable to the merits of this dispute, does not provide for interest to be awarded in the circumstances of this case.

349.    When it comes to post-award interest, this question is of procedural character and subject to Swedish law as the *lex arbitri*. Claimant has asked for interest on the monetary award from the date of the award until payment at a rate of one month LIBOR + 2%, compounded monthly, or such other applicable rate as may be determined by the Tribunal. In its second post-hearing brief, Respondent has opposed any award for interest at a rate higher than LIBOR, without any uplift. The Arbitral Tribunal holds that simple interest should be awarded. Claimant has not provided legal authority for the award of interest at any rate higher than that admitted as reasonable by Respondent. Swedish practice concerning interest awards does not include awarding compound interest in the absence of contractual support.

350.    The Arbitral Tribunal decides to award simple post-award interest on the moneys awarded at the average monthly LIBOR rate for US dollars.

L.    LEGAL FEES AND EXPENSES - COSTS OF THE ARBITRATION

I.    Legal fees and expenses; general observations on the Costs of Arbitration

351.    By order dated 5 September 2009, slightly modified in its subsequent letter dated 16 December 2009, the Arbitral Tribunal invited the Parties to file a Submission on Costs by 15 January 2010 and their comments, if any, on the other Party's Submission on Costs by 29 January 2010. Both Parties complied with the Tribunal's invitation.

---

[306] Respondent's PHB II, paras. 606 et seq, in particular 613.

352.   Claimant requests that it be awarded fees and expenses of USD 3,667,943.41.[307] Respondent requests that it be awarded fees and expenses of USD 747,975.05, GBP 2,089,958.74 and UAH 648,360.48.[308]

353.   Art. 44 of the SCC Rules stipulates that, unless otherwise agreed by the parties, the Arbitral Tribunal may in the final award, upon the request of a party, order one party to pay any reasonable costs incurred by another party, including costs for legal representation, having regard to the outcome of the case and other relevant circumstances.

354.   Pursuant to Art. 43(5) of the SCC Rules, which deals with the Costs of the Arbitration consisting of the fees of the Arbitral Tribunal, the Administrative Fee of the SCC Institute, and the expenses of the Arbitral Tribunal and the Institute:

> "[u]nless otherwise agreed by the parties, the Arbitral Tribunal shall, at the request of a party, apportion the Costs of the Arbitration between the parties, having regard to the outcome of the case and other relevant circumstances."

355.   Hence, following the principles set out above and the Parties not having agreed otherwise in this case, the Arbitral Tribunal bases its decision concerning the allocation of the costs of legal representation, other party costs, fees and expenses in this matter upon the outcome of the case as well as other relevant circumstances, in particular, the conduct of the Parties, noting at the outset that the expenses claimed by either party must be considered reasonable for an arbitration of this magnitude.

356.   When deciding on the allocation of costs, the Tribunal takes into account that Claimant has been successful in terminating the JAA and recovering damages, although it prevailed only partly, *i.e.* it succeeded in the claim concerning its participation in new wells in the RC Field, but it failed in its so-called top-up claim. The top-up claim is the much smaller claim of the two. With regard to the quantum of the successful claim, the Arbitral Tribunal awards Claimant USD 145.7 million plus interest, approximately a third of its overall claim for damages. However, the Arbitral Tribunal will not mechanically allocate the fees and expenses accordingly, one third and two thirds, but takes into

---

[307] Claimant's First Submission on Costs dated 15 January 2010, p. 13; Second Submission on Costs dated 29 January 2010, p. 5.
[308] Respondent's First Submission on Costs dated 15 January 2010, p. 11.

account other relevant factors, in particular Claimant's success in recovering damages, and the conduct of the Parties in the course of the arbitration.

357.   In reviewing the performance of the parties during the arbitration, the Arbitral Tribunal arrives at the conclusion that Respondent's conduct considerably complicated and lengthened these proceedings, thereby increasing their costs. The Tribunal refers in particular to Respondent's conduct during the phase of document production which cannot be called anything but obstructive, making it necessary for Claimant and its counsel to spend considerable time, effort and resources on this issue, and for the Tribunal to render several Procedural Orders, while Respondent refused to discharge its obligations in this regard and abide by the Tribunal's rulings.[309] Further, the Respondent was unsuccessful in a challenge of the Tribunal's jurisdiction. This challenge was raised in December 2009, more than a year after these proceedings had been commenced and less than three months prior to the hearing on the merits was scheduled to take place. This challenge was based on arguments which had no merit. Not only did it become clear that Respondent knew or should have known about the basic facts supporting its argument, specifically about Claimant's change of state of incorporation, much earlier, but the Respondent was certainly aware of its own lengthy involvement in this arbitral procedure, which caused the challenge to be hopeless on obvious formal grounds. Nevertheless, Respondent pursued its line of argumentation vigorously, thus making necessary an exchange of several submissions on this point, culminating with Respondent not attending the hearing on jurisdiction in March 2009 despite the fact that, in light of Respondent's approach and unsolicited evidence including witness statements submitted less than two weeks prior to the hearing, the Tribunal had communicated its decision to limit the hearing to the issue of jurisdiction, thus postponing the hearing on the merits until September 2009.[310] Lastly, on more than one occasion, Respondent did not abide by the deadlines set by the Tribunal, neither informing the Tribunal in advance, nor requesting an extension.

358.   On the other hand, the Arbitral Tribunal does not accept Respondent's argument objecting to Claimant's conduct of this arbitration on the basis of, *inter alia*, the exaggeration of claim, unsatisfactory witnesses, the presentation of bad arguments and

---

[309] See Claimant's First Submission on Costs dated 15 January 2010, paras. 16 - 34 for a detailed account of this part of the proceedings.
[310] See Claimant's First Submission on Costs dated 15 January 2010, paras. 35 et seq. for a detailed recount of this part of the proceedings.

a misleading presentation of the case.[311] Such factors have directly affected the Tribunal's evaluation of the evidence and, consequently, its decision on the merits as set out above which will, as mentioned, also affect its decision on costs. However, these are not relevant additional factors which might influence the decision on costs. Overall, and although the Arbitral Tribunal dismissed part of its case, the Tribunal does not find that Claimant has advanced its claims frivolously. In fact, it considers Claimant's handling of this arbitration entirely reasonable and diligent.

359.    Consequently, under Art. 44 of the SCC Rules, based on the outcome of the arbitration, but also taking into consideration additional relevant factors such as the conduct of the Parties during these proceedings and the time spent handling the several issues raised by the Parties, the Arbitral Tribunal has decided that Respondent shall bear its own costs as well as one third of Claimant's costs. The remaining two thirds of its costs of legal representation, fees and expenses Claimant shall bear itself. The Tribunal will so order.

## II.    Costs of the arbitration

360.    With respect to the Costs of the Arbitration under Art. 43 (5) of the SCC Rules, the Tribunal exercises its discretion on the same basis as it did for the legal fees and expenses and decides that Respondent shall bear two thirds and the Claimant shall bear one third.

## M.    AWARD

361.    For the reasons set out above in this Final Award, the Arbitral Tribunal hereby issues the following decisions:

(1)    it declares the JAA terminated due to the breach thereof by Respondent;

(2)    it orders Respondent to pay Claimant USD 145.7 million (ONE HUNDRED AND FORTY-FIVE MILLION AND SEVEN HUNDRED THOUSAND UNITED STATES DOLLARS) plus simple interest at the average monthly LIBOR rate for US dollars from the date of this award until payment;

---

[311] See Respondent's First Submission of Costs dated 15 January 2010, para. 11.

(3)     it orders Respondent to bear its own costs of legal representation (fees and disbursements) and to pay to Claimant USD 1,222,647.80 (ONE MILLION TWO HUNDRED AND TWENTY-TWO THOUSAND SIX HUNDRED AND FORTY-SEVEN UNITED STATES DOLLARS AND EIGHTY CENTS) plus simple interest at the average monthly LIBOR rate for US dollars from the date of this award until payment, representing a share of Claimant's legal fees and expenses;

(4)     it declares that the parties are jointly and severally liable for the payment of the costs of this arbitration, which have been determined as follows:

  a.  The fee of Wolfgang Peter, chairman, amounts to EUR 315,000 and compensation of expenses amounts to CHF 7,559.55 and SEK 51,273.

  b.  The fee of Sigvard Jarvin amounts to EUR 189,000 and compensation of expenses amounts to EUR 2,146.18, SEK 12,325 and CHF 24 plus a per diem allowance of EUR 1,200.

  c.  The fee of Per Runeland amounts to EUR 189,000 and compensation of expenses amounts to GBP 3,671.50, CHF 477,65 and SEK 12,220 plus a per diem allowance of EUR 1,650.

  d.  The expenses of Anne K. Hoffmann, LL.M. amount to CHF 6,914.50 and SEK 16,050.

  e.  The Administrative Fee of the SCC amounts to EUR 60,000 and the expenses amount to EUR 11,350.92.

  f.  As between the parties, the Claimant shall bear one third of the arbitration costs under Article 43 of the SCC Rules and the Respondent shall bear two thirds. The arbitration costs will be drawn from the advances paid to the SCC.

(5)     It rejects all claims and requests not dealt with expressly in this Section.

**N.    RECOURSE**

Pursuant to Section 41 of the Swedish Arbitration Act a party may bring action in the Stockholm District Court (Box 8307, 104 20 Stockholm, Sweden) against the award regarding the payment of compensation to the arbitrators and the SCC Institute. Such action must be brought within three months from receipt of the award.

Place of Arbitration: Stockholm, Sweden

The Arbitral Tribunal

Sigvard Jarvin
Arbitrator

Per Runeland
Arbitrator

Wolfgang Peter
Chairman

117