# EXHIBIT 4

[Translation from Swedish into English]
[Crest]



| SVEA COURT OF APPEAL | JUDGMENT | Case no. |
|---|---|---|
| Department 02 | 26 March 2015 | T 10470-10 |
| Division 020108 | Stockholm | |



### PLAINTIFF
PJSC Ukrnafta
Nestorivsky by-str 3 5
04053 Kiev
Ukraine

Counsel: Finn Madsen and Daniel Prawitz (Advokater)
Advokatfirman Vinge KB [Vinge Advocate Law Offices Limited Partnership]
Box 4255
203 13 Malmö

Counsel: Christer Söderlund (Advokat)
Advokatfirman Vinge KB
Box 1703
111 87 Stockholm

### DEFENDANT
Carpatsky Petroleum Corporation
Delaware, 2644163 808 Travis Street,
Suite 1040 Houston
77002 Texas
USA

Counsel: Bo G H Nilsson and Daniel Lander (Advokat)
Advokatfirman Lindahl KB [Lindahl Advocate Law Offices Limited Partnership]
Box 1065
101 39 Stockholm

### THE MATTER
Challenge of arbitration award issued on 24 September 2010

---

### JUDGMENT OF THE COURT OF APPEAL

1. The Court of Appeal rejects the plaintiff's case.

2. PJSC Ukrnafta shall compensate Carpatsky Petroleum Corporation for litigation costs of SEK 1,654,657 and USD 122,240 together with interest on the amounts under

Doc.ID 1189711

| Postal address | Visiting address | Telephone | Fax | Office hours |
|---|---|---|---|---|
| Box 2290 | Birger Jarls Torg 16 | +46 (0)8-561 670 00 | +46 (0)8-561 675 09 | Monday to Friday |
| 103 17 Stockholm | | +46 (0)8-561 675 00 | | 09:00-15:00 |
| | | E-mail: svea.avd2@dom.se | | |
| | | www.svea.se | | |

Section 6 the Interest Act from the date of the judgment of the Court of Appeal until payment is made. This amount includes fees for counsel of first SEK 1,550,000, and second USD 90,500.

—————————



## BACKGROUND

PJSC Ukrnafta ('Ukrnafta') – previously with the operating name OJSC Ukrnafta – is a joint stock company registered in Ukraine, and Carpatsky Petroleum Corporation ('Carpatsky') is a joint stock company registered in the State of Delaware in the United States. SE Poltavanaftogaz (a subsidiary of Ukrnafta) and Carpatsky Petroleum Corporation (predecessor of Carpatsky with its seat in the State of Texas, United States) entered into a contract referred to as the 'Joint Activity Agreement N. 410/95' ('the Cooperation Agreement') on 14 September 1995. The cooperation applied to the extraction of natural gas from and development of the Rudivsko-Chervonozavodsky natural gas field. The intention was that Ukrnafta would mainly contribute to the extraction of natural gas from certain sources while the counterparty's contribution would primarily be to provide capital, technology and certain advanced equipment. The parties entered into certain supplementary agreements in 1996 and 1998. According to these, the cooperation would last until 2023.

In 1996 Carpatsky Petroleum Corporation, with its seat in Texas, was absorbed into Carpatsky through a merger and the afore-mentioned company ceased to exist.

Carpatsky had liquidity problems for a number of years of the cooperation and did not satisfy its agreed contribution. No further investments were made by the parties from 2003.

The Ukrainian Government introduced a new enactment in January 2007, referred to as 'Decree 31', whereby companies operating within gas and oil extraction – where more than fifty per cent was directly or indirectly owned by the state – were obliged to sell their production to the state-owned Naftogaz at prices set by a central government authority. The parties' cooperation under the Cooperation Agreement was affected by Decree 31, which meant that it was not possible to produce and sell gas at a profit for as long as Decree 31 was in force.

Carpatsky requested arbitration against Ukrnafta in September 2007. Carpatsky claimed that Ukrnafta had committed a breach of contract and requested, among other things, that Ukrnafta should be ordered to pay Carpatsky a certain amount in damages. Ukrnafta claimed, for its part, that Carpatsky had committed a breach of contract and requested that Carpatsky should be ordered to pay damages to the company.

An arbitration award was issued following arbitration proceedings in Stockholm,
SCC V (124/2007). The arbitral tribunal found in the award that Ukrnafta had committed a
breach of contract by preventing Carpatsky from participating in the cooperation on equal
terms since 2004. The arbitration award means, among other things, that the Cooperation
Agreement was terminated, and that Ukrnafta was ordered to pay Carpatsky USD 145.7
million plus interest and compensation for costs.

## RELIEF SOUGHT

Ukrnafta has requested that the Court of Appeal set aside the entire arbitration award,
though pointing out that sub-paragraphs 4 (a) to (e) of the operative part of the final award
relating to the costs of the arbitration proceedings are, in the opinion of Ukrnafta, not part
of the arbitration award.

Carpatsky has opposed the setting aside of the arbitration award.

The parties have requested compensation for their litigation costs.

## THE FACTS AND POSITIONS PRESENTED BY THE PARTIES

### Ukrnafta

The arbitral tribunal has exceeded its mandate in the following respects or alternatively an
irregularity occurred in the course of the proceedings which probably influenced the
outcome (Section 34, first paragraph, items 2 and 6 of the Arbitration Act [1999:116 –
LSF]).

*Decree 31*
It was undisputed in the arbitration proceedings that Decree 31 needed to be repealed for
any loss to arise. During the arbitration proceedings, Carpatsky asserted that Decree 31
would possibly terminate at certain specified points in time. It was initially stated that
Decree 31 would terminate on 31 December 2008. When this date had passed without
Decree 31 having terminated, the date was adjusted to 31 December 2009. When this date
had also passed without Decree 31 having been repealed, July 2010 was instead stated as
the deadline for when Decree 31 would terminate. The arbitration award was issued on
24 September 2010, i.e. after July 2010 had passed. No other assertions

about when Decree 31 would be repealed had been presented by Carpatsky at that time. In other words, at the time of the arbitral tribunal's adjudication, there was no alternative date to that claimed by Carpatsky for when Decree 31 would terminate or assertion as to what would then apply, which could not already have been observed to be incorrect. In spite of this, the arbitral tribunal considered that Decree 31 would be repealed before the end of the term of the contract in 2023. This was a 'legal fact' [Sw: *rättsfakta*[1]] fact that had not been invoked by Carpatsky. Regardless of whether Carpatsky should be deemed to have asserted some other time for the termination of Decree 31 that was later than July 2010, the arbitral tribunal failed to adopt a position on the issue of when Decree 31 would be repealed.

The arbitral tribunal committed an irregularity in the course of the proceedings by rejecting the request of Ukrnafta to be allowed to adduce as evidence a new act on price regulation in Ukraine ('the Natural Gas Act'). This evidence could not have been adduced earlier. The evidence dismissed showed that Decree 31 would continue to be in force for the foreseeable future. If Ukrnafta had been permitted to adduce this evidence, it would have been likely that the arbitral tribunal would not have found that Ukrnafta was liable to pay damages or in any event set the damages at a significantly lower amount.

*Intentional breach of contract*

The Cooperation Agreement only afforded a right to compensation for direct loss (Article 20.1). The arbitral tribunal found that Article 20.1 was not applicable with reference to Ukrnafta having committed an intentional breach of contract and that the liability for damages, according to Ukrainian law, could not be limited in such a case.

- However, Carpatsky did not duly invoke that the breach of contract was intentional or that the limitation of liability should not apply for that reason.
- In any event, this was only invoked after the proceedings were declared to have been concluded or after the arbitral tribunal had notified the parties that no new circumstances may be presented.
- Ukrnafta had no opportunity to anticipate that the arbitral tribunal would apply the statutory provision in question as grounds for the award. For this reason, Ukrnafta was prevented from presenting its case by, for instance, invoking legal facts and adducing evidence on this issue.
- The arbitral tribunal did not consider Ukrnafta's other objections relating to a limitation of liability considering that the arbitral tribunal had found that Ukrnafta had committed an intentional breach of contract. However,

---

[1] *Translator's note:* a fact of direct relevance to the claim pleaded

Ukrnafta declared that its other objections were not dependent on the objection concerning the limitation of liability.

### Compensation for post-termination loss

During the arbitration proceedings, Carpatsky did not expressly claim compensation for damage that arose after the cessation of the Cooperation Agreement ('post-termination loss'). Despite this the arbitral tribunal awarded compensation for such loss.

### Calculation model

Both parties adduced expert evidence during the arbitration proceedings in respect of the size of the loss, and showed through this evidence how the arbitral tribunal should calculate such loss, if any. The parties used the same calculation model, namely a model that expressed the discounted cash flow of future payments ('the DCF method'). When using this model, the parties attributed different values to the assumptions included in the model and thereby generated different measures of the loss when the loss is equal to the present value of future payments ('Net Present Value').

The arbitral tribunal exceeded its mandate by setting adjusted values for some of the assumptions, but failed to apply the calculation model used by the parties. The arbitral tribunal simply subtracted the items. In any event, the arbitral tribunal committed an irregularity in the course of the proceedings that had an impact on the outcome of the case. Ukrnafta was not afforded an opportunity to express its views on the adjustments and was therefore denied the opportunity to present its case.

### Funds to invest

When calculating the loss, the arbitral tribunal proceeded erroneously from Ukrnafta having confirmed that Carpatsky had sufficient assets to invest in the parties' cooperation. During the arbitration proceedings, Ukrnafta clearly denied the allegations made concerning this matter.

The arbitral tribunal has also proceeded erroneously on the basis that Ukrnafta had not adduced any evidence to disprove that Carpatsky would have used these funds to invest.



### Carpatsky

It is denied that the arbitral tribunal exceeded its mandate or that an irregularity occurred in the course of the proceedings. In any event, if the Court of Appeal were to find that some sort of irregularity occurred in the course of the proceedings in the manner alleged by Ukrnafta, it is unlikely that this influenced the outcome.

*Decree 31*
Carpatsky claimed during the arbitration proceedings that Decree 31 would be repealed during the term of the contract, i.e. before 2023. No specific date was claimed. The fact that the expert appointed by Carpatsky stated different times as the point of departure for the Discounted Cash Flow calculations is a different matter. Such a calculation presumes an assumption of when payments will start. The date for a possible repeal of Decree 31 had no direct relevance to the arbitration award.

The arbitral tribunal did not commit an irregularity in the course of the proceedings by rejecting Ukrnafta's request concerning evidence.

*Intentional breach of contract*
Carpatsky claimed in the arbitration proceedings that this involved a direct loss. Carpatsky also claimed that Ukrnafta had committed an intentional breach of contract. The proceedings had still not been declared concluded at that time. This assertion was sufficiently concretized. The principle of intentional breach of contract in question was raised by the arbitral tribunal during the final hearing. It was denied that Ukrnafta was denied an opportunity to present its case.

*Compensation for post-termination loss*
It is denied that the arbitral tribunal awarded compensation for a loss that arose after the termination of the Cooperation Agreement ('post-termination loss').

*Calculation model*
Both parties adduced expert reports about the size of the loss, but these do not include any instructions about how the arbitral tribunal should assess the report when estimating



the size of the loss. The tribunal received no detailed explanation about the mathematical models used and none of the experts expressed an opinion on the alleged 'dynamic effects'. Nor does the fact that the arbitral tribunal adjusted certain parameters mean that it adjudicated on circumstances that had not been referred to. Nor do the expert's reports constitute a legal fact, but evidence of the size of the loss (evidentiary fact). The calculation of the loss formed part of the arbitral tribunal's substantive adjudication and is irrelevant within the framework of the challenge action.

*Funds to invest*

The arbitral tribunal did not misunderstand Ukrnafta's position as regards Carpatsky's economic possibilities to invest in the cooperation. Nor did the arbitral tribunal ignore the evidence adduced by Ukrnafta. The arbitral tribunal's substantive assessment – regardless of whether it is right or wrong – shall not be reconsidered through challenge proceedings.

## ELABORATION OF THE PARTIES' CASES

### Ukrnafta

*Decree 31*

The opportunity to pursue gas production at a profit lapsed through the introduction of Decree 31. When assessing Carpatsky's application for damages, Decree 31 thus means that a loss could not arise for Carpatsky. This fact was not disputed between the parties. In light of this, Carpatsky claimed that Decree 31 would be repealed on 31 December 2009. When this prediction proved to be wrong, it was claimed instead that Decree 31 would apply until July 2010. This was stated in the second supplementary report from the expert Kaczmarek in August 2009, which Carpatsky referred to in its written submission 'Post Hearing Memorial II'. It was clear at the time of the arbitral tribunal's adjudication that none of these dates were correct. Considering this, the arbitral tribunal ought to have concluded that no legal facts had been invoked to form the basis of a ruling whereby Decree 31 would be repealed before the term of the contract expired in 2023. However, the arbitral tribunal did not do so. Nor did the arbitral tribunal adopt a position on whether Decree 31 would terminate at another fixed point in time but instead considered the uncertainty in respect of Decree 31 when determining the discounting factor. Ukrnafta



emphasized during the arbitration proceedings that it was not sufficient for the arbitral tribunal to make an assumption that Decree 31 could terminate at some time, but instead the arbitral tribunal should identify the point in time at which this would occur.

On 26 July 2010 Ukrnafta asked for the permission of the arbitral tribunal to submit evidence in the form of a new act passed on 8 July 2010 regarding gas price regulation in Ukraine ('the Natural Gas Act') as well as some supplementary documentation. However, Ukrnafta was notified in a written communication from the arbitral tribunal on 28 July 2010 that the company was not permitted to submit the Act. Through this Ukrnafta was deprived of its right to bring its action in the arbitration proceedings. The Natural Gas Act was highly relevant to the issue of governmental regulation of natural gas prices and whether the price regulation that applied at the time would terminate. It was not possible to adduce the Act any earlier. According to Article 34 of the arbitration rules of the Arbitration Institute of the Stockholm Chamber of Commerce ('the SCC Rules') it is possible for an arbitral tribunal to reopen proceedings once they have been closed. There are strong reasons to do so in this case.

*Intentional breach of contract*

According to Article 20.1 of the Cooperation Agreement, a party's obligation to pay damages is limited to direct losses. In the arbitration proceedings, the parties had a difference of opinion concerning whether the compensation claimed by Carpatsky related to a direct loss in the manner referred to in this provision. During the final hearing, the arbitral tribunal raised the issue of what impact an intentional breach of contract had according to Ukrainian law on the limitation of liability contained in the provision. After the arbitral tribunal had declared under Article 25 of the SCC Rules that the parties were unable to make any supplementations, Carpatsky stated that Ukrainian law prescribed that limitation of liability paragraphs should be set aside in the event of an intentional breach of contract. However, Carpatsky's argument was limited to a brief report on the content of Ukrainian law without specifying any material circumstances. The first time that Ukrnafta had an opportunity to respond to the newly introduced legal rule was in the written submission 'Post Hearing Brief II'. Ukrnafta then objected, stating that the issue had been raised too late in the proceedings and that Carpatsky had not stated in any detail the way in which Ukrnafta had committed an intentional breach of contract. In spite of this, the arbitral tribunal based its ruling on this being an issue of an intentional breach of contract and that Article 20.1 could therefore not be applied. Other objections from Ukrnafta were not dealt with.

*Compensation for post-termination loss*

It is indicated by paragraph 318 of the arbitration award that Carpatsky did not request
compensation for future loss. Despite this, the arbitral tribunal concluded that the calculations
made by Kaczmarek, Carpatsky's expert, were based on both historical and future losses
(see Items 329 and 332 of the arbitration award).

*Calculation model*

When calculating the loss, the arbitral tribunal proceeded on the basis of Kaczmarek's
calculations but adjusted these in certain respects. These adjustments referred to, among other
things, the start date, assumptions in respect of the price and volume of gas and also
discounting rates. The arbitral tribunal failed in conjunction with this to consider the dynamic
effects of the model referred to by the parties. This characteristic of the model results in
changes to values based on certain assumptions also affecting values assigned to other values.
This issue involves complex relationships between different assumptions, on which both of the
parties based their calculations. If the method applied by the parties had been used, the loss
would have been USD 62.5 million instead of the USD 35.7 million awarded. The arbitral
tribunal consequently did not use the nominated calculation model and nor did it afford the
parties any opportunity to express their opinion on the above-mentioned adjustments in
relation to the calculation model.

*Funds to invest*

Carpatsky claimed during the arbitration proceedings that the company had funds available for
investments and that these funds would have been invested in the cooperation if Ukrnafta had
not committed a breach of contract. Carpatsky claimed that Ukrnafta's breach of contract
prevented Carpatsky's investments under the Cooperation Agreement and that this was the
reason for Carpatsky's loss. Ukrnafta for its part claimed that Carpatsky – even if a breach of
contract were deemed to have occurred – had not caused any loss. Ukrnafta amplified on this
in such a way that Carpatsky, even in an alternative hypothetical course of events where the
breach of contract had never taken place, would not have had funds to invest or in any event
would have chosen to refrain from an investment. Despite this, the arbitral tribunal concluded
that John Ellison, Ukrnafta's expert, had not questioned whether Carpatsky had funds to invest
in accordance with the Cooperation Agreement (paragraph 343 of the arbitration award).



In November 2009 Ukrnafta adduced certain evidence to prove that Carpatsky's finances
were poor, for example, a Power Point and a report from Ernst & Young. However, the
arbitral tribunal took no account of this evidence.

## Carpatsky

### *Decree 31*

The issue of Decree 31's possible repeal was afforded great scope in the arbitration
proceedings. Ukrnafta asserted that Decree 31 would continue to apply for the entire term of
the contract and that the parties' cooperation would therefore not generate any profit.
Carpatsky for its part claimed that Decree 31 would terminate during the term of the
contract. Carpatsky's action was not limited to any set date. The indication of dates did not
restrict the company's action but was primarily done for Kaczmarek's calculations. Nor did
the arbitral tribunal attribute the date of a possible repeal of Decree 31 any direct relevance
to the arbitration award. Instead the arbitral tribunal took account of this risk within the
framework of the choice of discounting factor. Each detail of the loss calculation is not a
'legal fact' [Sw: *rättsfakta*] that must be invoked, and an arbitral tribunal is not bound to use
the exact calculation method used by the parties.

Ukrnafta's request to be allowed to submit the Natural Gas Act was made on 26 July 2010.
This was ten months after the final hearing and almost six months after the arbitral tribunal
had declared the proceedings concluded under Article 34 of the SCC Rules. At the time of
Ukrnafta's request, the tribunal had a good picture of how the uncertainty relating to
Decree 31 should be dealt with. Not opening the proceedings again at that time does not
constitute an irregularity in the course of the proceedings. Noting the reasoning of the
arbitral tribunal, a consideration of the documents in question would not have influenced the
outcome of the case.

### *Intentional breach of contract*

Carpatsky argued during the arbitration proceedings that Ukrnafta had committed an
intentional breach of contract. The actual circumstances that the arbitral tribunal presented
as grounds for its assessment was that Ukrnafta knew that Carpatsky was interested in
participating in the exploitation and that Ukrnafta still refused to allow the company to



**JUDGMENT**

participate. Carpatsky had already pleaded these circumstances in its written submission 'Statement of Claim' and the circumstances were central to the arbitration proceedings.

A party's burden to present relevant facts does not extend to the presentation of legal rules. The legal rule in question was raised by the arbitral tribunal during the final hearing to draw the attention of the parties to its relevance. Carpatsky subsequently addressed the question in the written submission 'Post Hearing Memorial I' and Ukrnafta dealt with the issue in the written submission 'Post Hearing Brief II'. This was noted by the arbitral tribunal (see paragraph 325 of the arbitration award). The arbitral tribunal adopted a position on Ukrnafta's objection to the possibility in Ukrainian law of applying provisions concerning a limitation of liability and considered that the parties had ample opportunity to elaborate on their positions with regard to this issue during the arbitration proceedings. The action of the arbitral tribunal did not under any circumstances influence the outcome of the case as it actually involved a direct loss.

*Compensation for post-termination loss*

The arbitral tribunal ordered Ukrnafta to compensate the loss that occurred at the time of the breach of contract. The arbitral tribunal assessed the loss associated with the breach of contract and then estimated the value of the loss by applying the DCF method, i.e. by discounting expected revenues to the net present value. The arbitral tribunal did not award compensation for a loss that arose after the termination of the Cooperation Agreement ('post-termination loss'). Carpatsky's application in the arbitration proceedings includes the amount awarded.

*Calculation model*

The arbitral tribunal, and similarly the parties, applied a net present value method when calculating the loss. Following an assessment of the statements by experts and evidence in general, the arbitral tribunal found that nothing in the parties' calculations could be accepted straight off without adjusting the main parameters. This is not an irregularity that could constitute grounds for a setting aside. The parties had not given the arbitral tribunal any common instructions in respect of calculating the loss. This leaves the arbitral tribunal free to calculate the loss in whatever way they consider to be correct, taking account of the evidence presented. The arbitral tribunal is not bound by how the parties have calculated the loss but may make a free assessment of the evidence. The loss calculation forms part of the arbitral tribunal's substantive assessment of the dispute.

*Funds to invest*

In the course of the arbitration proceedings, the parties had a difference of opinion regarding Carpatsky's economic possibilities and intention to invest in the cooperation. In the arbitration award the arbitral tribunal correctly reported on the position of the parties. Ukrnafta's expert Ellison questioned in his report whether Carpatsky intended to invest funds in the cooperation but on the other hand not whether Carpatsky actually had sufficient funds. The arbitral tribunal did not misunderstand what Ellison had stated. Nor did the arbitral tribunal ignore evidence adduced by Ukrnafta. The reason for the evidence not being specifically mentioned in the arbitration award is that it related to another point in time than that considered relevant by the arbitral tribunal.

## THE INFORMATION PRESENTED

At the request of Ukrnafta, the party expert Jasnit Sansoye was heard. Ukrnafta also adduced a written statement of opinion from Jasnit Sansoye.

Both parties referred to the arbitration award and various documents from the arbitration proceedings. The parties declared that the information in the documents is undisputed but that they draw different conclusions from the information.

## REASONS FOR JUDGMENT

*Legal points of departure*

It is indicated by Section 34, first paragraph, item 2 LSF, that an arbitration award shall be set aside if the arbitrators have exceeded their mandate. If the arbitral tribunal bases its ruling on a circumstance ('legal fact') [Sw: *rättsfakta*] that has not been invoked by a party, it should normally be deemed to have exceeded its mandate, although some caution should be observed when assessing international disputes. The same adherence to Swedish procedural law concepts cannot be expected in such disputes. A mandate may also have been exceeded if the arbitrator has based his assessment on a legal argument that the parties have agreed should lie outside the adjudication. On the other hand, an arbitration award cannot be successfully challenged on substantive grounds (see Government Bill 1998/99:35, p. 139 and 145 f).




According to Chapter 34, first paragraph, item 6 LSF an arbitration award may be set aside if, without the fault of the party, an irregularity otherwise occurred in the course of the proceedings which probably influenced the outcome. This may be the case if the arbitral tribunal has overlooked a joint party instruction or if there has been an error in the management of the procedure of a more significant kind, e.g. if a party has not been afforded an opportunity to present its case to an appropriate extent (see, e.g. Lindskog, *Skiljeförfarande En kommentar* [Arbitration Proceedings. A commentary], 2ⁿᵈ ed. p. 895).

*Decree 31*

As grounds for its application for damages in the arbitration proceedings, Carpatsky claimed that Ukrnafta had committed a breach of contract by preventing Carpatsky from participating in the cooperation about which the parties had agreed and that Carpatsky, owing to this, had been caused a loss amounting to the amount claimed. A key issue when assessing whether Carpatsky had suffered loss was the possible termination of Decree 31. The arbitral tribunal, as a basis for its assessment, assumed that Decree 31 would be repealed before the expiry of the term of the contract, i.e. before 2023. The issue is whether Carpatsky, as claimed by Ukrnafta, had not pleaded this and whether the arbitral tribunal has therefore exceeded its mandate, or committed an irregularity in the course of the proceedings that influenced the outcome.

Ukrnafta claimed that Carpatsky during the arbitration proceedings only claimed that Decree 31 would terminate at three different points in time. According to Ukrnafta, Carpatsky first stated 31 December 2008, then 31 December 2009 and, when that date had also passed, finally July 2010 as the last date on which Decree 31 would terminate. Ukrnafta has referred to, among other things, Carpatsky having stated in a written submission to the arbitral tribunal on 30 November 2009 (Post Hearing Memorial II) that Carpatsky's expert Kaczmarek had adjusted his calculations in order to take into account an assumption that Decree 31 would terminate to apply from the start of 2010 and that the application for damages was based on this calculation. Ukrnafta has also referred to Kaczmarek, in his second revised report, proceeding on the basis of the assumption that Decree 31 would be repealed by no later than July 2010. Carpatsky claimed that the during the arbitration proceedings the company pleaded that Decree 31 would terminate during the term of the contact but that no specific date had been asserted.

The Court of Appeal initially concludes that it has not been reported in the arbitration award that Carpatsky asserted certain specific dates for the assumption of when Decree 31 would terminate.

It is also indicated in the case-file that the adjusted points in time for Decree 31's termination, which Ukrnafta asserts Carpatsky put forward in the arbitration proceedings, refer to details referable to calculations of the loss incurred made by Carpatsky's expert Kaczmarek. However, what an expert refers to in a calculation does not equate with what the party has pleaded in the arbitration proceedings. That the party's expert adjusted his calculations based on various points in time does not show, in the opinion of the Court of Appeal, that Carpatsky put forward these points in time as a basis for its action in the arbitration proceedings. Nor does the fact that Carpatsky referred to the adjusted calculations during the arbitration proceedings entail that these points in time were pleaded in the manner claimed by Ukrnafta. The case-file from the arbitration proceedings indicates instead that Carpatsky stated in several contexts that the company considered that the point in time at which Decree 31 would terminate was uncertain. Carpatsky stated, for instance, in a written submission dated 30 October 2009 (Post Hearing Memorial I) that it was not an issue of 'whether' Decree 31 would be repealed but only an question of 'when' and that Kaczmarek had mentioned as the most likely scenario that Decree 31 would be repealed shortly. However, no set point in time was given by Carpatsky. It is also indicated that Ukrnafta in its written submission dated 30 October 2009 (Post Hearing Brief I) objected that it was not sufficient that the arbitral tribunal made an assumption that Decree 31 would be repealed at any time but that a set point in time should be identified. Even this statement suggests that Carpatsky had not specified a set point in time on which the arbitral tribunal had to adopt a position.

For this reason, in the opinion of the Court of Appeal the information presented by Ukrnafta at the Court of Appeal does not support Carpatsky having asserted a certain set date for when Decree 31 would terminate. It is also the opinion of the Court of Appeal that the materials presented do not support the proposition that the arbitral tribunal (in the manner claimed by Ukrnafta) had a duty to set a certain date for when Decree 31 would terminate. The conclusion of the Court of Appeal is therefore that the arbitral tribunal was not guilty of exceeding its mandate or of committing an irregularity in the course of the proceedings in these parts.



As regards Ukrnafta's allegation that the arbitral tribunal incorrectly rejected Ukrnafta's request for permission to adduce evidence, it is indicated that Ukrnafta requested permission to submit a copy of the Natural Gas Act in a written submission to the arbitral tribunal on 26 July 2010. The arbitral tribunal answered by a written communication dated 28 July 2010 that it was unnecessary for Ukrnafta to submit a copy of the Act at the stage of the arbitration proceedings in question, but that the tribunal made a reservation that it may however be relevant to do so at a later stage.

As regards the arbitral tribunal's case-management in this respect, the parties have referred to Article 34 of the SCC Rules, which it is undisputed applied to the arbitration proceedings in question. According to this article, an arbitral tribunal should declare that the arbitration proceedings have been concluded when it considers that the parties have been afforded an opportunity to present their cases to a reasonable extent. Before a final arbitration award has been made, the arbitral tribunal, on its own initiative or following an application by a party, may reopen the proceedings in exceptional circumstances (same article).

It is indicated by the case-file that the arbitral tribunal declared on 4 February 2010 that the arbitration proceedings had been concluded in the sense referred to in Article 34 of the SCC Rules. Ukrnafta's request was thus made after that point in time. At that time the arbitration proceedings had been ongoing for several years and the parties had been afforded good opportunities, both before and after the final hearing, to argue about the issue of any future price regulation of gas in Ukraine. At the end of January 2010, Ukmafta had requested and received permission to supplement the case-file with evidence concerning the price regulation. In light of this, the Court of Appeal considers that what Ukrnafta had stated in its written communication to the arbitral tribunal dated 26 July 2010 does not mean that there were exceptional circumstances for reopening the proceedings at the stage in question. For this reason, no irregularity in the course of the proceedings has arisen.

*Intentional breach of contract*
It is indicated by the case-file that the Cooperation Agreement included a provision concerning the limitation of a party's liability to pay damages for direct losses (Article 20.1). The arbitral tribunal found in the arbitration award that Article 20.1 did not apply with reference to Ukrnafta having committed an intentional breach of contract and that Ukrainian law means that a liability to pay damages in such a case could not be limited.



The question is whether, in conjunction with this, any mandate had been exceeded or
irregularity in the course of the proceedings committed in the manner alleged by Ukrnafta.

It is indicated by Carpatsky's written submission 'Statement of Claim' that Carpatsky
claimed that Ukrnafta had committed a breach of contract by actively preventing Carpatsky
from continuing to invest according to the Cooperation Agreement. Furthermore, it is
indicated that Carpatsky in its written submission dated 30 October 2009 (Post Hearing
Memorial I) claimed that Ukrainian law means that an agreement that limits responsibility
in the case of an intentional breach of contract is invalid (according to Article 614 of the
Civil Code). It is also specified in the written submission that Article 20.1 of the
Cooperation Agreement – in the event that the arbitral tribunal should find that Ukrnafta had
committed an intentional breach of contract – does not prevent Carpatsky from receiving
full compensation for its loss (including loss of income) as each such limitation is without
effect.

In the opinion of the Court of Appeal, Carpatsky must, in any event through a written
submission dated 30 October 2009, be deemed to have pleaded that Ukrnafta's breach of
contract was intentional and that the limitation of liability should not apply for that reason.
Furthermore the actual circumstances adduced by Carpatsky in support of the action being
intentional had been shown with sufficient clarity at this point in time. As stated by
Ukrnafta, Carpatsky provided supplementary information on 30 October 2009 after the
arbitral tribunal had reminded them about the content of Article 25 of the SCC Rules and
explained that the parties were no longer permitted to make any supplementations.
According to the afore-mentioned article, however, the parties may amend or supplement
their action at any time until the proceedings have been declared concluded according to
Article 34 subject to the precondition that the arbitral tribunal does not consider this
inappropriate. It is indicated by the case-file that during the final hearing the arbitral tribunal
raised the issue of the content of Ukrainian law as regards the possibility of limiting the
liability to pay damages in the case of an intentional breach of contract and that the tribunal
had simultaneously stated that the parties could revert to this in their supplementary written
communications following the hearing. With regard to this, and as Carpatsky's
supplementation was made before the arbitral tribunal had declared the proceedings
concluded on 4 February 2010 according to Article 34 of the SCC Rules, the Court of
Appeal considers that Carpatsky's supplementation was duly made. For this reason, the
conclusion of the Court of Appeal is that the arbitral tribunal did not exceed its mandate by
basing its assessment on the circumstances in question and that nor did the arbitral tribunal
commit any irregularity in the course of the proceedings in this connection.

As regards the issue of Ukrnafta not having had sufficient opportunities to present its case, it is indicated, as mentioned in the preceding, that the chair of the arbitral tribunal during the final hearing in September 2009 raised the issue of the content of Ukrainian law as regards an intentional breach of contract and that the parties were also afforded an opportunity to revert to this. After both parties had submitted supplementary written submissions in October 2009 and Carpatsky in this connection had clarified its position with reference to an intentional breach of contract, the parties were afforded a further opportunity to once again submit supplementary written submissions to the arbitral tribunal. In accordance with this, Ukrnafta responded to Carpatsky's statements about an intentional breach of contract and the content of Ukrainian law in its written submission of 30 November 2009. In the opinion of the Court of Appeal, the conclusion to be drawn from this is that Carpatsky's position on the issue of an intentional breach of contract must have been apparent to Ukrnafta and that the company had been afforded sufficient opportunity to present its case.

Using the assessment made by the arbitral tribunal – namely that Ukrnafta had committed an intentional breach of contract and that for this reason damages could not be limited in accordance with Article 20.1 – there was no reason, as far as it is shown, for the arbitral tribunal to consider the objections otherwise presented by Ukrnafta concerning a limitation of damages according to the above-mentioned article. According to the Court of Appeal, this therefore means that Ukrnafta has not demonstrated that the arbitral tribunal incorrectly failed to adopt a position on any objection otherwise presented by the company.

In the opinion of the Court of Appeal, the mandate has thus not been exceeded nor an irregularity in the course of the proceedings committed during the arbitration proceedings in these respects.

*Compensation for post-termination loss*

It is indicated by the arbitration award that Carpatsky requested compensation for the value of its investment under the Cooperation Agreement and that the arbitral tribunal also considered this application. The arbitral tribunal estimated and valued the loss at the time of the breach of contract. In the opinion of the Court of Appeal, it is not possible to draw a conclusion from the arbitration award that the arbitral tribunal would have awarded compensation for a loss that was not claimed by Carpatsky. Nor is it indicated by the case-file in general that this would be the case. In other words, Ukrnafta has neither demonstrated that the mandate has been exceeded nor an irregularity in the course of the proceedings committed in this respect.


*Calculation model*

The parties held differing positions in the arbitration proceedings as regards the issue of whether Carpatsky suffered any loss. Carpatsky adduced a calculation made by Kaczmarek in support of its allegation concerning the size of the loss. Ukrnafta for its part adduced certain calculations made by Ellison. It is indicated by the arbitration award that the arbitral tribunal proceeded on the basis of Kaczmarek's calculations when assessing the loss, but that the tribunal adjusted certain values and assessed the loss to be a lower amount.

The Court of Appeal concludes that the arbitral tribunal's estimate of the loss is a substantive assessment and that the circumstance that the arbitral tribunal, according to Ukrnafta, had come to an incorrect result by not considering certain circumstances of importance when making the calculation cannot as such form grounds for challenge. If a party considers that certain conclusions should be drawn from the evidence, there is nothing preventing the arbitral tribunal from drawing completely different conclusions, and even if the parties are surprised by the arbitral tribunal's conclusions, this is no issue of any mandate having been exceeded or irregularity in the course of the proceedings having been committed (Heuman, *Skiljemannarätt* [Arbitration Law], p. 619).

As mentioned above, this may on the other hand have been an issue of an irregularity that could form grounds for challenge if the arbitral tribunal had gone beyond a joint instruction provided by the parties, e.g. concerning the application of legal rules or the proceedings. However, in the opinion of the Court of Appeal, the mere circumstance that both of the experts in their calculations proceeded on the basis of certain common assumptions does not mean that the parties can be deemed to have provided a binding instruction to the arbitral tribunal to calculate the loss in a certain way. Nor does the arbitration award or the information provided by the parties during the arbitration proceedings, which Ukrnafta otherwise pointed out, suggest that the parties should have provided such instructions as alleged by the company. In the assessment of the Court of Appeal, the conclusion is therefore that no mandate has been exceeded nor any irregularity in the course of the proceedings committed as regards the arbitral tribunal's calculation of the loss.

As concluded above, the fact that the arbitral tribunal deviated from the parties' calculations of the loss constitutes part of the tribunal's substantive assessment. There was no obligation for the tribunal to afford the parties an opportunity to express their views on this. Nor has there therefore been any irregularity in the course of the proceedings in this respect.

*Funds to invest*

It is indicated by the arbitration award that Ukrnafta denied that Carpatsky had been caused any loss. It is also indicated that Ukrnafta's position was such that Carpatsky had not demonstrated first that the company had sufficient funds to invest, and second that Carpatsky, even if funds had been available, would have used them to invest in the cooperation (paragraph 338). In accordance with this, the arbitral tribunal stated in its reasons that Carpatsky had to demonstrate that funds were available and that they would have been invested on 18 April 2005, i.e. at the time of the breach of contract (paragraph 342). There is no support for the arbitral tribunal having, in the manner claimed by Ukrnafta, erroneously proceeded on the basis of Ukrnafta having confirmed that Carpatsky had sufficient assets to invest, and nor has it been shown otherwise. The fact that the arbitration award includes a note that Ukrnafta's expert did not question whether Carpatsky had the necessary funds to invest in 2004/2005 (paragraph 343) does not lead to any other conclusion in the opinion of the Court of Appeal. Consequently, Ukrnafta has not demonstrated that the mandate has been exceeded or an irregularity in the course of the proceedings committed in this respect.

It is undisputed that Ukrnafta adduced certain evidence in November 2009 about Carpatsky's financial situation which was also permitted by the arbitral tribunal. As stated by Ukrnafta, this evidence was not specifically mentioned in the arbitration award. Nor can the conclusion be drawn, either from this or from that stated in the arbitration award, that the arbitral tribunal proceeded erroneously on the basis of Ukrnafta not having adduced any evidence to disprove that Carpatsky would have used these funds to invest. Nor has Ukrnafta demonstrated in this respect that the mandate has been exceeded or an irregularity in the course of the proceedings committed in this respect.

*Overall assessment*

In summary, the Court of Appeal has reached the conclusion that in no respect has a mandate been exceeded or irregularity in the course of the proceedings committed in the arbitration proceedings, as claimed by Ukrnafta. The plaintiff's case is therefore rejected.



*Litigation costs*

With this outcome, Ukrnafta shall compensate Carpatsky for its litigation costs at the
Court of Appeal. The amount requested is reasonable.

*Appeals*

According to Section 43, second paragraph of the Arbitration Act, an appeal may only
be made against a judgment of the Court of Appeal if the court considers that it is of
importance for the guidance of the application of the law that the appeal be entertained
by the Supreme Court.

The Court of Appeal does not consider that there is reason to permit an appeal against this
ruling.

**The ruling of the Court of Appeal may not be appealed.**

[signature]

[signature]                                        [signature]

Christine Lager (Senior Judge of Appeal, Head of Division), and Ulrika Beergrehn
(Judge of Appeal) and Anne Kuttenkeuler (Judge of Appeal and member reporting on
the case) participated in this ruling.

Date: 22 April 2015
Certified correct translation
James Hurst, jur.kand.
Authorized Public Translator (Sweden)
English Law Translations
(tel. +46 (0)18 380056 - www.elt.se)



SVEA HOVRÄTT  **DOM**  Mål nr
Avdelning 02  2015-03-26  T 10470-10
Rotel 020108  Stockholm

**KÄRANDE**
PJSC Ukrnafta
Nestorivsky by-str 3–5
04053 Kiev
Ukraina

Ombud: Advokaterna Finn Madsen och Daniel Prawitz
Advokatfirman Vinge KB
Box 4255
203 13 Malmö

Ombud: Advokaten Christer Söderlund
Advokatfirman Vinge KB
Box 1703
111 87 Stockholm

**MOTPART**
Carpatsky Petroleum Corporation
Delaware, 2644163 808 Travis Street,
Suite 1040 Huston
77002 Texas
USA

Ombud: Advokaterna Bo G H Nilsson och Daniel Lander
Advokatfirman Lindahl KB
Box 1065
101 39 Stockholm

**SAKEN**
Klander av skiljedom meddelad den 24 september 2010

_____

**HOVRÄTTENS DOMSLUT**

1. Hovrätten ogillar käromålet.

2. PJSC Ukrnafta ska ersätta Carpatsky Petroleum Corporation för rättegångskostnader

med 1 654 657 kr och 122 240 USD samt ränta på beloppen enligt 6 § räntelagen från

| **Postadress** | **Besöksadress** | **Telefon** | **Telefax** | **Expeditionstid** |
| --- | --- | --- | --- | --- |
| Box 2290 | Birger Jarls Torg 16 | 08-561 670 00 | 08-561 675 09 | måndag – fredag |
| 103 17 Stockholm | | 08-561 675 00 | | 09:00-15:00 |
| | | **E-post**: svea.avd2@dom.se | | |
| | | www.svea.se | | |

**DOM**

dagen för hovrättens dom tills betalning sker. I beloppet ingår ombudsarvode med dels

1 550 000 kr, dels 90 500 USD.

_____

## BAKGRUND

PJSC Ukrnafta (Ukrnafta) – tidigare med firma OJSC Ukrnafta – är ett aktiebolag registrerat i Ukraina och Carpatsky Petroleum Corporation (Carpatsky) är ett aktiebolag registrerat i delstaten Delaware i USA. Den 14 september 1995 ingick SE Poltavanaftogaz (ett dotterbolag till Ukrnafta) och Carpatsky Petroleum Corporation (en föregångare till Carpatsky med säte i delstaten Texas, USA) ett avtal som benämndes "Joint Activity Agreement N. 410/95" (samverkansavtalet). Samarbetet gällde utvinning av naturgas från och utveckling av naturgasfältet Rudivsko-Chervonozavodsky. Avsikten var att Ukrnafta huvudsakligen skulle bidra med utvinning av naturgas från vissa källor medan motpartens bidrag främst skulle vara att tillhandahålla kapital, teknologi och viss avancerad utrustning. År 1996 och 1998 ingick parterna vissa tilläggsavtal. Enligt dessa skulle samarbetet pågå till 2023.

År 1996 uppgick Carpatsky Petroleum Corporation med säte i Texas genom fusion i Carpatsky och det första nämnda bolaget upphörde att existera.

Under ett antal år i samarbetet hade Carpatsky likviditetsproblem och fullgjorde inte avtalade tillskott. Från 2003 gjordes inga ytterligare investeringar av parterna.

I januari 2007 infördes av Ukrainas regering en ny författning benämnd Dekret 31 som innebar att bolag som var verksamma inom gas- och oljeutvinning och som till mer än femtio procent var direkt eller indirekt ägda av staten, var skyldiga att sälja sin produktion till det statligt ägda Naftogaz till av en statlig myndighet fastlagda priser. Parternas samarbete under samverkansavtalet påverkades av Dekret 31, vilket innebar att det inte var möjligt att producera och sälja gas med vinst så länge Dekret 31 var i kraft.

Carpatsky påkallade i september 2007 ett skiljeförfarande mot Ukrnafta. Carpatsky gjorde gällande att Ukrnafta hade gjort sig skyldigt till avtalsbrott och yrkade bl.a. att Ukrnafta skulle förpliktas att till Carpatsky betala ett visst belopp i skadestånd. Ukrnafta gjorde å sin sida gällande att Carpatsky hade gjort sig skyldigt till avtalsbrott och yrkade att Carpatsky skulle förpliktas att betala skadestånd till bolaget.

SVEA HOVRÄTT           **DOM**           T 10470-10
Avdelning 02

Skiljedom meddelades efter skiljeförfarande i Stockholm, SCC V (124/2007).

I skiljedomen fann skiljenämnden att Ukrnafta hade gjorde sig skyldigt till kontrakts-brott genom att hindra Carpatsky från att delta i samarbetet på likvärdiga villkor sedan 2004. Skiljedomen innebar bl.a. att samarbetsavtalet hävdes, och att Ukrnafta för-pliktades att till Carpatsky betala 145,7 miljoner USD jämte ränta och ersättning för kostnader.

**YRKANDEN**

Ukrnafta har yrkat att hovrätten ska upphäva skiljedomen i sin helhet, dock med påpekande att punkterna 4 a–e i domslutet avseende kostnaderna för skiljeförfarandet enligt Ukrnaftas uppfattning inte är en del av skiljedomen.

Carpatsky har motsatt sig att skiljedomen upphävs.

Parterna har yrkat ersättning för rättegångskostnader.

**PARTERNAS GRUNDER**

**Ukrnafta**

I följande avseenden överskred skiljenämnden sitt uppdrag alternativt gjorde sig skyldig till fel i handläggningen som sannolikt inverkat på utgången (34 § första stycket 2 och 6 lagen [1999:116] om skiljeförfarande [LSF]).

*Dekret 31*

Det var i skiljeförfarandet ostridigt att Dekret 31 behövde upphävas för att skada skulle uppkomma. Carpatsky åberopade under skiljeförfarande att Dekret 31 skulle komma att upphöra vid vissa angivna tidpunkter. Inledningsvis angavs att Dekret 31 skulle upphöra den 31 december 2008. När detta datum hade passerat utan att Dekret 31 upphört att gälla justerades datumet till den 31 december 2009. När även detta datum hade passerat utan att Dekret 31 upphävts angavs i stället juli 2010 som sista tidpunkt då Dekret 31 skulle upphöra. Skiljedomen meddelades den 24 september 2010, dvs.

sedan juli 2010 passerat. Några andra påståenden om när Dekret 31 skulle upphävas hade då inte framförts av Carpatsky. Det fanns alltså vid tidpunkten för skilje-nämndens prövning inte något av Carpatsky åberopat alternativt datum då Dekret 31 skulle upphöra eller åberopande av vad som då skulle gälla, som inte redan kunde konstateras vara oriktigt. Skiljenämnden fann trots det att Dekret 31 skulle komma att upphävas före avtalstidens utgång 2023. Detta var ett rättsfaktum som inte hade åberopats av Carpatsky. Oavsett om Carpatsky skulle anses ha åberopat någon annan tidpunkt för Dekret 31:s upphörande som låg senare i tiden än juli 2010, underlät skiljenämnden att ta ställning till frågan när Dekret 31 skulle upphävas.

Skiljenämnden gjorde sig skyldig till ett handläggningsfel genom att avslå Ukrnaftas begäran om att som bevisning få åberopa en ny lag om prisreglering i Ukraina (den s.k. naturgaslagen). Bevisningen kunde inte ha åberopats tidigare. Den avvisade bevis-ningen visade att Dekret 31 skulle fortsätta att vara ikraft under överskådlig tid. Om Ukrnafta hade tillåtits att åberopa bevisningen skulle skiljenämnden sannolikt inte ha funnit att Ukrnafta var skadeståndsskyldigt eller i vart fall bestämt skadeståndet till ett betydligt lägre belopp.

*Uppsåtligt avtalsbrott*
Samverkansavtalet gav endast rätt till ersättning för direkt skada (artikel 20.1). Skilje-nämnden fann att artikel 20.1 inte var tillämplig med hänvisning till att Ukrnafta gjort sig skyldigt till uppsåtligt avtalsbrott och att skadeståndsansvar, enligt ukrainsk rätt, inte kan begränsas i ett sådant fall.

- Carpatsky hade dock inte behörigen åberopat att avtalsbrottet var uppsåtligt eller att ansvarsbegränsningen av den anledningen inte skulle gälla.
- I vart fall gjordes åberopandet först efter det att förfarandet förklarats avslutat eller efter det att skiljenämnden meddelat parterna att inga nya omständigheter fick anföras.
- Ukrnafta saknade möjlighet att förutse att skiljenämnden skulle lägga det aktuella lagrummet till grund för domen. Ukrnafta var därför förhindrat att utföra sin talan genom att t.ex. åberopa rättsfakta och bevisning i frågan.
- Skiljenämnden prövade inte Ukrnaftas övriga invändningar rörande ansvars-begränsning med hänsyn till att skiljenämnden funnit att Ukrnafta gjort sig

**DOM**

skyldigt till uppsåtligt avtalsbrott. Ukrnafta hade dock förklarat att dess övriga invändningar inte var beroende av invändningen om ansvarsbegränsningen.

*Ersättning för post-termination loss*

Carpatsky yrkade i skiljeförfarandet uttryckligen inte ersättning för skada som uppstått efter upphörande av samverkansavtalet (post-termination loss). Trots detta dömde skiljenämnden ut ersättning för sådan skada.

*Beräkningsmodellen*

Båda parter åberopade i skiljeförfarandet sakkunnigbevisning avseende skadans storlek och anvisade genom den bevisningen hur skiljenämnden skulle beräkna skadan, om någon. Parterna använde samma beräkningsmodell, nämligen en modell som gav uttryck för det diskonterade kassaflödet av framtida betalningar (DCF-metoden). Parterna satte vid användning av modellen in olika värden på de i modellen ingående antagandena och fick genom det olika mått på skadan där skadan är lika med nuvärdet av framtida inbetalningar (Net Present Value).

Skiljenämnden överskred sitt uppdrag genom att sätta justerade värden för vissa av antagandena men underlåta att tillämpa den beräkningsmodell som parterna hade använt. Skiljenämnden subtraherade helt enkelt posterna. Skiljenämnden gjorde sig i vart fall skyldig till ett handläggningsfel som inverkat på utgången i målet. Ukrnafta fick inte tillfälle att yttra sig över justeringarna och berövades därför möjligheten att utföra sin talan.

*Medel att investera*

Vid skadeberäkningen utgick skiljenämnden felaktigt från att Ukrnafta hade vitsordat att Carpatsky hade tillräckliga tillgångar att investera i parternas samarbete. Ukrnafta hade i skiljeförfarandet på ett tydligt sätt förnekat de påståenden som gjordes i denna fråga.

Skiljenämnden utgick vidare felaktigt från att Ukrnafta inte åberopade någon bevisning till vederläggande av att Carpatsky skulle ha använt dessa medel för att investera.

SVEA HOVRÄTT **DOM** T 10470-10
Avdelning 02

**Carpatsky**

Det förnekas att skiljenämnden överskred sitt uppdrag eller att det förekom något fel i handläggningen. Om hovrätten skulle finna att det i något avseende förekom fel i handläggningen på det sätt som Ukrnafta påstått, har det i vart fall inte sannolikt inverkat på utgången.

*Dekret 31*
Carpatsky åberopade i skiljeförfarandet att Dekret 31 skulle upphävas under kontraktstiden, dvs. före 2023. Något särskilt datum åberopades inte. Det förhållandet att den av Carpatsky åberopade sakkunnige angav olika tidpunkter som utgångspunkt för beräkningar av "Discounted Cash Flow" är en annan sak. En sådan beräkning förutsätter ett antagande om när betalningarna kommer att börja. Datumet för ett eventuellt upphävande av Dekret 31 fick inte någon direkt betydelse i skiljedomen.

Skiljenämnden gjorde sig inte skyldig till ett handläggningsfel genom att avslå Ukrnaftas begäran om bevisning.

*Uppsåtligt avtalsbrott*
Carpatsky gjorde i skiljeförfarandet gällande att det var fråga om direkt skada. Carpatsky åberopade vidare att Ukrnafta hade gjort sig skyldigt till uppsåtligt kontraktsbrott. Förfarandet hade då ännu inte förklarats avslutat. Åberopandet var tillräckligt konkretiserat. Den aktuella principen om uppsåtligt kontraktsbrott togs upp av skiljenämnden under slutförhandlingen. Det förnekas att Ukrnafta inte fick möjlighet att föra sin talan.

*Ersättning för post-termination loss*
Det förnekas att skiljenämnden dömde ut ersättning för skada som uppstått efter upphörandet av samarbetsavtalet (post-termination loss).

*Beräkningsmodellen*
Båda parter åberopade sakkunnigutredning om skadans storlek, men detta innebar ingen anvisning om hur skiljenämnden skulle värdera den utredningen vid upp-

skattning av skadans storlek. Nämnden fick ingen detaljerad förklaring av de matematiska modeller som användes och ingen av de sakkunniga uttalade sig om de påstådda s.k. dynamiska effekterna. Det förhållandet att skiljenämnden justerade vissa parametrar innebär inte heller att den dömde över icke åberopade omständigheter. Sakkunnigutredningen utgör inte ett rättsfaktum, utan bevisning om skadans storlek (bevisfaktum). Beräkningen av skadan ingick i skiljenämndens materiella prövning och saknar betydelse inom ramen för en klandertalan.

*Medel att investera*

Skiljenämnden missuppfattade inte Ukrnaftas inställning när det gällde Carpatskys ekonomiska möjligheter att investera i samarbetet. Skiljenämnden förbisåg inte heller den av Ukrnafta åberopade bevisningen. Skiljenämndens materiella bedömning – oberoende av om den är rätt eller fel – ska inte överprövas i ett klanderförfarande.

## UTVECKLING AV TALAN

### Ukrnafta

*Dekret 31*

Genom införandet av Dekret 31 bortföll möjligheten att bedriva gasproduktion med vinst. Vid bedömningen av Carpatskys skadeståndsyrkande innebar Dekret 31 därmed att någon skada inte kunde uppkomma för Carpatsky. Dessa förhållanden var ostridiga mellan parterna. I ljuset av detta gjorde Carpatsky gällande att Dekret 31 skulle upphävas den 31 december 2009. När den prognosen visade sig felaktig gjordes det i stället gällande att Dekret 31 skulle gälla till juli 2010. Detta angavs i sakkunnige Kaczmareks andra kompletterande rapport i augusti 2009, som Carpatsky hänvisade till i sin inlaga "Post Hearing Memorial II". Vid tidpunkten för skiljenämndens prövning stod det klart att inget av dessa datum var korrekta. Skiljenämnden borde med hänsyn till detta ha konstaterat att det saknades åberopade rättsfakta att lägga till grund för ett avgörande som innebar att Dekret 31 skulle komma att upphävas före avtalstidens utgång 2023. Det gjorde skiljenämnden dock inte. Skiljenämnden tog inte heller ställning till om Dekret 31 skulle upphöra vid någon annan bestämd tidpunkt utan beaktade i stället osäkerheten beträffande Dekret 31 vid bestämmande av

diskonteringsfaktorn. Ukrnafta framhöll under skiljeförfarandet att det inte var till-räckligt för skiljenämnden att göra ett antagande om att Dekret 31 skulle upphöra vid någon tidpunkt utan att skiljenämnden borde identifiera vid vilken tidpunkt detta skulle ske.

Den 26 juli 2010 begärde Ukrnafta tillstånd av skiljenämnden att ge in bevisning i form av en ny lag som antogs den 8 juli 2010 avseende gasprisregleringen i Ukraina (naturgaslagen) samt viss kompletterande dokumentation. I en skrivelse från skilje-nämnden den 28 juli 2010 underrättades Ukrnafta dock om att bolaget inte tilläts att ge in lagen. Genom detta berövades Ukrnafta rätten att föra sin talan i skiljeförfarandet. Naturgaslagen hade stor betydelse för frågan om statlig reglering av priser på naturgas och om den då gällande prisregleringen skulle komma att upphöra. Lagen hade inte kunnat åberopas tidigare. Enligt 34 § i Stockholms Handelskammares skiljedoms-instituts skiljedomsregler (SCC-reglerna) är det möjligt för en skiljenämnd att öppna förfarandet sedan det en gång har stängts. Det fanns starka skäl att göra det i detta fall.

*Uppsåtligt avtalsbrott*
Enligt artikel 20.1 i samverkansavtalet är en parts skyldighet att betala skadestånd begränsad till direkt skada (direct losses). Parterna hade i skiljeförfarandet olika uppfattning när det gällde om den av Carpatsky yrkade ersättningen avsåg direkt skada på det sätt som avses i bestämmelsen. Skiljenämnden aktualiserade under slutför-handlingen frågan vilken inverkan ett uppsåtligt avtalsbrott hade enligt ukrainsk rätt på ansvarsbegränsningen i bestämmelsen. Sedan skiljenämnden enligt 25 § i SCC-reglerna hade förklarat att parterna inte fick göra några tillägg uppgav Carpatsky att ukrainsk rätt föreskrev att ansvarsbegränsningsklausuler skulle åsidosättas vid uppsåtligt avtalsbrott. Carpatskys argumentation var dock begränsad till en kortfattad redogörelse för innehållet i ukrainsk rätt utan angivande av några sakomständigheter. Första gången Ukrnafta hade möjlighet att bemöta den nyintroducerade rättsregeln var i inlagan "Post Hearing Brief II". Ukrnafta invände då att frågan hade rests i ett för sent skede av förfarandet och att Carpatsky inte närmare hade angett på vilket sätt Ukrnafta gjort sig skyldigt till ett uppsåtligt avtalsbrott. Skiljenämnen grundade trots detta sitt avgörande på att det var frågan om ett uppsåtligt avtalsbrott och att artikel 20.1 därför inte kunde tillämpas. Övriga invändningar från Ukrnafta bemöttes inte.

**DOM**

*Ersättning för post-termination loss*

Av punkten 318 i skiljedomen framgår att Carpatsky inte yrkade ersättning för framtida skada. Trots detta konstaterade skiljenämnden att Carpatskys sakkunnige Kaczmareks beräkningar utgick från såväl historiska som framtida förluster (se punkterna 329 och 332 i skiljedomen).

*Beräkningsmodellen*

Skiljenämnden utgick vid beräkningen av skadan från Kaczmareks beräkningar men justerade dessa i vissa avseenden. Justeringarna gällde bl.a. starttidpunkten, antaganden om gaspris och volym av gas samt diskonteringsränta. Skiljenämnden underlät i samband med detta att ta hänsyn till de dynamiska effekterna i den av parterna anvisade modellen. Denna egenskap hos modellen leder till att ändringar av värden som grundat sig på vissa antaganden även inverkar på värden som åsatts andra värden. Det är frågan om komplexa samband mellan olika antaganden, vilka båda parter utgått från i sina beräkningar. Om den av parterna tillämpade metoden hade använts skulle skadan ha blivit 62,5 miljoner USD i stället för utdömda 35,7 miljoner USD. Skiljenämnden använde alltså inte den anvisade beräkningsmodellen och beredde inte heller parterna möjlighet att uttala sig om ovan nämnda justeringar i förhållande till beräkningsmodellen.

*Medel att investera*

Carpatsky gjorde i skiljeförfarandet gällande att bolaget hade medel tillgängliga för investeringar och att dessa medel skulle ha investerats i samarbetet om inte Ukrnafta gjort sig skyldigt till avtalsbrott. Carpatsky hävdade att Ukrnaftas avtalsbrott hindrade Carpatskys investeringar enligt samverkansavtalet och att detta var orsaken till Carpatskys skada. Ukrnafta gjorde å sin sida gällande att Carpatsky – även om avtalsbrott skulle anses ha förekommit – inte hade orsakats någon skada. Ukrnafta utvecklade det på så sätt att Carpatsky även i ett alternativt hypotetiskt händelseförlopp där avtalsbrottet aldrig hade ägt rum, inte skulle ha haft medel att investera eller i vart fall skulle ha valt att avstå från en investering. Trots detta konstaterade skiljnämnden att Ukrnaftas sakkunnige John Ellison inte ifrågasatte att Carpatsky hade medel att investera enligt samverkansavtalet (punkten 343 i skiljedomen).

**DOM**

Ukrnafta åberopade i november 2009 viss bevisning till styrkande av att Carpatskys ekonomi var dålig, bl.a. en Power Point och en rapport från Ernst & Young. Skiljenämnden beaktade dock inte denna bevisning.

## Carpatsky

*Dekret 31*

Frågan om Dekret 31:s eventuella upphävande fick stort utrymme i skiljeförfarandet. Ukrnafta åberopade att Dekret 31 skulle bestå under hela kontraktstiden och att parternas samarbete därför inte skulle ge någon vinst. Carpatsky gjorde å sin sida gällande att Dekret 31 skulle komma att upphöra under kontraktstiden. Carpatskys talan var inte begränsad till några bestämda datum. Angivandet av datumen begränsade inte bolagets talan utan gjordes primärt för Kaczmareks beräkningar. Skiljenämnden gav inte heller datumet för ett eventuellt upphävande av Dekret 31 någon direkt betydelse i skiljedomen. I stället beaktade skiljenämnden denna risk inom ramen för valet av diskonteringsfaktor. Varje enskildhet i skadeberäkningen är inte ett rättsfaktum som måste åberopas, och en skiljenämnd är inte bunden att använda exakt den beräkningsmetod som parterna använt.

Ukrnaftas begäran om att få ge in naturgaslagen gjordes den 26 juli 2010. Detta var tio månader efter slutförhandlingen och nära ett halvår efter det att skiljenämnden hade förklarat förfarandet avslutat enligt 34 § i SCC-reglerna. Nämnden hade vid tidpunkten för Ukrnaftas begäran en god bild av hur den skulle hantera osäkerheten kring Dekret 31. Att då inte öppna förfarandet igen utgör inte något handläggningsfel. Med tanke på hur skiljenämnden resonerade skulle ett beaktande av de aktuella handlingarna inte ha påverkat målets utgång.

*Uppsåtligt avtalsbrott*

Carpatsky åberopade i skiljeförfarandet att Ukrnafta hade gjort sig skyldigt till uppsåtligt avtalsbrott. De faktiska omständigheter som skiljenämnden lade till grund för sin bedömning var att Ukrnafta kände till att Carpatsky var intresserat av att delta i exploateringen och att Ukrnafta ändå vägrade bolaget att delta. Carpatsky redogjorde

**DOM**

för dessa omständigheter redan i inlagan "Statement of Claim" och omständigheterna var centrala i skiljeförfarandet.

Rättsregler omfattas inte av parts åberopsbörda. Den aktuella rättsregeln togs upp av skiljenämnden under slutförhandlingen för att uppmärksamma parterna på dess betydelse. Carpatsky utvecklade därefter frågan i inlagan "Post Hearing Memorial I" och Ukrnafta behandlade frågan i inlagan "Post Hearing Brief II". Detta noterades av skiljenämnden (se punkten 325 i skiljedomen). Skiljenämnden tog ställning till Ukrnaftas invändning om möjligheten i ukrainsk rätt att tillämpa föreskrifter om ansvars-begränsning och bedömde att parterna hade haft väl tilltagna möjligheter att utveckla sin talan i denna fråga under skiljeförfarandet. Skiljenämndens agerande påverkade under alla omständigheter inte utgången av målet eftersom det faktiskt var fråga om en direkt skada.

*Ersättning för post-termination loss*
Skiljenämnden förpliktade Ukrnafta att ersätta den skada som inträffade vid tidpunkten för kontraktsbrottet. Skiljenämnden värderade skadan vid kontraktsbrottet och upp-skattade då skadans värde genom att tillämpa DCF-metoden, dvs. genom att diskontera förväntade intäkter till nuvärdet. Skiljenämnden dömde inte ut ersättning för skada som uppstått efter upphörandet av samarbetsavtalet (post-termination loss). Carpatskys yrkande i skiljeförfarandet rymmer utdömt belopp.

*Beräkningsmodellen*
Skiljenämnden tillämpade vid beräkningen av skadan, liksom parterna, en nuvärdes-metod. Skiljenämnden fann efter en bedömning av de sakkunnigas uppgifter och bevisningen i övrigt att ingen av parternas beräkningar kunde godtas rakt av utan justerade de huvudsakliga parametrarna. Detta är inget hävningsgrundande fel. Parterna hade inte gett skiljenämnden någon gemensam anvisning i fråga om skadeberäkningen. Det står en skiljenämnd fritt att beräkna skadan på vilket sätt den bedömer vara korrekt med beaktande av föreliggande bevisning. Skiljenämnden är inte bunden av hur parterna har beräknat skadan utan får göra en fri bevisvärdering. Skadeberäkningen utgör en del i skiljenämndens materiella bedömning av tvisten.

**DOM**

*Medel att investera*

Parterna hade i skiljeförfarandet olika uppfattningar när det gällde Carpatskys
ekonomiska möjligheter och avsikt att investera i samarbetet. Skiljenämnden
redovisade i skiljedomen parternas inställning på ett korrekt sätt. Ukrnaftas sakkunnige
Ellison ifrågasatte i sin rapport att Carpatsky avsåg att investera medel i samarbetet
men däremot inte att Carpatsky i och för sig hade tillräckliga medel. Skiljenämnden
missuppfattade inte vad Ellison uppgett. Skiljenämnden bortsåg inte heller från
bevisning som åberopats av Ukrnafta. Anledningen till att bevisningen inte särskilt
nämns i skiljedomen är att den avsåg en annan tidpunkt än den som skiljenämnden
fann relevant.

## UTREDNINGEN

På begäran av Ukrnafta har förhör hållits med partssakkunnige Jasnit Sansoye.
Ukrnafta har även åberopat ett skriftligt utlåtande av Jasnit Sansoye.

Båda parter har hänvisat till skiljedomen och olika handlingar från skiljeförfarandet.
Parterna har förklarat att uppgifterna i handlingarna är ostridiga men att de drar olika
slutsatser av uppgifterna.

## DOMSKÄL

*Rättsliga utgångspunkter*

Av 34 § första stycket 2 LSF framgår att en skiljedom ska upphävas om skiljemännen
har överskridit sitt uppdrag. Om skiljenämnden grundar sitt avgörande på en
omständighet (rättsfaktum) som inte åberopats av en part bör den normalt anses ha
överskridit sitt uppdrag, även om viss försiktighet bör iakttas vid bedömningen i
internationella tvister. I sådana tvister kan man inte räkna med samma bundenhet till
svenska processuella begrepp. Ett uppdragsöverskridande kan vidare föreligga om
skiljenämnden grundar sin bedömning på rättslig argumentation som parterna har enats
om ska ligga utanför prövningen. En skiljedom kan däremot inte med framgång
klandras på materiell grund. (Se prop. 1998/99:35 s. 139 och 145 f.)

**DOM**

Enligt 34 § första stycket 6 LSF kan en skiljedom upphävas om det utan partens vållande har förekommit något fel i handläggningen som sannolikt har inverkat på utgången. Så kan vara fallet om skiljenämnden har åsidosatt en gemensam parts-föreskrift eller om det förekommit ett processledningsfel av mer väsentligt slag, t.ex. om en part inte beretts tillfälle att i erforderlig omfattning utföra sin talan (se t.ex. Lindskog, Skiljeförfarande En kommentar, 2 uppl. s. 895).

*Dekret 31*

Carpatsky åberopade som grund för sitt yrkande om skadestånd i skiljeförfarandet att Ukrnafta hade gjort sig skyldigt till kontraktsbrott genom att hindra Carpatsky från att delta i det samarbete som parterna avtalat om och att Carpatsky genom detta orsakats skada uppgående till yrkat belopp. En central fråga vid bedömningen av om Carpatsky lidit någon skada var Dekret 31:s eventuella upphörande. Skiljenämnden lade till grund för sin bedömning att Dekret 31 skulle komma att upphävas före avtalstidens utgång, dvs. före 2023. Frågan är om Carpatsky, som Ukrnafta har gjort gällande, inte hade åberopat detta och om skiljenämnden därför har överskridit sitt uppdrag, eller gjort sig skyldigt till ett handläggningsfel som påverkat utgången.

Ukrnafta har gjort gällande att Carpatsky under skiljeförfarandet endast åberopade att Dekret 31 skulle komma att upphöra vid tre olika tidpunkter. Enligt Ukrnafta angav Carpatsky först den 31 december 2008, därefter den 31 december 2009 och, när även det datumet passerat, slutligen juli 2010 som sista tidpunkt då Dekret 31 skulle upphöra. Ukrnafta har hänvisat till bl.a. att Carpatsky i en inlaga till skiljenämnden den 30 november 2009 (Post Hearing Memorial II) angav att Carpatskys sakkunnige Kaczmarek hade justerat sina beräkningar för att ta hänsyn till ett antagande att Dekret 31 skulle upphöra att gälla från början av 2010 och att skadeståndsyrkandet utgick från denna beräkning. Ukrnafta har även hänvisat till att Kaczmarek i sin andra reviderade rapport utgick från antagandet att Dekret 31 skulle komma att upphävas senast i juli 2010. Carpatsky har gjort gällande att bolaget under skiljeförfarandet åberopade att Dekret 31 skulle upphöra under avtalstiden, men att något speciellt datum inte åberopades.

**DOM**

Hovrätten konstaterar inledningsvis att det i skiljedomen inte redovisas att Carpatsky åberopade vissa specifika datum för antagandet om när Dekret 31 skulle upphöra.

Av utredningen framgår vidare att de justerade tidpunkter för Dekret 31:s upphörande som Ukrnafta menar att Carpatsky åberopade i skiljeförfarandet avser uppgifter som är hänförliga till Carpatskys sakkunnige Kaczmareks beräkningar av uppkommen skada. Vad en sakkunnig hänvisar till i en beräkning utgör dock inte partens åberopanden i skiljeförfarandet. Att den partssakkunnige gjorde justerade beräkningar utifrån olika tidpunkter visar alltså enligt hovrätten inte att Carpatsky åberopade dessa tidpunkter till grund för sin talan i skiljeförfarandet. Inte heller den omständigheten att Carpatsky under skiljeförfarandet hänvisade till de justerade beräkningarna kan anses innebära att tidpunkterna åberopades på det sätt som Ukrnafta gör gällande. Av utredningen från skiljeförfarandet framgår i stället att Carpatsky i flera sammanhang framhöll att bolaget bedömde att det vara osäkert vid vilken tidpunkt Dekret 31 skulle komma att upphöra. Carpatsky framhöll t.ex. i inlagan den 30 oktober 2009 (Post Hearing Memorial I) att det inte var frågan "om" Dekret 31 skulle komma att upphävas utan endast frågan om "när" och att Kaczmarek hade nämnt som det mest sannolika scenariot att Dekret 31 skulle komma att upphävas inom kort. Någon bestämd tidpunkt angavs dock inte av Carpatsky. Det framgår vidare att Ukrnafta i sin inlaga den 30 oktober 2009 (Post Hearing Brief I) invände att det inte var tillräckligt att skilje-nämnden gjorde ett antagande om att Dekret 31 skulle komma att upphävas vid någon tidpunkt utan att den borde identifiera en bestämd tidpunkt. Även det uttalandet talar för att Carpatsky inte hade angivit en bestämd tidpunkt som skiljenämnden hade att ta ställning till.

Det är därför hovrättens bedömning att den utredning som Ukrnafta presenterat i hovrätten inte ger stöd för att Carpatsky åberopade vissa bestämda datum för när Dekret 31 skulle komma att upphöra. Det är vidare hovrättens bedömning att utredningen inte heller ger stöd för att skiljenämnden – på sätt som Ukrnafta gjort gällande – var skyldig att fastställa ett visst datum för när Dekret 31 skulle komma att upphöra. Hovrättens slutsats är därför att skiljenämnden inte gjorde sig skyldig till något uppdragsöverskridande eller handläggningsfel i dessa delar.

SVEA HOVRÄTT                           **DOM**                           T 10470-10
Avdelning 02

När det gäller Ukrnaftas påstående om att skiljenämnden felaktigt avslog Ukrnaftas
begäran om att få åberopa bevisning framgår att Ukrnafta i en inlaga till skiljenämnden
den 26 juli 2010 begärde att få ge in en kopia av naturgaslagen. Skiljenämnden svarade
i en skrift den 28 juli 2010 att det i det aktuella skedet av skiljeförfarandet inte var
nödvändigt att Ukrnafta gav in en kopia av lagen men att nämnden reserverade sig för
att detta dock kunde bli aktuellt i ett senare skede.

Parterna har när det gäller skiljenämndens handläggning i detta avseende hänvisat till
34 § i SCC-reglerna, vilka ostridigt gällde för det aktuella skiljeförfarandet. Enligt den
paragrafen ska en skiljenämnd förklara att handläggningen av skiljeförfarandet är
avslutad när den anser att parterna har beretts möjlighet att i skälig omfattning utföra
sin talan. Innan en slutlig skiljedom har meddelats får skiljenämnden, på eget initiativ
eller på ansökan av en part, återuppta handläggningen av skiljeförfarandet om
synnerliga skäl föreligger (samma paragraf).

Av utredningen framgår att skiljenämnden den 4 februari 2010 förklarade att hand-
läggningen av skiljeförfarandet var avslutad i den mening som avses i 34 § SCC-
reglerna. Ukrnaftas begäran gjordes alltså efter denna tidpunkt. Skiljeförfarandet hade
då pågått under flera år och parterna hade såväl före som efter slutförhandlingen haft
goda möjligheter att argumentera i frågan om en eventuell fortsatt prisreglering av gas
i Ukraina. Ukrnafta hade i slutet av januari 2010 begärt och fått tillstånd att komplet-
tera utredningen med bevisning om prisregleringen. Mot denna bakgrund finner
hovrätten att det som Ukrnafta anförde i sin skrift till skiljenämnden den 26 juli 2010
inte innebar att det förelåg synnerliga skäl för att återuppta förfarandet i det aktuella
skedet. Något handläggningsfel har därför inte förekommit.

*Uppsåtligt avtalsbrott*

Av utredningen framgår att samverkansavtalet innehöll en bestämmelse om begräns-
ning av en parts skadeståndsansvar till "direct losses" (artikel 20.1). Skiljenämnden
fann i skiljedomen att artikel 20.1 inte var tillämplig med hänvisning till att Ukrnafta
hade gjort sig skyldigt till uppsåtligt avtalsbrott och att ukrainsk rätt innebar att ett
skadeståndsansvar i ett sådant fall inte kunde begränsas. Frågan är om det i samband

**DOM**

med detta förekom något uppdragsöverskridande eller handläggningsfel på de sätt som Ukrnafta har påstått.

Av Carpatskys inlaga "Statement of Claim" framgår att Carpatsky gjorde gällande att Ukrnafta hade gjort sig skyldigt till kontraktsbrott genom att aktivt hindra Carpatsky från fortsatta investeringar enligt samverkansavtalet. Vidare framgår att Carpatsky i inlagan den 30 oktober 2009 (Post Hearing Memorial I) gjorde gällande att ukrainsk rätt innebär att ett avtal som begränsar ansvaret vid uppsåtligt kontraktsbrott är ogiltigt (enligt artikel 614 i "Civil Code"). I inlagan anges även att artikel 20.1 i samverkans-avtalet – för det fall skiljenämnden skulle finna att Ukrnafta gjort sig skyldigt till uppsåtligt kontraktsbrott – inte hindrar Carpatsky från att få full ersättning för sin skada (inklusive förlorade intäkter) eftersom varje sådan begränsning är utan verkan.

Enligt hovrättens mening måste Carpatsky i vart fall genom inlagan den 30 oktober 2009 anses ha gjort gällande att Ukrnaftas avtalsbrott var uppsåtligt och att ansvars-begränsningen av den anledningen inte skulle gälla. Det framgick vid denna tidpunkt vidare med tillräcklig tydlighet vilka faktiska omständigheter som Carpatsky åbero-pade till stöd för att agerandet var uppsåtligt. Som Ukrnafta har framhållit gjordes Carpatskys komplettering den 30 oktober 2009 efter att skiljenämnden hade erinrat om innehållet i 25 § i SCC-reglerna och förklarat att parterna inte längre fick göra några tillägg. Enligt den nämnda paragrafen får parterna dock när som helst fram till dess att handläggningen förklaras avslutad enligt 34 § ändra eller komplettera sin talan under förutsättning att skiljenämnden inte anser att det är olämpligt. Av utredningen i målet framgår att skiljenämnden under slutförhandlingen tog upp frågan om innehållet i ukrainsk rätt när det gällde möjligheten att begränsa ett skadeståndsansvar vid uppsåtligt kontraktsbrott och att nämnden samtidigt framhöll att parterna kunde återkomma till detta i sina kompletterande skrifter efter förhandlingen. Med hänsyn till detta och då Carpatskys komplettering gjordes innan skiljenämnden den 4 februari 2010 förklarade förfarandet avslutat enligt § 34 i SCC-reglerna, finner hovrätten att Carpatskys komplettering skedde i behörig ordning. Hovrättens slutsats är därför att skiljenämnden inte överskred sitt uppdrag genom att lägga de aktuella omständig-heterna till grund för sin bedömning och att skiljenämnden inte heller gjorde sig skyldig till något handläggningsfel i samband med detta.

**DOM**

När det gäller frågan om Ukrnafta inte haft tillräcklig möjlighet att utföra sin talan framgår som nämnts i det föregående att skiljenämndens ordförande under slutför-handlingen i september 2009 tog upp frågan om innehållet i ukrainsk rätt i fråga om uppsåtligt avtalsbrott och att parterna också gavs möjlighet att återkomma till detta. Sedan båda parter inkommit med kompletterande inlagor i oktober 2009 och Carpatsky i samband med det klargjorde sin inställning i frågan om uppsåtligt kontraktsbrott, fick parterna tillfälle att ytterligare en gång inkomma med kompletterande inlagor till skiljenämnden. Ukrnafta bemötte i enlighet med detta Carpatskys uttalanden om uppsåtligt kontraktsbrott och innehållet i ukrainsk rätt i sin inlaga den 30 november 2009. Slutsatsen av detta är enligt hovrättens bedömning att Carpatskys inställning i frågan om uppsåtligt kontraktsbrott måste ha stått klar för Ukrnafta och att bolaget i tillräcklig omfattning bereddes tillfälle att utföra sin talan.

Med den bedömning som skiljenämnden gjorde – nämligen att Ukrnafta hade gjort sig skyldigt till uppsåtligt kontraktsbrott och att skadeståndet därför inte kunde begränsas enligt artikel 20.1 – saknades det, såvitt framkommit, anledning för skiljenämnden att pröva de invändningar som Ukrnafta i övrigt hade framfört om en begränsning av skadeståndet enligt den nämnda artikeln. Enligt hovrätten innebär det därför att Ukrnafta inte har visat att skiljenämnden felaktigt underlät att ta ställning till någon invändning som bolaget i övrigt framställt.

Enligt hovrättens bedömning har det alltså inte förekommit något uppdrags-överskridande eller handläggningsfel under skiljeförfarandet i dessa avseenden.

*Ersättning för post-termination loss*

Av skiljedomen framgår att Carpatsky yrkade ersättning för värdet av sin investering enligt samverkansavtalet och att skiljenämnden också prövade detta yrkande. Skilje-nämnden uppskattade och värderade skadan vid tidpunkten för kontraktsbrottet. Enligt hovrättens bedömning går det av skiljedomen inte att dra slutsatsen att skiljenämnden skulle ha dömt ut ersättning för skada som inte yrkats av Carpatsky. Att så skulle ha varit fallet framgår inte heller av utredningen i övrigt. Ukrnafta har alltså inte visat att något uppdragsöverskridande eller handläggningsfel förekommit i detta avseende.

SVEA HOVRÄTT             **DOM**             T 10470-10
Avdelning 02

*Beräkningsmodellen*

Parterna hade i skiljeförfarandet olika inställning när det gällde frågan om Carpatsky
lidit någon skada. Carpatsky åberopade till stöd för sitt påstående om skadans storlek
en beräkning gjord av Kaczmarek. Ukrnafta åberopade å sin sida vissa beräkningar
gjorda av Ellison. Av skiljedomen framgår att skiljenämnden vid sin bedömning av
skadan utgick från Kaczmareks beräkningar men att nämnden justerade vissa värden
och bedömde att skadan uppgick till ett lägre belopp.

Hovrätten konstaterar att skiljenämndens uppskattning av skadan är en materiell
bedömning och att det förhållandet att skiljenämnden enligt Ukrnafta kom till ett
felaktigt resultat genom att inte beakta vissa förhållanden av betydelse vid beräkningen
i sig inte är klandergrundande. Anser en part att vissa slutsatser bör dras av bevis-
ningen, finns det inget som hindrar att skiljenämnden drar helt andra slutsatser och
även om parterna överraskas av skiljenämndens konklusioner är det inte frågan om
något uppdragsöverskridande eller handläggningsfel (Heuman, Skiljemannarätt
s. 619).

Som nämnts ovan kan det däremot vara frågan om ett klandergrundande fel om
skiljenämnden har gått utöver en gemensam anvisning som lämnats av parterna, t.ex. i
fråga om tillämpningen av rättsregler eller förfarandet. Men enbart den omständigheten
att de båda sakkunniga vid sina beräkningar utgick från vissa gemensamma antaganden
innebär enligt hovrätten inte att parterna kan anses ha lämnat en bindande anvisning till
skiljenämnden att beräkna skadan på visst sätt. Inte heller skiljedomen eller de upp-
gifter från parterna under skiljeförfarandet som Ukrnafta i övrigt pekat på talar för att
parterna skulle ha lämnat en sådan anvisning som bolaget påstår. Enligt hovrättens
bedömning är slutsatsen därför att det inte förekommit något uppdragsöverskridande
eller handläggningsfel när det gäller skiljenämndens beräkning av skadan.

Som konstaterats ovan är den omständigheten att skiljenämnden avvek från parternas
beräkningar av skadan en del i nämndens materiella bedömning. Det har inte funnits
någon skyldighet för nämnden att bereda parterna tillfälle att yttra sig över detta. Något
handläggningsfel i detta avseende har därför inte heller förekommit.

SVEA HOVRÄTT            **DOM**            T 10470-10
Avdelning 02

*Medel att investera*

Av skiljedomen framgår att Ukrnafta förnekade att Carpatsky orsakats någon skada.
Vidare framgår att Ukrnaftas inställning var att Carpatsky inte hade visat dels att
bolaget hade tillräckliga medel att investera, dels att Carpatsky, även om det fanns
medel, skulle ha använt dem för investering i samarbetet (punkten 338). Skilje-
nämnden framhöll i enlighet med detta i sina skäl att Carpatsky hade att visa att det
fanns medel och att de skulle ha investerats den 18 april 2005, dvs. vid tidpunkten för
kontraktsbrottet (punkten 342). Något stöd för att skiljenämnden – så som Ukrnafta
gjort gällande – felaktigt skulle ha utgått från att Ukrnafta hade vitsordat att Carpatsky
hade tillräckliga tillgångar att investera finns inte i skiljedomen och har inte heller
framkommit i övrigt. Att det i skiljedomen finns en notering om att Ukrnaftas expert
inte ifrågasatt att Carpatsky 2004/2005 hade nödvändiga medel att investera (punkten
343) leder enligt hovrätten inte till någon annan slutsats. Ukrnafta har således inte visat
att det förekommit något uppdragsöverskridande eller fel i handläggningen i detta
avseende.

Det är ostridigt att Ukrnafta i november 2009 åberopade viss bevisning om Carpatskys
finansiella förhållanden, som också tilläts av skiljenämnden. Som Ukrnafta framhållit
omnämns denna bevisning inte särskilt i skiljedomen. Varken av detta eller av det som
framgår i skiljedomen kan slutsatsen dras att skiljenämnden felaktigt utgick från att
Ukrnafta inte åberopade någon bevisning till vederläggande av att Carpatsky skulle ha
använt dessa medel för att investera. Inte heller i denna del har Ukrnafta alltså visat att
det förekommit något uppdragsöverskridande eller fel i handläggningen.

*Sammanfattande bedömning*

Sammanfattningsvis har hovrätten kommit fram till att det inte i något avseende som
Ukrnafta gjort gällande har förekommit uppdragsöverskridande eller handläggningsfel
i skiljeförfarandet. Käromålet ska därför ogillas.

SVEA HOVRÄTT            **DOM**            T 10470-10
Avdelning 02

*Rättegångskostnader*

Vid denna utgång ska Ukrnafta ersätta Carpatsky för rättegångskostnader i hovrätten.
Det yrkade beloppet är skäligt.

*Överklagande*

Enligt 43 § andra stycket lagen om skiljeförfarande får hovrättens dom överklagas bara
om rätten anser det vara av vikt för ledningen av rättstillämpningen att överklagandet
prövas av Högsta domstolen.

Hovrätten anser att det inte finns skäl att tillåta att avgörandet överklagas.

**Hovrättens avgörande får inte överklagas.**

I avgörandet har deltagit hovrättslagmannen Christine Lager samt hovrättsråden Ulrika
Beergrehn och Anne Kuttenkeuler, referent.